## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CEDAR HAVEN ACQUISITION, LLC,[1] | Case No. 19-11736 (CSS) |
| Debtor. | |

### DECLARATION OF CHARLES B. BLALACK IN SUPPORT
### OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Charles B. Blalack, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.     I am the Managing Partner of Stone Barn Holdings, LLC ("**Stone Barn**"), which is (i) the Managing Member for Cedar Haven Acquisition, LLC d/b/a Cedar Haven Healthcare Center ("**Cedar Haven**" or the "**Debtor**" or the "**Company**"), and (ii) and holds ninety-five (95%) percent of membership interests in the Company.  I am authorized to submit this declaration (the "**Declaration**") on behalf of the Debtor.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtor's management team and advisors, my review of relevant documents and information concerning the Debtor's business, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

2.     As Managing Partner of Stone Barn, I bring a background in venture capital, operations and investment banking with experience on boards of both public and private companies.  I have been Managing Partner of Stone Barn since its inception in approximately

---

[1]     The Debtor in this case, along with the last four digits of the federal tax identification numbers, is Cedar Haven Acquisition, LLC (8400).  The mailing address for the Debtor is 590 South 5th Avenue, Lebanon, Pennsylvania 17042.

2012.  Since December, 2014, I have been involved in the management of Cedar Haven, and was previously the Chief Executive Officer and owner of the parent company that owned Spring Creek Rehabilitation Center in Harrisburg, Pennsylvania.  In such capacity, I am familiar with the day-to-day operations, business and financial affairs of the Debtors.

3.      I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records.  I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of: (a) the Debtor's petition for relief under title 11 of the United States Code (the "**Bankruptcy Code**") filed on the date hereof (the "**Petition Date**"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "**First Day Pleadings**").

4.      To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized in two parts.  Part I of this Declaration provides a description of the Company's business, capital structure and the circumstances surrounding the filing of the Chapter 11 petition.  Part II of this Declaration sets forth the relevant facts in support of the Debtor's various First Day Pleadings filed concurrently herewith.

**PART I.      BACKGROUND**

**A.      DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS.**

5.      The Debtor is a Licensed Skilled Nursing Facility located in Lebanon, Pennsylvania, that offers professionally supervised nursing care and related medical and health services to persons whose needs are such that they can only be met in a nursing facility on an inpatient basis because of age, illness, disease, injury, convalescence or physical or mental infirmity.  The Company is known for its experienced team, high-quality care, therapeutic success,

and friendly atmosphere.  For individuals in need of skilled nursing home care after a hospital stay, when recovering from the onset of sudden illness or injury, after surgery, or for chronic disease management, care is provided 24-hours-a-day, 7-days a week.

6.      The Company, as it exists today, was formed in 2014 through the sale of Cedar Haven Healthcare Center by the Lebanon County Commissioners to Cedar Haven.  The Company is one of many privatized formerly county-owned skilled nursing facilities in Pennsylvania.  Since the Company has come under new ownership, the quality of clinical care has improved, and the number of employees and employee wages have increased.

7.      The Company is an integral part of the community in which it sits.  In addition to much needed healthcare facilities and services for every level of resident need, the Company is an important trading partner with over fifty (50) vendors and other entities that partly rely on the Company for their livelihoods.  In short, the Company is an important economic engine for the greater Lebanon, Pennsylvania region.  Moreover, at any given time, the Company employs approximately five hundred (500) mostly-skilled employees.  These employees rely on the Company for their livelihoods and the Company relies on these incredible employees to act in a professional manner.  The lifeblood of Cedar Haven is its employees and the work they do each day to ensure each resident's health, safety, and welfare.

8.      The Company's policy is to admit persons who require the provision of inpatient services that are needed on a daily basis, ordered by and provided under the direction of a physician, and which require the skills of and are furnished directly by or under the supervision of technical or professional personnel, such as, registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech pathologists, *etc*.

9.     Cedar Haven offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services.  Cedar Haven is a 324 licensed bed facility located at 590 South 5th Avenue, Lebanon, Pennsylvania. (the "**Facility**").

10.     The life care benefits that the Company provides include: (i) skilled nursing, (ii) memory care, (iii) short-term rehabilitation, (iv) in-house therapy, (v) respite care, and (vi) hospice care.

    a.  **Skilled Nursing**.  The Facility provides skilled nursing care for those requiring home care following a hospital stay, sudden illness or injury, surgery, or related to chronic disease management.

    b.  **Memory Care**. The Facility's memory care unit provides excellent care for individuals challenged by Alzheimer's, dementia, and other forms of memory loss.

    c.  **Short-term Rehab & In-house Therapy**.  The Facility's therapy department is comprised of modern facilities and over twenty (20) certified therapists who assist both long- and short-term residents with their physical, speech, and occupational therapy goals.

    d.  **Respite Care**.  Cedar Haven provides Respite Services for caregivers who need temporary, short-term care for their loved ones in a nurturing and fun environment.

    e.  **Hospice Care**.  Cedar Haven provides high-quality care to residents during many phases of life, including treatment for terminal illness and compassionate end-of-life care.  The Facility's staff has a rich history of providing supportive and dignified care to its community.  Our team supports our residents and their families to improve quality of life and provide the best possible care.

11.     As of the Petition Date, the Facility employs approximately five hundred (500) employees (the "**Employees**").  The Employees include (i) registered nurses, licensed practical nurses and certified nursing assistants; (ii) physicians; (iii) physical, occupational, and speech therapist; and (iv) social service, activities, housekeeping, laundry, maintenance, dietary, and

administrative staff.  The Employees are retained on a full-time, part-time, or casual basis, all of whom are all located in the greater Lebanon, Pennsylvania area.

12.     Cedar Haven's nursing department includes highly skilled Registered Nurses, Licensed Practical Nurses and Certified Nursing Assistants.  The nursing team is available 24-hours a day to assist with resident medications, wound care, and the activities of daily living. Cedar Haven's team of physicians is led by its medical director.  Physicians are on-site six days a week, and are available on-call as needed.  Cedar Haven's therapy department has over twenty (20) certified therapists who assist the Facility's long and short-term residents with their physical, occupational, and speech therapy goals.  The therapy team also works with families and caregivers to provide training and support for a safe discharge.

13.     The Company currently has 294 residents, consisting of 259 Medicaid residents, 21 private pay residents, 11 Medicare residents, 2 HMO residents and 1 bed holds resident.  Based on the Company's 324 licensed beds, its current occupancy is 90.74%.

14.     The Company receives most of its revenue from Medicaid reimbursements for the services it provided to its residents.  The Company also receives significant revenue from Medicare, Medicare Plan B, HMO insurers, other providers of private insurance.  The Company receives a small amount of revenue from its gift shop, Renova[2], vending machines and bed tax revenues.

15.     The Company records its revenues based on its standard charges for resident services rendered.  The Company has contractual arrangements with the Commonwealth of Pennsylvania Department of Human Services (DHS) and the Centers for Medicare & Medicaid

---

[2]   Renova is a County run program where the Company was asked to continue to provide physical space as an accommodation.   Renova is an intermediate care wing of the Company that provides residential care for approximately twenty-five (25) people with intellectual disabilities.

Services (Medicare) to render services to qualifying Medicaid and Medicare beneficiaries under cost-based programs which result in the Company receiving payments for such services which differ from the standard charges. Any differences of this nature are recorded as contractual adjustments.

16.     Under the Medical Assistance program, nursing services provided to beneficiaries are paid at prospectively determined rates per day. These rates vary according to clinical diagnostic and other factors and are subject to limitations and adjustments including a budget adjustment factor. In addition, the Company is eligible to receive disproportionate share incentive payments if occupancy is at least 90% and 80% of the resident occupancy are beneficiaries of medical assistance. Net revenue from the Medical Assistance and Medicare programs accounted for approximately 73% and 19%, respectively, of the Company's net resident service revenue for the year ended December 31, 2018.

**The Leased Facility**

17.     The Company leases the land, facility, fixtures, and the Certificate of Need from 590 South 5th Avenue, LLC (the "**Landlord**"). The Landlord retains title to these items and they are not separable under the terms of the lease agreement. In December 2017, the Landlord obtained a HUD-insured loan secured by the healthcare facility. As part of the refinancing, the Company entered into an amended lease with the Landlord. The lease is partially guaranteed by the sole member of Stone Barn.

18.     In addition, the Company is responsible for any additional sums, amounts, fees, expenses, and costs payable or reimbursable to the Landlord, including payments to the reserve for taxes, insurance, payments to the replacement reserve and necessary maintenance.

**Related Party Transactions**

19.     The Company has service agreements with Stone Barn, and Stone Barn Management, LLC ("**SBM**"), an affiliate of Stone Barn.  The service agreements are subordinated to the lease payments to Landlord.

20.     The Company is supported by efforts and professional services by Stone Barn and SBM.  The industry's usual and customary fee of five percent (5%) is split between both entities relative to their different responsibilities.   Together, Stone Barn and SBM provide strategic development, competitive understandings and operational plans to constantly improve the Company along with the Company's management.   Stone Barn supervises and oversees the performance by SBM of its management services at the facility and also provides oversight, advisory, supportive, consultative and administrative services for the Debtor in connection with, among other things, the areas of: (i) dietary; (ii) facility maintenance; (iii) clinical assistance; (iv) resident care and quality assurance; (v) administration; (vi) purchasing; (vii) and data processing, pursuant to that certain Management Services Agreement dated as of July 30, 2015.  Stone Barn also prepares a written annual budget for the operation of the Facility for the Debtor.   The agreement is for a period of five (5) years through July 2020, with automatic renewal options for two additional five-year terms.  The agreement requires the Company to pay a fee of five percent (5%), in total, of net revenues, less any amount paid by the Company to Management or any other third party for management services.

21.     SBM provides certain non-clinical and non-medical administrative services for the Debtor, including, among other things: (i) fiscal management and administration; (ii) nursing; (iii) finance and accounting; (iv) dietary; (v) facility maintenance; (vi) housekeeping and laundry; (vii) social services; (viii) recreational therapy; (ix) marketing and admissions; and (x) clinical

reimbursement, pursuant to that certain Management Services Agreement dated as of August 1, 2015.

22.    Since May 2015, the Cedar Haven has been managed by Stone Barn and SBM. Stone Barn and SBM specialize in providing long-term care residential facilities with strategic support and expertise in the areas of accounting, banking, marketing and sales, operations management, and technology.

23.    The fee for the services provided by Stone Barn and SBM is five percent (5%) of revenues and was $1,503,550.00 for the year ended December 31, 2018.

**B.    CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THIS CHAPTER 11 CASE.**

24.    Despite the improvements made by the Company in the operations and financial success of the Facility, the Company seeks chapter 11 relief in an effort to restructure its debts and to alleviate burdensome costs deriving from (i) a prior union strike, (ii) challenges due to reductions in Medicaid reimbursement rates, and (iii) contentious litigation.

**Medicaid Reductions**

25.    In 2017, the Company experienced three large Medicaid reimbursement reductions that totaled $12.25 per resident day:



26.     As a skilled-nursing facility committed to caring for the aging population of Lebanon County (with 86% Medicaid residents in 2017), this rate change affected the Company's profitability dramatically.

27.     Additionally, there was a staggering number of call-offs by employees that made the Company's efficient operation even more difficult.  In nursing alone, Cedar Haven experienced 219 call-offs in August and 155 call-offs between September 1st and 20th of 2017.  These excessive call-offs dramatically increased overtime and temporary nursing agency costs.

**The 2017 Union Strike and Subsequent Decertification**

28.     These difficulties were complicated by the Company's relationship with the Union that represented over 250 (84%) of the Company's employees at the time, The American Federation of State, County and Municipal Employees, AFL-CIO Council 89 (the "**Union**").  In October 2017, after approximately eleven meetings over several months, Cedar Haven and the Union reached an impasse over contract negotiations.  Reaching an agreement was frustrated by the Union's lack of meaningful movement, especially in light of significant cuts in Medicaid reimbursements affecting Cedar Haven's revenue and a 12% increase in health insurance costs.

29.     In October, Cedar Haven implemented its Last, Best and Final offer.  The National Labor Relations Board thoroughly investigated the Union's claim that Cedar Haven committed an unfair labor practice by implementing its Last, Best and Final offer, and such claim was dropped.

30.     Cedar Haven employees represented by the Union decided to strike beginning on October 20, 2017.  During the strike, Cedar Haven remained focused on its mission — to deliver high-quality care to its residents every day.  Cedar Haven deployed US Nursing Corporation staff from other areas to ensure that its residents would continue to receive quality care despite the strike.  This emergency staffing effort cost Cedar Haven over $5 million, but was necessary in

order to care for the needs of our residents.  Sixty-nine (69) Union-represented employees chose not to strike, seventy (70) more returned to work by January, 2018, and fifty (50) other non-Union employees continued to care for our residents.  Through multiple job fairs and accelerated hiring campaigns, Cedar Haven was able to hire over one hundred (100) new staff members during the strike.

31.     During this period, the Facility's census declined 314 to 290 residents, in part due to slanderous misinformation that was circulated in the community by the Union.  The Company employed an innovative communication strategy to educate the community with information about the strike and was able to successfully inform tens of thousands of individuals with our message.  During this challenging period, I loaned $2.5M of my own personal funds to support the Cedar Haven payroll.  Additionally, during this period SBM did not collect approximately $1.7M in management fees, instead prioritizing payment to vendors who were providing necessary direct care and healthcare services to our residents.

32.     In April 2018, our employees voted to decertify the Union, recognizing their confidence in the Company to provide appropriate and competitive benefits without the need for Union negotiation.

33.     In 2018, Cedar Haven was downgraded to a 3-star facility due in part to dietary deficiencies directly related to our dietary vendor's performance (the Company received 5 dietary deficiencies and one care-related deficiency).  The average census level during the 5-star period was 311.  During the following period with the dietary vendor's deficiencies, Cedar Haven's average census declined to 294.  The decline in star rating affected our census because the Centers for Medicare and Medicaid Services (**"CMS"**) encourages our potential residents from all referral sources to review our star rating on the CMS website and compare it to our major competitors.

34.     Additionally, WellSpan Good Samaritan Hospital, our primary referral source, has a strict policy prohibiting them from including a 3-star facility in their preferred provider program. Other referral sources, like Lancaster General, print the star rating on the sheet of discharge options that they present to their patients when offering choices for sub-acute care.  Broadly, the annual income received for an additional census level is $100,000.00.  The dietary deficiencies impacted the star rating and therefor the average census level was lowered by approximately 17 residents. The approximate revenue per person per day is $225.00 per day which is $82,125.00 annually. The impact of 17 less census created a loss for the Company of approximately of $1,396,125.00 per year.

35.     The Company is also currently a defendant in ten (10) lawsuits filed by various former vendors seeking in excess of $4.9 million in damages.  While the Company believes it has valid defenses to many of these claims, the Company simply cannot afford to continue to litigate all of these claims in various courts.

36.     Despite these challenges, Cedar Haven was slightly profitable in March of 2019 However, soon after the Company received notice that it would face additional Medicaid reimbursement reductions of $7.15 per resident per day.  Our decreased census and slashed reimbursement rate, paired with the exorbitant costs accrued during the strike and the ongoing litigation, put Cedar Haven in another extremely challenging period.

37.     In response to these challenges, Cedar Haven underwent a restructuring in May of 2019.  The Company raised private pay bed rates and introduced a new pricing structure for amenities including salon services and television rentals, which had previously been provided free of charge for residents.  The Company conducted a thorough audit of its existing staffing schedule and, under the leadership of its new Director of Nursing, launched a completely new schedule that

improved the effectiveness and efficiency of the business as a provider of high-quality healthcare services.  The Company continues to find ways to be more efficient in its operations.

38.     Today, Cedar Haven is faced with challenges due to the continued decline in Medicaid reimbursement, our decreased census, ongoing litigation costs and the rising costs of providing care for our residents.

## C.     THE COMPANY'S OWNERSHIP AND CAPITAL STRUCTURE.

39.     Stone Barn owns ninety-five percent (95%) and Michael D. D'Arcangelo owns five percent (5%) of the membership interests of the Debtor.  Charles B. Blalack, the Debtor's Managing Partner, owns one hundred percent (100%) of the membership interests of Stone Barn.

### THE PREPETITION CREDIT FACILITY

40.     On December 1, 2015, the Debtor and Capital Finance, LLC and the additional financing institutions from time to time party (collectively, the **"Existing Lender"**) and Capital Finance, LLC, as Agent (together with its successors and assigns **"Agent"**), entered into the that certain Credit and Security Agreement dated December 1, 2015 (as amended by that certain First Amendment to Credit and Security Agreement and Waiver dated November 30, 2018 (the **"Existing Loan Agreement"**).  The Existing Loan Agreement is guaranteed by Stone Barn (the **"Senior Guarantor"**).

41.     Pursuant to the Existing Loan Agreement, the Existing Lender provided the Debtor with a $3,000,000.00 revolving credit facility (the "**Revolving Credit Facility**").  As of the Petition Date, the outstanding principal balance of the Revolving Credit Facility was $1,417,591.00 (the "**Pre-Petition Obligations**").

42.     The Pre-Petition Obligations are secured by liens (the **"Pre-Petition Liens"**) on substantially all of the Debtor's assets (the "**Pre-Petition Collateral**").  The Agent, for the benefit of itself and the Existing Lender, has a *first priority* lien on: (a) all Accounts arising from the delivery of goods and rendering services by the Debtor prior to an event of default and the proceeds thereof; (b) Deposit Accounts and the proceeds thereof; and (c) All Accounts arising after an event of default and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the event of default in accordance with the terms of the Intercreditor Agreement (*as defined below*) (the "**Existing Lender Priority Collateral**").

**THE OPERATING LEASE OBLIGATIONS.**

43.     The Debtor is also indebted to the Landlord and Capital Funding, LLC (**"Capital Funding"**) pursuant to that certain Operating Lease (and related agreements) dated December 17, 2017 (as amended, the "**Operating Lease**"), pursuant to which the Debtor leases and operates its 324-bed long term skilled nursing facility known as "Cedar Haven Healthcare Center" (the "**Facility**") located at 590 South 5th Avenue, Lebanon, Pennsylvania.  The Debtor's obligations under the Operating Lease are partially guaranteed by Charles B. Blalack, subject to a monetary cap equal to twenty-four (24) months of fixed rent.

44.     The initial term of the Operating Lease was for 30 years and current monthly rent due under the Operating Lease is $250,000 (the **"FHA Obligations"**).  The FHA Obligations are secured by liens (the "**FHA Liens**") on substantially all of the Debtor's assets ("**Capital Funding's Collateral**") pursuant to that certain Operator Security Agreement (the "**Operator Security Agreement**"), dated as of December 1, 2017, by and between the Debtor and Capital Funding and are governed by the Intercreditor Agreement (*as defined below*).

45.     Capital Funding has a *first priority* lien on substantially all of the Debtor's assets, except for the Existing Lender Priority Collateral, in accordance with the terms of the Intercreditor Agreement (the "**Capital Funding Priority Collateral**").

**THE INTERCREDITOR AGREEMENT**

46.     The relative rights of the Existing Lender, Capital Funding, the Landlord and the Debtor are governed by that certain Intercreditor Agreement, dated as of December 12, 2017 (the "**Intercreditor Agreement**").

47.     Pursuant to section 2.1(a) of the Intercreditor Agreement, the Existing Lender has a first priority security interest in the Existing Lender Priority Collateral to secure the Pre-Petition Obligations and Capital Funding has subordinated to Existing Lender's security interest Capital Funding's security interest in the Existing Lender Priority Collateral.

48.     Pursuant to section 2.2(a) of the Intercreditor Agreement, Capital Funding has a first priority security interest in Capital Funding Priority Collateral to secure the FHA Obligations and the Existing Lender has subordinated to Capital Funding Existing Lender's security interest, if any, in the Capital Funding Priority Collateral to secure the FHA-Insured Loan.

49.     Finally, pursuant to section 4.3 of the Intercreditor Agreement, in the event of the commencement of a bankruptcy case by the Debtor, the Existing Lender has the non-exclusive option to continue to provide financing to the Debtor if the Existing Lender deems such financing to be in its best interests.   The subordination and lien priority provisions in the Intercreditor Agreement continue to apply to all Existing Lender Priority Collateral arising on the commencement and during the pendency of this Chapter 11 Case pursuant to the terms of the Intercreditor Agreement.

**THE CHAS BLALACK LOAN AND SECURITY AGREEMENT**

50.     On November 9, 2018, the Debtor and I entered into that certain Loan and Security Agreement (the **"Blalack Loan Agreement"**) whereby the Debtor acknowledged: (i) that I had advanced an aggregate sum of Two Million Five Hundred Seven Thousand Nine Hundred Ninety-Seven Dollars ($2,507,997.00) to the Debtor plus accrued interest in the amount of Three Hundred Twenty-Six Thousand Six Hundred Twenty-Nine Dollars and Eighty Cents ($326,629.80); and (ii) that the balance of such loans, including interest on such loans accruing at the Debtor's borrowing rate, was Two Million Eight Hundred Thirty-Four Thousand Six Hundred Twenty-Six Dollars and Eighty Cents ($2,834,626.80) (the **"Blalack Loan"**).  The Blalack Loan was advanced by me to fund continued operations to ensure residents would continue to receive the care they needed during the strike and thereafter.  Interest on the Blalack loan accrues at a rate of eight (8%) percent per annum and is secured by a junior lien on all of the Debtor's assets.  To further aid in easing the liquidity crisis the strike caused, Stone Barn and SBM also voluntarily agreed to defer $1,497,023.86 in management fees for operating the Facility.

## II.     EVIDENTIARY SUPPORT FOR FIRST DAY PLEADINGS[3]

51.     The Debtor has filed or will file a number of "first day" and "second day" motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtor to operate with minimal disruption during the pendency of the Chapter 11 Case and to ensure the best outcome for the Debtor, its estate, its creditors, and all other parties-in-interest.  A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

---

[3]   Any capitalized terms used but not defined in this section shall have the meaning ascribed to it in the underlying applicable motion or application.

52.    I have reviewed each of the First Day Pleadings, including the exhibits thereto.  The Debtor believes, and I agree, that the Debtor has satisfied the applicable standards for the relief requested in each of the First Day Pleadings and that the Court's grant of the requested relief is in the best interests of the Debtor's estate, its creditors, and all other parties-in-interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the First Day Pleadings should be approved.

**A.    DEBTOR'S APPLICATION FOR APPOINTMENT OF STRETTO AS CLAIMS AND NOTICING AGENT ("CLAIMS AGENT APPLICATION")**

53.    Pursuant to the Claims Agent Application, the Debtor seeks the entry of an order appointing Stretto ("**Stretto**") as the Court-appointed claims and noticing agent for this Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's Chapter 11 Case.

54.    The Debtor's selection of Stretto satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least three (3) court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtor submits, based on all engagement proposals obtained and reviewed, that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise.  The terms of Stretto's retention are set forth in that certain Engagement Agreement annexed to the Claims Agent Application as **<u>Exhibit A</u>** (the "**Engagement Agreement**").  Through the Claims Agent Application, the Debtor is seeking approval solely of the terms and provisions as set forth therein and the proposed order attached thereto.

55.    Although the Debtor has not yet filed its schedules of assets and liabilities, it anticipates that there will be in excess of 1,500 entities to be noticed in this case.  Considering the number of expected claimants and the complexity of the Debtor's business, I respectfully submit

that authorizing the relief requested herein is in the best interests of both the Debtor's estate and

its creditors, and appropriate in this Chapter 11 Case due to the number of creditors, equity holders,

and other parties-in-interest involved in this case, which will likely impose heavy administrative

and other burdens on the Debtor, the Court, and the Clerk's Office.  Accordingly, I believe that

appointing Stretto as the claims and noticing agent in this Chapter 11 Case will maximize the value

of the Debtor's estate for all of its stakeholders.

**B.    DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE IMPLEMENTATION OF PROCEDURES TO MAINTAIN AND PROTECT CONFIDENTIAL RESIDENT INFORMATION (THE "CONFIDENTIALITY MOTION")**

56.    By this Motion, the Debtor respectfully requests entry of the Proposed Order,

pursuant to sections 105(a), 107, and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007,

9018, and 9037, and Local Rule 1007, authorizing the implementation of procedures to protect

confidential information of the Debtor's Residents as required by the Health Insurance Portability and

Accountability Act of 1996 ("**HIPAA**").

57.    In the ordinary course of providing care for its residents, the Debtor is required to

maintain the confidentiality of resident information pursuant to HIPAA.  However, the Debtor

recognizes that such requirements may conflict with the duty to disclose certain information under

the Bankruptcy Code, including, without limitation, the duty to file a list of creditors under section

521(a)(1)(A) and a list of schedules of assets and liabilities under section 521(a)(1)(B)(i).

58.    The Debtor believes that the requirements to maintain resident confidentiality under

HIPAA conflict with the requirements to disclose information under the Bankruptcy Code,

specifically the duty to file a list of all creditors under section 521(a)(1)(A) and the duty to file

schedules of all assets and liabilities under section 521(a)(1)(B)(i).  I therefore respectfully request

that such resident information be protected through the proposed Resident Confidentiality Procedures herein pursuant to section 107(c) of the Bankruptcy Code, which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury.

59.    I believe that the relief requested herein appropriately balances the need to maintain confidential resident information under HIPAA with the need for adequate disclosure under the Bankruptcy Code.  Given the nature of any information that may reveal even the identity of resident, confidentiality in this context is of paramount importance.

**C.    DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE CONTINUED USE OF THE DEBTOR'S CASH MANAGEMENT SYSTEM; AND (B) EXTENDING THE TIME TO COMPLY WITH THE REQUIREMENTS OF SECTION 345(B) OF THE BANKRUPTCY CODE (THE "CASH MANAGEMENT MOTION")**

60.    Pursuant to the Cash Management Motion, the Debtor seeks the entry of interim and final orders authorizing the Debtor to continue using its cash management system, existing bank accounts, and business forms and granting Debtor a sixty (60) day extension to comply with the investment and deposit requirements of section 345(b) of the Bankruptcy Code.

**The Debtor's Bank Accounts**

61.    As of the Petition Date, the Debtor's Cash Management System employed a total of nine (9) bank accounts, including one (1) account holding funds of its residents in trust (collectively, the "**Bank Accounts**") with the following financial institutions (collectively with any other institutions with which the Debtor maintains or established deposit accounts or investment accounts, the "**Banks**"):  (a) CIBC Bank USA ("**CIBC**"); and (b) First National Bank ("**FNB**").

62.    **Schedule 1** attached to the Cash Management Motion sets forth for each of the Bank Accounts the name of the institution at which the account is maintained, the account number (last four digits only) and a description of the purpose of the account.  The Debtor manages its

cash receipts, transfers and disbursements through the Bank Accounts.  In doing so, the Debtor routinely deposits, withdraws and otherwise transfer funds to, from and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer.  On a daily basis, the Debtor processes large numbers or transactions through the Cash Management System as described below.  The Debtor maintains current and accurate records of all transactions processed through the Cash Management System.

**The Debtor's Cash Management System and Bank Accounts**

63.     Prior to the Petition Date, in the ordinary course of business the Debtor employed a cash management system to efficiently collect, transfer, and disburse funds generated by its business operations (the "**Cash Management System**").  The Cash Management System facilitates the Debtor's cash forecasting and reporting, as well as enables the Debtor to maintain control over the administration of its Bank Accounts and to monitor and record the collection and disbursement of funds.  The Debtor does not engage in any intercompany transfers.

64.     Among other benefits, the Cash Management System permits the Debtor to accurately monitor cash availability at all times and permits the Debtor to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and maximizes interest income.

65.     The Cash Management System consists of the following Bank Accounts:

a. <u>Operating Account</u>.  The Debtor maintains an operating account (the "**Operating Account**") at CIBC.  The Operating Account receives payments from residents, insurers, rental income from the Renova Center,[4] and funding from the Capital Finance line of credit, are deposited

---

[4]    The Renova Center ("**Renova**") is an intermediate care facility that provides residential (live-in) services to 25 individuals with severe or profound intellectual disabilities.  Renova sublets a space on the Debtor's property and pays the Debtor approximately $26,525.00 per month for rent, laundry services, maintenance and food, subject to adjustment in subsequent months.

directly into the Operating Account and all disbursements, including payroll, is funded from such Operating Account.

b. <u>Disbursement Account</u>. The Debtor maintains a disbursement account (the "**Disbursement Account**") at CIBC. The Disbursement Account is funded by the Operating Account and is used for check and wire payments.

c. <u>Government Receipts Account</u>. The Debtor maintains an account at CIBC that is used to accept deposits from government payors (i.e., Medicaid / Medicare) and other insurance payers (the "**Government Receipts Account**"). The Government Receipts Account is swept daily into the Commercial Account.

d. <u>Commercial Account</u>. The Debtor maintains an account at CIBC to accept commercial receipts and the funds swept from the Government Receipts Account (the "**Commercial Account**"). All funds collected in the Commercial Account are transferred daily to Capital Finance.

e. <u>Deposit Account</u>. The Debtor maintains a deposit account with FNB to accept deposits from the Debtor's gift shop, employee lunches, vending machines and other miscellaneous sources (the "**Deposit Account**").

f. <u>Gift Account</u>. The Debtor maintains an account with FNB to accept deposits from residents' families, friends, and other contributors (the "**Gift Account**"). Funds from the Gift Account are used for the betterment of the Debtor's facility for resident purposes. The funds in the Gift Account may be earmarked for a specific use, such as a bench in memory of someone, but may be given for the facility's need. Improvements such as benches, outdoor plantings, improvements to pathways, indoor seating areas, certain supplies or clothing for residents without financial resources may be purchased with these funds.

g. <u>HRA Account</u>. The Debtor maintains a separate account with FNB to pay employee health insurance claims (the "**HRA Account**"). The HRA Account is funded by the Operating Account.

h. <u>Petty Cash Account</u>. The Debtor maintains a separate account with FNB for miscellaneous facility expenses.

i. <u>Trust Fund</u>.  Finally, the Debtor maintains a separate account with FNB to hold personal funds of the Debtor's residents (the "**Trust Fund**").  Money held in the Trust Fund is disbursed to residents upon request. The Trust Fund currently holds approximately $280,000.00.

66.    FNB is an authorized bank depository by the Office of the United States Trustee for Region 3 (the "**U.S. Trustee**") pursuant to the U.S. Trustee's Operating Guidelines for Chapter 11 Cases (the "**UST Operating Guidelines**").  Although CIBC is not identified as an authorized depository, it is a highly-rated financial institution that is well-capitalized and financially stable, and the Bank Accounts maintained at CIBC are insured by the Federal Deposit Insurance Corporation (the "**FDIC**").

**The Debtor's Business Forms**

67.    In addition to the Cash Management System and Bank Accounts, the Debtor uses in the ordinary course of business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices) (collectively, the "**Business Forms**").

68.    Most of the Business Forms are printed on an as-needed basis from an electronic template and therefore, the Debtor intends to designate "Debtor-in-Possession" on such forms. However, with respect to preprinted Business Forms, the Debtor requests that it be authorized to continue to use these preprinted Business Forms on a postpetition basis and once its existing stock is depleted, the Debtor will then replace them with stock containing the "Debtor-in-Possession" designation.  I submit that it would be expensive and wasteful, and disruptive to the Debtor's business, to destroy all of these forms and order new ones.  Absent this relief, the estate will be required to bear a potentially significant expense that the Debtor believes is unwarranted, without any meaningful corresponding benefit, and would unnecessarily distract the Debtor away from its efforts from administering this Chapter 11 Case.

69.     The Debtor utilizes the Cash Management System in the ordinary course of its business.  The Cash Management System currently in place enables the Debtor to (a) closely control and monitor corporate funds, (b) fully comply with requirements of its credit facility, (c) ensure cash availability, and (d) reduce administrative expenses by facilitating the efficient movement of funds.  In light of the manner in which the Debtor generates and tracks revenues related to its operations, any disruption in the Debtor's cash management procedures will hamper the Debtor's reorganizational efforts.  Altering the Cash Management System may disrupt (i) payments to key vendors, Capital Finance, contractors, and employees, and (ii) the receipt of funds from the Debtor's residents and their insurance providers.  Therefore, it is essential that the Debtor be permitted to continue to use its Cash Management System in accordance with its existing cash management procedures.

70.     I respectfully submit that under the circumstances, the maintenance of the Debtor's Cash Management System in substantially the same form as it existed prior to the Petition Date is in the best interests of the Debtor's estate and creditors.  Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtor's stabilization of their postpetition operations and (b) assist the Debtor in its effort to maximize value for its estate.

71.     In order to ensure that the Debtor's residents continue timely to pay their invoices and vendors continue to provide goods and services to the Debtor, it is critical that the Debtor maintains as much consistency as possible during the early stages of this case in order to avoid serious disruption to its operations.  Changing accounts could significantly and negatively impact Debtor's cash flow as it takes a substantial amount of time to open new accounts.

72.     By virtue of the nature and scope of the Debtor's business operations and the number of customers and suppliers of goods and services with whom the Debtor deals on a regular basis, it is important that the Debtor be permitted to continue to use the preprinted Business Forms without alteration or change and without the "Debtor-in-Possession" designation.  Otherwise, the estate will be required to bear a potentially significant expense, which the Debtor respectfully submits is unwarranted.  Once such preprinted Business Forms are depleted, the Debtor will then seek to replace them with forms containing the "Debtor-in-Possession" designation.

73.     The Debtor requires this relief to minimize the disruption of the Cash Management System and its Bank Accounts, and to assist it in accomplishing a smooth transition to operating in Chapter 11.

D.     **DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO PAY CERTAIN PREPETITION TAXES AND FEES ("PREPETITION TAXES MOTION")**

74.     Pursuant to the Prepetition Taxes Motion, the Debtor seeks entry of interim and final orders, (i) authorizing, but not directing, the Debtor to pay, in its discretion, certain prepetition taxes and related obligations as necessary to conduct its business operations in the ordinary course and (ii) authorizing financial institutions to honor all checks, drafts, and other forms of payment, including fund transfers, used by the Debtor relating to the foregoing.

75.     Prior to the Petition Date, the Debtor, in its ordinary course of business, incurred various taxes, including property and sales taxes, as well as license and regulatory fees, and other fees (collectively, the "**Taxes and Fees**").  The Debtor remits the Taxes and Fees to various federal, state, and local authorities, including taxing and licensing authorities (collectively, the "**Authorities**").  The Debtor pays the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually, or annually depending on the nature and incurrence of a particular Tax or Fee.  As of the Petition Date, the Debtor's financial records

indicate that approximately $4,000.00 in Taxes and Fees have accrued relating to the prepetition period, of which approximately $500.00 will become due and payable in the first twenty-one (21) days of this Chapter 11 Case.

**Real Property Taxes**

76.     The Debtor is required to pay taxes on its leased real property (the "**Real Property Taxes**").  The Real Property Taxes include School District, Fire Protection, Lebanon Count, and South Lebanon Township taxes that the Debtor is obligated to pay under the lease agreement for its facilities in Lebanon, Pennsylvania.  In accordance with the terms of the lease agreement, the Debtor deposits the Real Property Taxes into a reserve account from which its landlord pays the Authorities.  Annually, the Debtor pays approximately $255,000.00 with respect to the School District Taxes for fiscal year July – June, which taxes are paid in August, and approximately $85,000.00 per calendar year for the Municipal Taxes.  In accordance with the lease agreement, the Debtor prepays its landlord for the Real Property Taxes at $25,000.00 per month.  As of the Petition Date, the Debtors' financial records indicate that they are substantially current on the payment of Real Property Taxes but, out of an abundance of caution, seek to pay such taxes if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

**Personal Property Taxes**

77.     The Debtor is required to pay taxes on business owned and leased personal property (the "**Personal Property Taxes**" and, together with the Real Property Taxes, the "**Property Taxes**").  Personal property generally includes furniture, fixtures, equipment, machinery, tools, supplies, inventory, and any other property not classified as real property.  As of the Petition Date, the Debtor's financial records indicate that they are substantially current on the payment of

Personal Property Taxes to all Authorities but, out of an abundance of caution, seek to pay such taxes if due within the first twenty-one (21) days of the Petition Date and thereafter as necessary in the ordinary course of business.

**Sales Taxes**

78.     In the ordinary course of business, the Debtor collects sales tax (the "**Sales Taxes**") from (i) the sale of food and beverages to customers (usually residents and visiting family members); (ii) salon services; and (iii) television rentals.  The Debtor remits approximately $3,000.00 in the aggregate in Sales Taxes per year to the Authorities.  Based on historical monthly payments, as of the Petition Date, the Debtor estimates that it owes approximately $125.00 in Sales Taxes to the Authorities relating to the prepetition period.  The Debtor does not believe any Sales Tax will become due and payable in the first twenty-one (21) days of this Chapter 11 Case.

**Regulatory, Licensing, and Other Fees**

79.     In the ordinary course of business, the Debtor is obligated to pay a variety of regulatory and licensing fees, as well as fees related to the operations of the healthcare business, including business licenses, registrations, and other types of permits and fees (the "**Business Fees**") in order to continue conducting its business.  As of the Petition Date, Business Fees are paid to federal, local and state Authorities in Pennsylvania.  The Debtor typically pays the Business Fees quarterly or annually, or as otherwise required under applicable law.

80.     The Debtor pays approximately $10,000.00 per year with respect to the Business Fees.  The Debtor estimates that, as of the Petition Date, it owes approximately $4,000.00 in Business Fees to the Authorities relating to the prepetition period, of which approximately $500.00 will become due and payable in the first twenty-one (21) days of this Chapter 11 Case.

81.     I am informed that certain states may impose personal liability on the Debtor's directors and officers to the extent the Debtor fails to meet its obligation to remit Taxes and Fees, even if the failure to pay such Taxes and Fees was not a result of any malfeasance on its part.  I am also informed that the Debtor's failure to pay certain Taxes and Fees could cause some states to challenge the Debtor's right to operate within the states' jurisdictions.  Addressing any action taken by these states would be costly and burdensome and would be an unnecessary distraction during this Chapter 11 Case.  Therefore, I believe that it is in the best interests of the Debtor's estate to eliminate the possibility of the foregoing distractions.

82.     Without question, the payment of the Taxes and Fees is necessary here.  It is in the best interest of the Debtor's estate that the Taxes and Fees be paid on time to avoid any disruptions.  Delayed payment of the Taxes and Fees may cause the Authorities to take precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative maneuvering at the expense of the Debtor's time and resources.  Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.  Based on the foregoing, I submit that the relief requested herein is in the best interest of the Debtor, its estate, its creditors, its stakeholders, and other parties-in-interest and, therefore, should be granted.

**E.      DEBTOR'S MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR'S PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE ("UTILITIES MOTION")**

83.     Pursuant to the Utilities Motion, the Debtor seeks the entry of interim and final orders (a) approving the Debtor's proposed form of adequate assurance of postpetition payment to its utilities, as that term is used in section 366 of the Bankruptcy Code (the "**Utility Companies**"), of a two (2) week deposit for each Utility Company for a total of approximately $18,062.00; (b) approving procedures for resolving any objections by the Utility Companies relating to the

Proposed Adequate Assurance, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtor solely on the basis of the commencement of this case, a debt that is owed by the Debtor for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtor's Proposed Adequate Assurance.

84.     In connection with the operation of its business and the management of its property, the Debtor obtains utility services, including electric, gas, water, oil & diesel, sewer, trash removal, ISP, telephone, cable and other similar services (collectively, the "**Utility Services**"), from the Utility Companies covering a number of utility accounts.  The relief requested in this Motion is for all Utility Companies providing Utility Services to the Debtor and is not limited to those listed on the list of providers of Utility Services attached to the Final Order as **Schedule 1** (the "**Utility Company List**").  The Debtor has made an extensive and good faith effort to identify all of the Utilities that provide them Utility Services and to include them in **Schedule 1**.  Nevertheless, the Debtor reserves the right to supplement **Schedule 1** by filing a notice (a "**Supplemental Notice**," and together with Schedule 1, as may be so supplemented, the "**Utilities List**") at a later date with the Court if necessary.

85.     On average, prior to the Petition Date, the Debtor spent approximately $40,321.00 each month on account of Utility Services.  As reflected on **Schedule 1**, only one (1) of the Debtor's Utility Companies holds a deposit, which deposit equals approximately two-months' costs for that Utility Company.

86.     Uninterrupted Utility Services are essential to the Debtor's business operations during the pendency of this Chapter 11 Case.  Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations could be severely

disrupted, and such disruption would jeopardize the Debtor's reorganizational efforts.  It is essential that the Utility Services continue uninterrupted.  Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to the Utility Companies without jeopardizing the Debtor's business operations.

87.    I maintain that the relief requested in this Motion strikes a fair balance between protecting the rights of the Utility Companies and the rights of the Debtor under the Bankruptcy Code and the need for the Debtor to continue to receive, for the benefit of its estate, the Utility Services upon which it depends.  I do not believe that the Utility Companies will be prejudiced by the Proposed Adequate Assurance, the requirement to provide the Debtor with uninterrupted access to Utility Services, and the procedures for resolving objections to the Proposed Adequate Assurance.

**F.    MOTION OF THE DEBTOR FOR ENTRY OF AN INTERIM AND FINAL ORDER AUTHORIZING THE DEBTOR TO (I) CONTINUE INSURANCE COVERAGE ENTERED INTO PREPETITION AND SATISFY PREPETITION OBLIGATIONS RELATED THERETO; (II) RENEW, AMEND, SUPPLEMENT, EXTEND, OR PURCHASE INSURANCE POLICIES; (III) HONOR THE TERMS OF THE PREMIUM FINANCING AGREEMENTS AND PAY PREMIUMS THEREUNDER; AND (IV) ENTER INTO NEW PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS (THE "INSURANCE MOTION")**

88.    Pursuant to the Insurance Motion, the Debtor seeks the entry of interim and final orders authorizing the Debtor to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto; (ii) renew, amend, supplement, extend, or purchase Insurance Policies; (iii) honor the terms of the Premium Financing Agreements and pay premiums thereunder; and (iv) enter into new Premium Financing Agreements in the ordinary course of business.

89.    In the ordinary course of business, the Debtor maintains approximately eight (8) insurance policies that are administered by various third-party insurance carriers (collectively, the "**Insurance Carriers**").  These policies provide coverage for, among other things, general and

professional liability, umbrella liability, commercial auto, commercial property, employment practices liability, workers compensation, excess professional liability and cyber liability (collectively, the "**Insurance Policies**").  A schedule of the Insurance Policies is attached to the Insurance Motion as **<u>Exhibit C</u>**.[5]

90.    The aggregate annual premium for the Insurance Policies is approximately $599,681.04, not including applicable taxes and surcharges, deductibles, and broker and consulting fees and commissions.

91.    The Debtor finances the premiums for its Insurance Policies (collectively, the "**Financed Policies**") because it is not economically advantageous for the Debtor to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. Accordingly, in the ordinary course of business, the Debtor finances the premiums on the Financed Policies pursuant to a premium financing agreement with US Premium Finance (the "**Premium Financing Agreement**").  In consideration for US Premium Finance's obligation to pay the Debtor's insurance premiums on account of the Financed Policies, the Premium Financing Agreement requires the Debtor to pay US Premium Finance an initial down payment, followed by nine (9) monthly payments.  Payment details on the respective Insurance Agreements are set forth on **<u>Exhibit C</u>**.

92.    As of the Petition Date, the Debtor has paid approximately $688,359.00 on account of the down payments and the Premium Financing Agreement.  The Debtor believes that all obligations under the Premium Finance Agreement that were due and payable on or prior to the

---

[5]    In addition to the Insurance Policies listed on **<u>Exhibit C</u>** attached hereto, the Debtor maintains numerous insurance policies with respect to, among other things, employee health, dental, vision, AD&D, and life insurance benefits. These programs are described, and relief is requested with respect to such programs, in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Salaries, Benefits and Other Compensation, and (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (II) Granting Related Relief* filed contemporaneously herewith.

Petition Date have been fully paid, but, out of an abundance of caution, the Debtor seeks authority to satisfy any such prepetition obligations outstanding as of the Petition Date.

93.    The Debtor's obligations under the Premium Financing Agreement are secured by all sums payable to the Debtor under the Financed Policies, including, among other things, all dividends, payments on claims, unearned premiums and unearned commissions.  If the Debtor was unable to continue honoring its obligations under the Premium Financing Agreement, US Premium Finance may seek relief from the automatic stay to terminate the Financed Policies to recoup its losses.  The Debtor could then be required to obtain replacement insurance on an expedited basis and likely at significant cost to its estate.  The Debtor likely would face great hardship if it was required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance.  Even if the Financed Policies were not terminated, any interruption in the Debtor's payments could have a severe, adverse effect on the Debtor's ability to finance premiums for future policies.

94.    In addition, pursuant to the Insurance Policies, the Debtor may be required to pay various deductibles or retention amounts (the "**Insurance Deductibles**"), depending upon the type of claim and insurance policy involved.  Under certain Insurance Policies, the Insurance Carriers and third-party administrators may pay claimants and then invoice the Debtor for reimbursement for claims paid within any Insurance Deductible.  In such situations, the Insurance Carriers may have prepetition claims against the Debtor.  As of the Petition Date, the Debtor does not believe there are any material prepetition obligations owed to Insurance Carriers relating to Insurance Deductibles, but, out of an abundance of caution, the Debtor seeks authority to satisfy any such prepetition obligations, and to continue honoring all obligations thereunder on a postpetition basis in the ordinary course of business.

95.    Continuation of the Debtor's Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtor's business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's commercial activities, including the Office of the United States Trustee's (the "**U.S. Trustee**") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, to ensure uninterrupted coverage, the Debtor requests authority to maintain its existing Insurance Policies, pay any prepetition Insurance Obligations related thereto, honor its obligations under the Premium Financing Agreement, and enter into new Insurance Policies in the ordinary course of business.  In addition, to the extent that the Premium Financing Agreement expires during the course of this Chapter 11 Case, the Debtor seeks authority to renew its Premium Financing Agreement without further Court approval.  I respectfully submit that renewal of the Premium Financing Agreement falls squarely within its ordinary course of business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtor would not need the Court's prior approval to renew the Premium Financing Agreement. To reduce the administrative burden, as well as to confirm its ability to satisfy one of its obligations of operating as a debtor-in-possession, the Debtor seeks the Court's authority now to renew the Premium Financing Agreement when and as necessary in the Debtor's business judgment.

96.    In the ordinary course of business, the Debtor utilizes KMDR Partners, Inc. as its insurance broker (the "**Insurance Broker**") to obtain its Insurance Policies.  The Insurance Broker primarily assists the Debtor with the procurement and negotiation of the Insurance Policies, enabling the Debtor to obtain the Insurance Policies on advantageous terms and at competitive rates.  The Insurance Broker is compensated for its services through either a commission from the Insurance Carriers, or payment under the Premium Financing Agreement (the "**Brokerage Fees**").

To the best of the Debtor's knowledge, it does not owe any prepetition Brokerage Fees; however, *de minimis* Brokerage Fees may be included in the aforementioned Premium Finance Agreement. To the extent the Debtor has to pay the Brokerage Fees in the future, the Debtor seeks the Court's authority to do so since the employment of the Insurance Broker allows the Debtor to obtain and manage its Insurance Programs in a reasonable and prudent manner and to realize considerable savings in the procurement of the Insurance Programs by having access to market comparables provided by the Insurance Brokers.

97.    The Debtor believes it is essential to its estate and consistent with the Bankruptcy Code and the UST Operating Guidelines that it continues to satisfy all obligations related to the Insurance Policies and have the authority to supplement, amend, extend, renew, or replace its Insurance Policies as needed, in its judgment, without further order of the court.  Continuation of the Insurance Policies is essential to preserving uninterrupted operations and the value of the Debtor's estate.  Failing to maintain the Insurance Policies would impair—if not altogether halt— the Debtor's ability to operate, resulting in a material adverse effect on the Debtor's business and the value of its estate.

98.    I believe that continuing to perform under the Premium Financing Agreement on a postpetition basis is in the best interests of its estate.  Moreover, in light of its financial circumstances, alternative insurance premium finance companies may not be willing to provide insurance premium financing to the Debtor on attractive market terms on a postpetition basis. Simply put, it is critical for the Debtor to continue to perform under its existing Premium Financing Agreement.

G.  **DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) PAY CERTAIN PREPETITION WAGES, SALARIES, BENEFITS, AND OTHER COMPENSATION AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED OBLIGATIONS, AND (II) GRANTING RELATED RELIEF ("EMPLOYEE WAGE MOTION")**

99.     Pursuant to the Employee Wage Motion, the Debtor requests entry of the Proposed Orders authorizing the Debtor to (i) pay, in its discretion, all prepetition amounts required or related to the Prepetition Employee Obligations and Employee Benefits Programs (together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "**Employee Obligations**"); and (ii) maintain, and continue honoring and paying, in its discretion, all amounts with respect to the Employee Obligations as such were in effect as of the commencement of this Chapter 11 Case and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, including amounts owed to third-party administrators.

100.    To enable the Debtor to carry out the relief requested, the Debtor also requests that the Court authorize all applicable financial institutions and banks (the "**Banks**"), and Infinisource, Inc. (the "**Payroll Processor**") to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtor relating to the Employee Obligations, whether such checks were presented or electronic-payment requests were submitted prior to or after the date hereof.

101.    As of the Petition Date, the Debtor employs five hundred (500) employees (the "**Employees**").  The Employees are retained on a full-time, part-time, or casual basis, all of whom are all located in Lebanon, Pennsylvania.  On occasion, the Debtors also utilize the services of temporary employees.  None of the Debtor's Employees are represented by a union.

102.    In general, full-time salaried Employees are part of the Debtor's management team and are scheduled to work at least 40 hours per week.  Full-time hourly Employees are regularly scheduled to work at least 37.5 hours per week.  Both categories of Employees are entitled to the Employee Benefits Programs described below.  Regular part-time Employees are typically scheduled to work more than 30 hours, but fewer than 37.5 hours each week.  Those Employees regularly working more than 30 hours per week are also eligible for all Employee Benefits Programs.  Part-time Employees that are regularly scheduled to work fewer than 30 hours per week are not entitled to the Employee Benefits Programs (other than those statutorily required).  Casual Employees are those who work on an as-needed basis.  These Employees are also not entitled to the Debtor's Employee Benefits Programs (other than those statutorily required).  To remain in a casual employee status, the employee must work at least 16 hours per pay period, unless another schedule has been specifically agreed to by Human Resources.

A.    PREPETITION EMPLOYEE OBLIGATIONS.

103.    The following summarizes the various types of Prepetition Employee Obligations offered by the Debtor:

(a)    *Wages*

104.    In the ordinary course of business, the Debtor pays its Employees wage and salary obligations (collectively, the "**Wages**") on either a salaried or hourly basis.  Among the Debtor's Employees, 21 are salaried employees and 479 are hourly employees.  Nearly all of the Employees receive their wages, salaries, and other compensation by direct deposit, with the remaining Employees receiving checks.

105.    In the ordinary course of business, Employees are paid on a bi-weekly basis, with one week in arrears.  The Debtor's last payroll was paid to Employees on August 2, 2019 for the period from July 14 2019 to July 27, 2019.  The next scheduled payroll is due to be paid on August 16, 2019 for the period from July 28, 2019 to August 10, 2019.  The Debtor estimates that the total amount of the August 16, 2019 payroll will be approximately $600,000.

106.    Payroll is funded to the Payroll Processor every other Thursday, with the applicable Employees paid the following Friday.  As of the Petition Date, the Debtor estimates it owes Employees approximately $300,000 on account of accrued but unpaid Wages, all of which will become due and owing within the first twenty-one (21) days of this Chapter 11 Case (collectively, the "**Unpaid Wages**").  The Debtor believes that, as of the Petition Date, no Employee is owed Unpaid Wages in excess of the $13,650.00 cap under section 507(a)(4) of the Bankruptcy Code.

(b)    *Employee Incentive Programs*

107.    In the ordinary course of business, the Debtor has typically maintained incentive programs for certain categories of Employees (collectively, the "**Incentive Programs**").  The Incentive Programs consist of (i) a quarterly attendance bonus for Employees with satisfactory attendance records at work (the "**Attendance Bonus**"); (ii) a sign-on bonus paid over the first year of employment for new Employees remaining with the company for three months, six months, and one year (the "**Sign-on Bonus**"); and (iii) a Referral Bonus when existing employees refer a new employee for a full-time or regular part-time position (the "**Referral Bonus**").

108.    Payments under the Incentive Programs are paid to Employees with their Wages when they become due.   The Attendance Bonus is paid to qualifying employees in the month following the end of the quarter.  The Sign-on Bonus payments are made with the payroll that includes the employee's three-month (15% of total), six-month (20%) and one-year (65%)

anniversaries.  The Referral Bonuses are partially paid at the end of the new employee's orientation period and the balance at their one-year anniversary.  The Debtor estimates that approximately $10,000.00 in unpaid Incentive Programs was accrued as of the Petition Date.

109.     For those Employees who receive bonuses, the bonuses earned under the Incentive Programs are an important aspect of their overall compensation.  Maintaining historical prepetition practices with regard to Incentive Programs is essential to ensuring that the Debtor can retain its Employees and continue to operate its business and maximize value through the duration of this Chapter 11 Case.  Therefore, the Debtor seeks authority, but not direction, to honor its obligations under the Incentive Programs and to maintain the Incentive Programs in the ordinary course of the Debtor's business.

*(c)     Reimbursable Expenses*

110.     Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed Employees for certain allowed business and travel-related expenses incurred on behalf of the Debtor (the "**Reimbursable Expenses**").  Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses.  Reimbursement is contingent on the Debtor's determination that the charges are for legitimate, reimbursable business expenses.

111.     Reimbursable Expenses approximate to $300.00 to $400.00 per month.  As of the Petition Date, the Debtor estimates that it owes approximately $1,000.00 in outstanding prepetition Reimbursable Expenses.  The Debtor's incurrence of Reimbursable Expenses varies from month-to-month.  As a result, the Debtor cannot accurately estimate prepetition, unpaid Reimbursable Expenses.

112.    Employees incurred the Reimbursable Expenses as business expenses on the Debtor's behalf and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred the Reimbursable Expenses, the Debtor requests authority to (a) continue paying the Reimbursable Expenses in accordance with prepetition practices, including payment to and in adherence with the Debtor's policy for reimbursing Employees such expenses, and honor any prepetition obligations related thereto to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval; and (c) pay all Reimbursable Expenses to Employees that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period.  The Debtor requests authority to pay up to $500.00 on an interim basis and $1,000.00 on a final basis on behalf of the Reimbursable Expenses. The Debtor also seeks authority to continue its reimbursement policy in the ordinary course during the administration of the Chapter 11 Case.

(d)    *Holidays/Paid Time-Off and Leaves of Absence*

113.    The Debtor offers full-time Employees pay for predetermined holidays ("**Paid Holidays**").  In addition, Employees are eligible for paid time away from work based on the employee's length of service.  These absences include personal illness, vacation, preventive care, care for a family member, school activities, medical/dental appointments, personal business and emergencies (collectively, "**Paid Time Off**").  The maximum Paid Time Off an Employee may accrue at any time is 7.08 hours per pay period.  The Debtor anticipates that certain Employees will seek to use or redeem for cash Paid Time Off accrued during the prepetition period after the Petition Date ("**PTO Payouts**").  As of Petition Date, the Debtor estimates that its accrued liability in connection with unused Paid Time Off equaled approximately $170,000.00.  All of the Paid

Time Off is fully-vested and eligible to be redeemed; however, no PTO Payouts will be honored unless required by applicable state law.

114.    I respectfully request permission to honor all unused Paid Time Off that accrued prior to the Petition Date, in accordance with its historical practices and in the ordinary course of business.[6]  The Debtor also seeks authority to continue to incur and pay eligible Employees for Paid Holidays consistent with past practices.

*(e)    Deductions and Withholdings*

115.    During each applicable payroll period, the Debtor routinely deducts certain amounts from its Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee Benefits Programs discussed herein (*e.g.*, contributions relating to health care benefits and 401(k)) and (b) other miscellaneous deductions (collectively, the "**Deductions**").  Every two-weeks, the Debtor deducts and the Payroll Processor remits to appropriate third-party recipients approximately $70,000.00 from the Employees' paychecks for the Deductions.  As of the Petition Date, approximately $200.00 in Employee Deductions have been withheld and not yet remitted to third-party recipients.  Out of an abundance of caution, the Debtor requests authority to remit any unpaid prepetition Deductions that exist. Additionally, the Debtor seeks authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices.  The Deductions represent earnings that applicable authorities have designated for deduction from Employees' paychecks and, thus, may not be property of the Debtor's estate.

---

[6]    In addition, the Debtor also provides all Employees with other leaves of absence as required by law (collectively, the "**Leaves of Absence**").  Leaves of Absence include jury duty, voting leave, medical leave, and bereavement leave.  Employees do not accrue Leaves of Absence over time, and Leaves of Absence are not reflected as a liability on the Debtor's respective balance sheets.

116.    In addition to the Deductions, the Debtor is required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "**Withheld Amounts**").  The Debtor is also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "**Payroll Taxes**").  On a monthly basis, the Debtor remits approximately $360,000.00 in Payroll Taxes, which amounts include employer taxes plus what is withheld and remitted on behalf of the Employee.  As of the Petition Date, the Debtor estimates accrued and unpaid Payroll Taxes (collectively, the "**Unremitted Payroll Taxes**") total approximately $175,000.00.  Because the Deductions and Unremitted Payroll Taxes are not property of the Debtor's estate, the Debtor requests that the Court authorize the Debtor to transmit these amounts, all of which will become due within the first twenty-one (21) days of this Chapter 11 Case, to the appropriate parties in the ordinary course of business.

B.    **EMPLOYEE BENEFITS PROGRAMS.**

117.    In the ordinary course of business, the Debtor offers eligible Employees the opportunity to participate in a number of health and welfare benefits programs, including medical, dental and vision insurance, life and disability insurance, and other employee benefit plans as described below (collectively, the "**Employee Benefits Programs**").  Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtor's workforce during this Chapter 11 Case.

118.    Medical Plan.  The Debtor offers a choice of three medical plans to eligible Employees (the "**Medical Plan**"), which is administered by Meritain Health (an Aetna Company) ("**Meritain**").  The coverage in the Medical Plan and associated premiums differ depending on the level of coverage Employees elect to receive and whether the Employee has dependents covered

by the applicable plan.  The Employees contribute toward the coverage through payroll deductions, with the Debtor paying the balance of the premiums.  As of the Petition Date, the Debtor believes that there are no outstanding pre-petition premiums for the Medical Plan.

119.    <u>Dental Plan</u>.  Eligible Employees may also enroll in a dental plan (the "**Dental Plan**") administered by Meritain.  The Employees contribute toward the Dental Plan coverage through payroll deductions, with the Debtor paying the balance of the premiums.  As of the Petition Date, the Debtor believes that there are no outstanding pre-petition premiums owed to Meritain on account of the Dental Plan.

120.    <u>Vision Plan</u>.  Eligible Employees may also enroll in a vision plan (the "**Vision Plan**") administered by Meritain.  The Employees contribute toward the Vision Plan coverage through payroll deductions, with the Debtor paying the balance of the premiums.  As of the Petition Date, the Debtor estimates that no amounts are owed to Meritain on account of the Vision Plan.

121.    <u>Company-Paid Plans</u>.  The Debtor provides eligible Employees with company-paid Life and Accidental Death & Dismemberment insurance (the "**Company-Paid Plan**").  The Company-Paid Plan is administered by Guardian.  As of the Petition Date, the Debtor estimates that approximately $600.00 is owed to the plan administrator on account of the Company-Paid Plan.

122.    <u>Employee-Paid Plans</u>.  The Debtor also provides full-time Employees with the opportunity to participate in an employee-paid benefit plan, Legal and ID Shield (the "**Employee-Paid Plan**").  The Employee-Paid Plan is administered by Legal Shield.  Employees contribute 100% of the cost of their Employee-Paid Plans with after-tax deductions from their paychecks.  As of the Petition Date, the Debtor estimates that it owes approximately $425.00 to the plan administrator on account of the Employee-Paid Plan.

123.   401(k) Plan.   The Debtor maintains for the benefit of eligible Employees an employee savings plan, administered through Mass Mutual, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "**401(k) Plan**").   The Debtor matches twenty-five percent (25%) of the first four percent (4%) contributed toward the 401(k) Plan, for those Employees that opt into the 401(k) Plan.   There are approximately 107 participants in the 401(k) Plan.   The Debtor withholds certain amounts from participating Employee's paychecks and contributes such amounts to the 401(k) Plan (the "**Employee 401(k) Contributions**").   The Debtor estimates that it withholds a total of approximately $20,000.00 in Employee 401(k) Contributions and matches approximately $3,5000 each month.   As of the Petition Date, approximately $11,850.00 has been withheld or obligated as matching funds and not yet remitted to the 401(k) Plan administrator.   The Debtor requests authority to continue the 401(k) Plan and Employee 401(k) Contributions on a postpetition basis.

124.   Other Policies and Benefits.   Eligible Employees have the benefit of certain other policies and benefits, including, but not limited to, jury duty, bereavement leave, voting leave, and military duty leave, some of which are mandated or encouraged by law and some of which may have pay or benefits components.   The Debtor seeks authorization to continue the aforementioned policies and benefits and to make any payments on account of any accrued but unpaid amounts owing thereunder.

125.   The Debtor requests authority to (a) continue the Employee Benefits Programs in the ordinary course of business, (b) continue making the above-described contributions to the Employee Benefits Programs, and (c) pay any amounts related thereto, including premiums, claims amounts, and administration fees, to the extent that they remain unpaid as of the Petition Date in

the ordinary course of business.  The Debtor requests authority to pay $123,000 in pre-petition administrative fees, monthly premiums, and funding for Employee Benefits Programs on an interim basis and $140,000 on a final basis.

## C.    THE PAYROLL PROCESSOR

126.    As noted above, the Debtor uses the Payroll Processor to administer payroll funds made available to Employees through direct deposit.  The Payroll Processor's responsibilities include processing payroll and transferring funds from the Debtor to its Employees and to the relevant taxing and garnishing authorities.  The Debtor pays the Payroll Processor approximately $108,000.00 per year for its services.  As of the Petition Date, the Debtor estimates the Payroll Processor is owed approximately $2,300.00.  Because the services provided by the Payroll Processor are crucial to the smooth functioning of the Debtor's payroll system, the Debtor requests permission to pay any unpaid Payroll Processor fees, and to continue to pay fees that accrue during this bankruptcy case in the ordinary course of business.

127.    The payment of the Employee Obligations and continuation of the Employee Benefits Programs serve the sound business purpose of maximizing the value of the Debtor's estate.  The Debtor's success in this Chapter 11 Case, and the future of the reorganized company, hinges in large part on the morale and continued dedication and efforts of its Employees.  The vast majority of the Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses, support their families, and maintain their health and well-being.  Consequently, these Employees would be exposed to significant financial difficulties if the Debtor was not permitted to (i) continue paying compensation, (ii) provide employee benefits, and (iii) maintain existing programs.  Through the payment of the Employee Obligations, the Debtor seeks to motivate and encourage the Employees to continue to support the Debtor's

reorganization efforts.  Accordingly, this Court should grant the requested relief under section 363 of the Bankruptcy Code.

128.    The potential harm and economic disadvantage that would stem from the failure to pay the Employee Obligations is grossly disproportionate to the amount of any prepetition claim that may be paid.  Any failure by the Debtor to pay the Employee Obligations would negatively impact the morale of the Debtor's workforce at a critical time for the Debtor and its business which could impact resident care.  The Debtor seeks to minimize the personal hardship the Employees would suffer if the Employee Obligations are not paid when due or as expected.  The Debtor has examined other options short of payment of the Employee Obligations and have determined that to avoid significant disruption of the Debtor's business operations and ensure continued excellent resident care, there exists no practical or legal alternative to payment of such obligations.

129.    Paying the Employee Obligations and continuing with the Employee Benefits Programs will benefit the Debtor's estate and its creditors by allowing the Debtor to continue business operations postpetition ensuring continued excellent resident care.  The Employees provide the Debtor with services essential to its residents and the operation of the Debtor's business, and the Debtor believes that absent the payment of the employee compensation and benefits owed to the Employees, the Debtor will experience employee turnover and instability at this critical time.

130.    Payment of the Employee Obligations is a necessary and critical element of the Debtor's effort to preserve its going concern value and will give the Debtor the greatest likelihood of retention of its Employees as the Debtor seeks to operate its business in this Chapter 11 Case.  Indeed, the Debtor believes that without the relief requested herein, its Employees may seek

alternative opportunities.  Such a development would deplete the Debtor's workforce, thereby undermining the Debtor's restructuring efforts.

H.  **DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTOR TO (I) MAINTAIN, ADMINISTER, MODIFY, AND RENEW ITS REFUND PROGRAMS AND PRACTICES AND (II) HONOR OBLIGATIONS RELATED THERETO (THE "REFUND PROGRAMS MOTION")**

131.    Pursuant to the Refund Programs Motion, the Debtor seeks entry of interim and final (a) authorizing the Debtor (i) to maintain, administer, modify, and renew their Refund Program and make payments to residents and allow offsets by Third-Party Payors or to otherwise honor accrued prepetition obligations owed under their Refund Program (collectively, and as identified therein, the "**Refund Program Obligations**") and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business, (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of Refund Program Obligations, (c) scheduling a final hearing to consider approval of this Motion on a final basis, and (d) granting related relief.

132.    In the ordinary course of business, the Debtor is required to make refunds to residents and third-party payors, including healthcare insurers, private pay sources ("**Private Third Party Payors**"), Medicare, Medicaid, and potentially other governmental and quasi-governmental agencies (and together with the Private Third Party Payors, the "**Third-Party Payors**"), when overpayments are identified.  In the ordinary course of business, the Debtor routinely issues refunds or are subject to offsets for reimbursement of overpayments made by or on behalf of residents resulting from the interaction between the Debtor's billing procedures, resident medical insurance deductibles, and third-party payments (the "**Refund Program**").

133.    The case-by-case nature of the Debtor's medical services makes the process of determining each resident's insurance coverage particularly complex.  As a result, whether due to

data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, resident accounts—once fully processed—may contain credit balances.  Once the Debtor receives payments from residents or insurers, the Debtor reviews accounts that have credit balances and refund any surplus to the resident or are subject to an offset to the Third-Party Payor's receivable balance based on an overpayment.

134.    When the Debtor discovers and verifies an overpayment from a resident or Third-Party Payor, the amount of the overpayment is reviewed in the Debtor's billing system, which then administers refunds to the resident as appropriate.  Offsets by Third-Party Payors are reconciled by the Debtor after the offset occurs.  There is typically a significant lag between when the resident is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtor's billing system.  After the overpayment amount is determined, either the Debtor issues a check or other form of payment to the resident or the Third-Party Payor offsets future receivables in the amount of the overpayment.

135.    At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check or offset has not yet been issued.  Moreover, some refund checks issued to residents before the Petition Date may not have been presented for payment or may not have cleared the Debtor's banking system or accounting system and, accordingly, have not been honored and paid as of the Petition Date.  Nonetheless, the Debtor is required, under the laws of Pennsylvania, to reimburse residents and Third-Party Payors as overpayments are identified.  The Debtor estimates that approximately $9,000.00 in refunds to residents or Third-Party Payor offsets are processed in a given month, although larger amounts of refunds may be due and owing at any given time.

136.     As of the Petition Date, the Debtor estimates that approximately $27,000.00 in refunds and credit balances may be due and owing under the Refund Program, of which approximately $9,000.00 could become due and owing during the first twenty-one (21) days of this Chapter 11 Case.  The Debtor requests authority to pay and allow offsets up to $9,000.00 in Refund Program Obligations, in the ordinary course of business on an interim basis, pending entry of the Final Order granting the relief requested herein, and to continue to issue and pay and allow offsets for the Refund Program Obligations to residents and Third-Party Payors, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a post-petition basis.

137.     The necessity of the Refund Program in the medical services industry cannot be overstated.  Failure to honor the Refund Program Obligations would likely cause the Debtor to lose a significant number of payors and residents, which would damage its reputation for reliability, thereby resulting in a long-term decline in business.  Additionally, if the Refund Program Obligations are not honored, the Debtor may face legal sanctions or be liable for fines in the jurisdiction in which it operates.  Thus, the Refund Program is necessary for the Debtor to remain competitive and maintain its resident base at this critical juncture.

I.     **MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF PREPETITION OBLIGATIONS OWED TO CRITICAL VENDORS (THE "CRITICAL VENDOR MOTION")**

138.     Pursuant to the Critical Vendor Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to pay, in consultation with the DIP Lender, all or a portion of their Critical Vendor Claims to Critical Vendors in an amount not to exceed $100,000.00 on an interim basis and $200,000.00 on a final basis (with respect to each of the interim and final periods, as applicable, the "**Critical Vendor Cap**").

139.     In the ordinary course of its business, the Debtor purchases goods and/or services from certain vendors or suppliers, whose continued, uninterrupted provision of such good and/or services will play a crucial role in maintaining the Debtor's ongoing business operations as a skilled nursing and rehabilitation facility (the "**Critical Vendors**").  The Critical Vendors provide a variety of goods and services, all of which are required to continue the daily operations of the Debtor's business.  In addition, certain Critical Vendors are essential in order to maintain resident care at the Debtor's facilities, and for the Debtor to comply with requirements under the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**").

140.     Because the Debtor will benefit from avoiding the severe disruption to the Debtor's operations that would occur if the Debtor was to lose certain essential, unique and/or sole-source material and service providers, it is prudent for the Debtor, in its discretion, to pay selected Critical Vendors some or all of their prepetition claims.  Consistent with these needs, and to ensure that the Debtor's liquidity is preserved as it transitions its business into chapter 11, the Debtor seeks authority to implement procedures that will assist it in securing favorable terms and to deal with any vendors that may repudiate or otherwise refuse to honor existing agreements with the Debtor.

141.     The Debtor is mindful of its fiduciary obligation to seek to preserve and maximize the value of its estate.  Toward that end, the Debtor has carefully estimated all potential vendor claims as of the Petition Date, including the Critical Vendor Claims, and has determined that the ability to satisfy the Critical Vendor Claims is necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtor and its residents.  To be clear, the Debtor is aware of the need to seek relief only for those vendors truly critical to the Debtor's ongoing operations and resident care.  Furthermore, as discussed above, the Debtor believes that a portion of the Critical Vendor Claims may be entitled to administrative priority under section 503(b)(9) of the

Bankruptcy Code, and that payment of those Critical Vendor Claims would merely expedite the treatment to which such vendors would otherwise be entitled and abides by the priority scheme of the Bankruptcy Code.

142.    The Debtor has spent significant time reviewing and analyzing its books and records to identify truly critical suppliers of goods and services. The Debtor has carefully reviewed its suppliers to determine, among other things, (i) which suppliers were sole source or limited source suppliers, without whom the Debtor could not continue to operate without disruption, (ii) the Debtor's ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (iii) which suppliers would be prohibitively expensive to replace, (iv) which suppliers would present an unacceptable risk to the Debtor's operation given the volume of essential services or products that such suppliers provide, and (v) the extent to which suppliers may have an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code.  After compiling this information, the Debtor estimated the amount it believes it would be required to pay to ensure the continued supply of critical goods and services.

143.    Based on their consideration of these factors, the Debtor anticipates that most Critical Vendors will be medical supply or service providers, facility equipment maintenance, laboratories, or staffing service providers that do not have a contractual relationship with the Debtor and are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtor's operations or adversely affecting resident care

and safety.[7]  The Debtor estimates that it will be required to pay approximately $100,000 of the Critical Vendor Claims during the interim period prior to a final hearing on this Motion.

144.    As discussed in further detail in the Critical Vendor Motion, the Critical Vendors are so essential to the Debtor's business and resident care that the absence of any of its particular goods or services, even for a short duration, could disrupt the Debtor's operation and cause irreparable harm to the Debtor's business, goodwill, and resident care. This irreparable harm to the Debtor, its residents and to the Debtor's creditors will far outweigh the cost of payment of the Critical Vendor Claims.

145.    The relief requested herein is specifically designed to ensure the Debtor's ability to continue to provide health care services to its residents without interruption, comply with applicable HIPAA requirements, and to preserve the going concern value of the Debtor's business. In contrast, the Debtor will suffer irreparable harm if essential goods and services are not provided by the Critical Vendors.  The Debtor cannot take the material risk that the Critical Vendors will refuse to perform postpetition if their prepetition claims are not paid.   While the Debtor has historically enjoyed productive working relationships with these vendors, the limited number of vendors who can supply the Debtor with the quantity and quality of goods and services that meets their operational needs provides such vendors with considerable bargaining power in the event of non-payment by the Debtor.  At this critical time following the filing of this Chapter 11 Case, the loss of such vendors will significantly impair the Debtor's ability to provide quality resident care, comply with HIPPA requirements, and maximize value for the benefit of all stakeholders.

---

[7]    A complete list identifying the Critical Vendors has been provided to the United States Trustee, counsel to Capital Finance, LLC, (the "**DIP Lender**"), and the Court.  Such list will also be provided promptly to counsel for any official committee appointed in this Chapter 11 Case.

146.     While the Debtor expects to secure a continuing postpetition supply of goods and services in most cases through consensual negotiation with the Critical Vendors, the Debtor recognizes that it must consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid.  The Critical Vendors are so critical to the Debtor's business that the lack of each of their particular goods or services, even for a short duration, would damage the Debtor's business, disrupt the Debtor's operation, and cause irreparable harm to the Debtor's business, goodwill, and resident care.  This irreparable harm to the Debtor, its residents and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors.

147.     The Debtor believes that payment of some or all Critical Vendor Claims owed to Critical Vendors will be necessary to preserve the Debtor's business and operations at the outset of this Chapter 11 Case.  During this period, it is imperative that the Debtor remains focused and avoid distractions from vendors attempting to assert leverage or deny provision of goods and services going forward, suddenly and without notice, which could cripple the Debtor's operations and resident care.  Moreover, the loss of Critical Vendors and the efforts that would be required to replace such vendors would be a substantial and costly distraction at a time when the Debtor must focus on providing resident care and sustaining its business operations.

148.     Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to provide the Debtor with Customary Trade Terms.  The Customary Trade Terms are important to the Debtor's cash flow and overall business operations.  The Debtor's historical practice has been to obtain favorable trade terms from its vendors.

149.    The continued availability of trade credit, in amounts and on terms consistent with those the Debtor has maintained over the years, is advantageous to the Debtor.  It allows the Debtor to maintain and enhance necessary liquidity and focus on returning to profitability.  The Debtor believes that preserving working capital through the retention and reinstatement of advantageous trade credit terms will enable the Debtor to stabilize business operations at this critical time, to maintain its competitiveness, and to maximize the value of its business for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the Debtor's restructuring efforts and its residents.  Any occurrence affecting operations could prolong the Debtor's Chapter 11 Case, increase administrative expenses, and jeopardize its restructuring efforts.

150.    Overall, the sums involved are small compared to the irreparable harm that the Debtor would suffer if relationships with the Critical Vendors were terminated.  Thus, I submit that the requested relief is specifically designed to facilitate the Debtor's reorganization efforts. The Court should authorize the payment of Critical Vendor Claims to prevent enormous disruptions to the Debtor's business and resulting losses in value of the Debtor's estate.

**J.      DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION FINANCING; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (C) AUTHORIZING THE USE OF CASH COLLATERAL; (D) GRANTING ADEQUATE PROTECTION; (E) MODIFYING THE AUTOMATIC STAY; (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF (THE "DIP MOTION")**

151.    The Debtor requires immediate access to liquidity to ensure that they are able to continue operating their business and provide for the care, welfare and safety of its resident.  To that end, prior to filing this chapter 11 case, the Debtor secured from Capital Finance, LLC (in its capacity as the postpetition lender, the "**DIP Lender**") a super-priority, secured, debtor-in-

- 51 -

possession credit facility (the "**DIP Facility**") consisting of a revolving credit facility (the "**DIP Revolving Facility**") with a maximum credit amount of $3,000,000.00 (the "**Maximum Credit Amount**").

152.    The DIP Facility is subject to the terms and conditions of the DIP Financing Agreement attached to the Interim Order (the "**DIP Financing Agreement**"), the Existing Loan Agreement (as defined below), the Interim Order, the Final Order, and all other security documents, guarantees and other legal documentation entered into in connection with the DIP Facility and/or the Existing Loan Agreement (including, without limitation, all Loan Documents (as defined in the Existing Loan Agreement), each as modified and supplemented by the DIP Financing Agreement, the Interim Order, and the Final Order (collectively, together with the DIP Financing Agreement, the Existing Loan Agreement, the "**DIP Loan Documents**").

153.    The DIP Facility will ensure that ongoing business operations and critical resident care can continue without disruption.  Among other things, the proceeds from the DIP Facility, together with anticipated cash flow from operations, will be used to honor employee wages and benefits, procure goods and services integral to the Debtor's ongoing business operations, fund certain operational expenses, and allow the Debtor to maintain favorable relationships with its vendors, suppliers, employees, residents, and satisfy working capital needs in the ordinary course.

154.    The Debtor believes that the DIP Facility represents the best and only source of financing available to the Debtor under the circumstances and generally provides for:

- a $3 million revolving DIP Facility secured by consensual first priority priming liens on the DIP Collateral (subject only to certain Prior Permitted Senior Liens) as well as additional liens described herein;

- borrowings and disbursements to be made pursuant to the terms of an agreed Approved Budget, a copy of which is attached to the Interim Order (the "**Approved Budget**"); and

- a scheduled maturity date of the DIP Facility of the earlier of (i) December 1, 2019; (ii) the effective date of a Plan; (iii) consummation of a sale of substantially all assets of the Debtor; (iv) thirty-five (35) days after the Petition Date if the Final Order has not been entered in the Chapter 11 Case on or prior thereto; and (v) the date on which the maturity of the Post-Petition Obligations is accelerated in accordance with the DIP Financing Agreement.

155.    Absent interim approval of the DIP Facility, there is a significant risk that the Debtor would be forced to cease operations or otherwise stop paying their obligations as they become due, thereby threatening the health safety and welfare of the Debtor's resident.

156.    As more fully set forth below, in addition to the obligations due to Capital Finance, LLC (in its capacity as the prepetition lender, the "**Existing Lender**"), substantially all the Debtor's assets are encumbered by the liens of Debtor's landlord, 590 South 5th Avenue, LLC (the "**Landlord**") and the Landlord's lender Capital Funding, LLC (the "**Capital Funding**") as part of a loan to Landlord to purchase the Facility (as defined below).  After reaching out to several other potential sources, the Debtor does not believe third-party debtor-in-possession financing would be reasonably available and has determined that the proposed DIP Facility provides the best path forward under the circumstances to address their immediate liquidity needs and fund administration of this chapter 11 case.

157.    As noted above, the Debtor proposes to use the DIP Facility and Cash Collateral to provide resident care, satisfy employee wages, employee benefits, certain other operational expenses as set forth in the Approved Budget, and to fund administration of this Chapter 11 Estate. Without access to the DIP Facility and Cash Collateral to satisfy these obligations, the Debtor will have insufficient funds to provide for: (i) resident welfare, care and safety; (ii) pay wages for their employees; (iii) preserve and maximize the value of its estate; and (iv) administer this Chapter 11 Case through a reorganization process.  Thus, the Debtor's access to the DIP Facility and Cash Collateral is critical to the continued operation of the Debtor's business as a going concern for the

benefit of all stakeholders. Absent approval of the Interim Order, the Debtor will not have access to the DIP Facility or the Cash Collateral necessary to fund administration of this chapter 11 estate, causing immediate and irreparable harm to the Debtor's estate to the detriment of all resident, stakeholders and other parties-in-interest.

158.    The Debtor does not believe that alternative sources of financing are readily available due to the Debtor's capital structure and their inability to obtain a commitment from other potential lenders to provide debtor-in-possession financing. Substantially all of the Debtor's assets are encumbered by liens arising under the Existing Loan Agreement and the Operating Lease. As a result, the Debtor does not believe that third-party debtor-in-possession financing would be reasonably available given the Debtor's existing capital structure.

159.    Indeed, the Debtor, after consulting its advisors, believes that because any potential sources of financing have insisted on priming the Existing Lender and Capital Funding (collectively, the "**Prepetition Secured Parties**"), such outside financing is not a feasible option. Without the consent of the Prepetition Secured Parties, any attempts at non-consensual priming of the Prepetition Secured Parties' liens would likely involve a costly, extended and contested hearing. The Debtor does not believe that they would be able to demonstrate adequate protection for the non-consensual priming of the Prepetition Secured Parties' liens. Moreover, any such outside financing would expose the Debtor to the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.

160.    In contrast, the proposed DIP Facility offered by the DIP Lender will allow the Debtor to avoid the need to engage in a costly and time-consuming priming fight at the outset of this Chapter 11 Case. Accordingly, the Debtor believes that the DIP Facility provides, on balance,

a more attractive postpetition financing proposal than alternative postpetition financing obtained from a third-party.  Further, the DIP Facility is the product of extensive good faith, arms'-length negotiations with the DIP Lender and is essential to continue to provide resident care and continue to operate as a going concern.

161.    The Debtor's determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of alternatives.  Specifically, and in the face of limited cash on hand, the Debtor and its advisors determined that the Debtor would require significant postpetition financing to support its operational and restructuring activities.  Accordingly, the Debtor negotiated the DIP Loan Documents with the DIP Lender in good faith, at arms' length, and with the assistance of its advisors, and the Debtor believes that it has obtained the best financing available.

162.    I believe that the terms and conditions of the DIP Facility and the DIP Loan Documents (i) are fair, reasonable, and the best available to the Debtors under the circumstances, (ii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration.

163.    At the Final Hearing, the Debtors will seek final approval of the DIP Facility pursuant to a proposed final order, which shall be in form and substance acceptable to the DIP Lender, approving such postpetition financing arrangements, notice of which Final Hearing and Final Order will be provided in accordance with the proposed Interim Order.

## CONCLUSION

164.    For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

165.    This concludes my declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 2, 2019

_____
Charles B. Blalack