**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CEDAR HAVEN ACQUISITION, LLC,[1] | Case No. 19-11736 (CSS) |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(A) AUTHORIZING POSTPETITION FINANCING, (B) GRANTING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C)**
**AUTHORIZING THE USE OF CASH COLLATERAL, (D) GRANTING ADEQUATE**
**PROTECTION, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A**
<u>**FINAL HEARING, AND (G) GRANTING RELATED RELIEF**</u>

The above-captioned debtor and debtor-in-possession (the "**Debtor**") files this motion (this

"**Motion**")[2] for entry of an interim order, substantially in the form attached hereto as <u>**Exhibit A**</u>

(the "**Interim Order**") and final order (the "**Final Order**" and, together with the Interim Order,

the "**DIP Order**"); (a) authorizing the Debtor to obtain postpetition secured financing; (b) granting

liens and providing superpriority claims with respect to such postpetition financing; (c) authorizing

the Debtor to use Cash Collateral; (d) approving the form of adequate protection to be provided by

the Debtor; (e) modifying the automatic stay to the extent necessary to effectuate the terms and

conditions of the Interim Order; (f) scheduling a final hearing (the "**Final Hearing**") to consider

entry of the Final Order; and (g) granting related relief.  In support of this Motion, the Debtor

submits the *Declaration of Charles B. Blalack in Support of the Debtor's Chapter 11 Petitions and*

*First Day Pleadings* (the "**First Day Declaration**").  In further support of this Motion, the Debtor

respectfully states as follows:

---

[1]   The Debtor in this case, along with the last four digits of the federal tax identification numbers, is Cedar Haven
Acquisition, LLC (8400).  The mailing address for the Debtor is 590 South 5th Avenue, Lebanon, Pennsylvania
17042.

[2]   Capitalized terms used in this Motion but not otherwise defined herein shall have the meanings ascribed to them
in the Interim Order or the DIP Financing Documents, as applicable.

## PRELIMINARY STATEMENT

1.      The Debtor requires immediate access to liquidity to ensure that they are able to continue operating their business and provide for the care, welfare and safety of its residents.  To that end, prior to filing this chapter 11 case, the Debtor secured from Capital Finance, LLC (in its capacity as the postpetition lender, the "**DIP Lender**") a super-priority, secured, debtor-in-possession credit facility (the "**DIP Facility**") consisting of a revolving credit facility with a maximum credit amount of $3,000,000.00 (the "**Maximum Credit Amount**").

2.      The DIP Facility is subject to the terms and conditions of the DIP Financing Agreement, attached to the Interim Order (the "**DIP Financing Agreement**"), and that certain Credit and Security Agreement dated December 1, 2015 (as amended by that certain First Amendment to Credit and Security Agreement and Waiver dated November 30, 2018 (the "**Existing Loan Agreement**") among Debtor, Capital Finance, LLC and the additional financing institutions from time to time party (collectively, the "**Existing Lender**") and Capital Finance, LLC, as Agent (together with its successors and assigns "**Agent**"), the Interim Order, the Final Order, and all other security documents, guarantees and other legal documentation entered into in connection with the DIP Facility and/or the Existing Loan Agreement (including, without limitation, all Loan Documents (as defined in the Existing Loan Agreement), each as modified and supplemented by the DIP Financing Agreement, the Interim Order, and the Final Order (collectively, together with the DIP Financing Agreement, the Existing Loan Agreement, the "**DIP Financing Documents**").

3.      The DIP Facility will ensure that ongoing business operations and critical resident care can continue without disruption.  Among other things, the proceeds from the DIP Facility, together with anticipated cash flow from operations, will be used to honor employee wages and

benefits, procure goods and services integral to the Debtor's ongoing business operations, fund certain operational expenses, and allow the Debtor to maintain favorable relationships with its vendors, suppliers, employees, residents, and satisfy working capital needs in the ordinary course.

4.    The Debtor believes that the DIP Facility represents the best and only source of financing available to the Debtor under the circumstances and generally provides for:

- a $3 million revolving DIP Facility secured by consensual first priority priming liens on the DIP Collateral (subject only to certain Prior Permitted Senior Liens) as well as additional liens described herein;

- borrowings and disbursements to be made pursuant to the terms of an agreed Budget, a copy of which is attached to the Interim Order (the "**Budget**"); and

- a scheduled maturity date of the DIP Facility of the earlier of (i) December 1, 2019; (ii) the effective date of a Plan; (iii) consummation of a sale of substantially all assets of the Debtor; (iv) thirty-five (35) days after the Petition Date if the Final Order has not been entered in the Chapter 11 Case on or prior thereto; and (v) the date on which the maturity of the Post-Petition Obligations is accelerated in accordance with the DIP Financing Agreement.

5.    Absent interim approval of the DIP Facility, there is a significant risk that the Debtor would be forced to cease operations or otherwise stop paying their obligations as they become due, thereby threatening the health safety and welfare of the Debtor's residents.

6.    As more fully set forth below, in addition to the obligations due to Capital Finance, LLC, in its capacity as the Existing Lender, substantially all the Debtor's assets are encumbered by the liens of Debtor's landlord, 590 South 5th Avenue, LLC (the "**Landlord**") and the Landlord's lender Capital Funding, LLC (the "**Capital Funding**") as part of a loan to Landlord to purchase the Facility (as defined below). After reaching out to several other potential sources, the Debtor does not believe third-party debtor-in-possession financing would be reasonably available and has determined that the proposed DIP Facility provides the best path forward under the circumstances to address their immediate liquidity needs and fund administration of this chapter 11 case.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtor consents, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.     Venue is proper pursuant to 28 U.S.C.  §§ 1408 and 1409.

9.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C.  §§ 101-1532 (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1(b), 4001-2 and 9013-1(m).

## GENERAL BACKGROUND

10.     On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), thereby commencing this case (the "**Chapter 11 Case**").

11.     The Debtor continues to be in possession of its property, to operate its business, and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     No trustee, examiner, or official committee of unsecured creditors has been appointed in this Chapter 11 Case.

13.     Additional factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of this Chapter 11 Case, is set forth in the First Day Declaration, which is fully incorporated here by reference.

## DEBTOR'S CAPITAL STRUCTURE

### I.     DEBTOR'S OWNERSHIP AND MANAGEMENT STRUCTURE

14.     Stone Barn Holdings, LLC ("**Stone Barn**") owns ninety-five percent (95%) and Michael D. D'Arcangelo owns five percent (5%) of the membership interests of the Debtor. Charles B. Blalack, the Debtor's Managing Partner, owns one hundred percent (100%) of the membership interests of Stone Barn.

15.     Stone Barn Management, Inc. ("**SBM**"), an affiliate of Stone Barn, provides certain non-clinical and non-medical administrative services for the Debtor, including, among other things: (i) fiscal management and administration; (ii) nursing; (iii) finance and accounting; (iv) dietary; (v) facility maintenance; (vi) housekeeping and laundry; (vii) social services; (viii) recreational therapy; (ix) marketing and admissions; and (x) clinical reimbursement, pursuant to that certain Management Services Agreement dated as of August 1, 2015.

16.     Stone Barn generally supervises and oversees the performance by SBM of its management services at the facility and also provides oversight, advisory, supportive, consultative and administrative services for the Debtor in connection with, among other things, the areas of: (i) dietary; (ii) facility maintenance; (iii) clinical assistance; (iv) resident care and quality assurance; (v) administration; (vi) purchasing; (vii) and data processing, pursuant to that certain Management

Services Agreement dated as of July 30, 2015. Stone Barn also prepares a written annual budget for the operation of the Facility for the Debtor.

## II.   THE PREPETITION CREDIT FACILITY

17.   On December 1, 2015, the Debtor and the Existing Lender and Agent entered into the Existing Loan Agreement, and together with the Financing Documents (as defined in the Existing Loan Agreement), collectively, the "**Pre-Petition Financing Documents**"). The Existing Loan Agreement is guaranteed by Stone Barn (the "**Senior Guarantor**")

18.   Pursuant to the Existing Loan Agreement, the Existing Lender provided the Debtor with a $3,000,000.00 revolving credit facility (the "**Revolving Credit Facility**"). As of the Petition Date, the outstanding principal balance of the Revolving Credit Facility was $1,417,591 (the "**Pre-Petition Obligations**").

19.   The Pre-Petition Obligations are secured by liens (the **"Pre-Petition Liens"**) on substantially all of the Debtor's assets (the "**Pre-Petition Collateral**"). The Agent, for the benefit of itself and the Existing Lender, has a *first priority* lien on: (a) all Accounts arising from the delivery of goods and rendering services by the Debtor prior to an event of default and the proceeds thereof; (b) Deposit Accounts and the proceeds thereof; and (c) All Accounts arising after an event of default and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the event of default in accordance with the terms of the Intercreditor Agreement (*as defined below*) (the "**Existing Lender Priority Collateral**").

## III.   THE OPERATING LEASE OBLIGATIONS.

20.   The Debtor is also indebted to the Landlord and Capital Funding pursuant to that certain Operating Lease (and related agreements) dated December 17, 2017 (as amended, the "**Operating Lease**"), pursuant to which the Debtor leases and operates a 324-bed long term skilled

nursing facility known as "Cedar Haven Healthcare Center" (the "**Facility**") located at 590 South 5th Avenue, Lebanon, Pennsylvania (the "**Leased Premises**").  The Debtor's obligations under the Operating Lease are partially guaranteed by Charles B. Blalack, subject to a monetary cap equal to twenty-four (24) months of fixed rent (the "**Guarantor**").

21.    The initial term of the Operating Lease was for 30 years and current monthly rent due under the Operating Lease is $250,000 (the "**FHA Obligations**").  The FHA Obligations are secured by liens (the "**FHA Liens**") on substantially all of the Debtor's assets ("**Capital Funding's Collateral**") pursuant to that certain Operator Security Agreement (the "**Operator Security Agreement**"), dated as of December 1, 2017, by and between the Debtor and Capital Funding and are governed by the Intercreditor Agreement (*as defined below*).

22.    Capital Funding has a *first priority* lien on substantially all of the Debtor's assets, except for the Existing Lender Priority Collateral, in accordance with the terms of the Intercreditor Agreement ("**Capital Funding Priority Collateral**").

## IV.    THE INTERCREDITOR AGREEMENT

23.    The relative rights of the Existing Lender, Capital Funding, the Landlord and the Debtor are governed by that certain Intercreditor Agreement, dated as of December 12, 2017 (the "**Intercreditor Agreement**").

24.    Pursuant to section 2.1(a) of the Intercreditor Agreement, the Existing Lender has a first priority security interest in the Existing Lender Priority Collateral to secure the Pre-Petition Obligations and Capital Funding has subordinated to Existing Lender's security interest Capital Funding's security interest in the Existing Lender Priority Collateral.

25.    Pursuant to section 2.2(a) of the Intercreditor Agreement, Capital  Funding has a first priority security interest in Capital Funding Priority Collateral to secure the FHA Obligations

and the Existing Lender has subordinated to Capital Funding Existing Lender's security interest, if any, in the Capital Funding Priority Collateral to secure the FHA-Insured Loan.

26.     Finally, pursuant to section 4.3 of the Intercreditor Agreement, in the event of the commencement of a bankruptcy case by the Debtor, the Existing Lender has the non-exclusive option to continue to provide financing to the Debtor if the Existing Lender deems such financing to be in its best interests.   The subordination and lien priority provisions in the Intercreditor Agreement continue to apply to all Existing Lender Priority Collateral arising on the commencement and during the pendency of this Chapter 11 Case pursuant to the terms of the Intercreditor Agreement.

V.     **THE CHAS BLALACK LOAN AND SECURITY AGREEMENT**

27.     On November 9, 2018, the Debtor and Chas B. Blalack (**"Mr. Blalack"**) entered into that certain Loan and Security Agreement (the **"Blalack Loan Agreement"**) whereby the Debtor acknowledged: (i) that Mr. Blalack advanced an aggregate sum of Two Million Five Hundred Seven Thousand Nine Hundred Ninety-Seven Dollars ($2,507,997.00) to the Debtor plus accrued interest in the amount of Three Hundred Twenty-Six Thousand Six Hundred Twenty-Nine Dollars and Eighty Cents ($326,629.80); and (ii) that the balance of such loans, including interest on such loans accruing at the Debtor's borrowing rate, was Two Million Eight Hundred Thirty-Four Thousand Six Hundred Twenty-Six Dollars and Eighty Cents ($2,834,626.80) (the **"Blalack Loan"**).  The Blalack Loan was advanced by Mr. Blalack to fund continued operations to ensure residents would continue to receive the care they needed during the strike and thereafter.  Interest on the Blalack loan accrues at a rate of eight (8%) percent per annum and is secured by a junior lien on all of the Debtor's assets.  To further aid in easing the liquidity crisis the strike caused,

Stone Barn and SBM also voluntarily agreed to defer $1,497,023.86 in management fees for operating the Facility.

<u>**TERMS AND CONDITIONS OF THE DIP FACILITY**</u>

I.    **HIGHLIGHTED PROVISIONS UNDER BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2.**

28.    The following chart contains a summary of the essential terms of the proposed DIP Facility in accordance with Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B) and Local Rule 4001-2.[3]

| Description | Summary of Material Terms |
|---|---|
| Borrower | Cedar Haven Acquisition, LLC |
| Guarantor | Stone Barn Holdings, LLC |
| DIP Lender and Agent | Capital Finance, LLC |
| Commitment | A super-priority, secured, debtor-in-possession credit facility consisting of a revolving credit facility with a maximum credit amount of $3,000,000.00 which shall be available on an interim basis subject to the terms of the Interim Order and the Budget. |
| Interest Rate | The outstanding principal balance of the DIP Facility shall bear interest at the rate of 30-day LIBOR plus 4.75% per annum. |
| Term | All DIP Obligations will be due and payable in full in cash on the earliest date to occur (the "**Maturity Date**") of (i) December 1, 2019; (ii) the effective date of a Plan; (iii) consummation of a sale of substantially all assets of the Debtor; (iv) thirty-five (35) days after the Petition Date if the Final Order has not been entered in the Chapter 11 Case on or prior thereto; and (v) the date on which the maturity of the Post-Petition Obligations is accelerated in accordance with the DIP Financing Agreement. |
| Use of DIP Facility and Cash Collateral | To (i) refinance the Revolving Credit Facility, (ii) fund certain fees and expenses associated with the DIP Facility, and (iii) to pay for working capital, operating expenses and other general corporate purposes incurred by the Debtor during the Chapter 11 Case and set forth in the Budget. |

---

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the Interim Order or any documents referenced. To the extent that anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined shall have the meanings ascribed to them in the DIP Financing Documents or the Interim Order, as applicable.

| Description | Summary of Material Terms |
|---|---|
| | Advances under the DIP Facility ("**DIP Loan**") would be available up to a maximum amount outstanding at any one time equal to (i) the lesser of (A) the Maximum Credit Amount, and (B) the amount of the Postpetition Borrowing Base, <u>minus</u> (ii) the aggregate amount of the Revolving Credit Facility (the "**DIP Availability**").<br><br>All proceeds of DIP Collateral coming into the possession or control of the Debtor or the DIP Lender (whether cash or other property) shall be applied to reduce the Revolving Credit Facility (otherwise referred to a "**Gradual Roll-up**"). |
| Fees | Unused Line Fee (as that term is defined in the Existing Loan Agreement) of 3/100 percent (0.03%) of the difference between the Revolving Loan Commitment (as that term is defined in the Existing Loan Agreement) and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations (as that term is defined in the Existing Loan Agreement) for each month, as further provided in the Existing Loan Agreement.<br><br>A Closing Fee in the amount of $22,500.00, which shall be paid the date of the entry of the Interim Order.<br><br>An Exit Fee in the amount of $22,500.00, which shall be paid on the Commitment Termination Date.<br><br>A Collateral Fee to the Agent in an amount equal to (i) the average daily balance of the sum of the Revolving Loan Outstanding (as that term is defined in the Credit Agreement) during the preceding month, multiplied by (ii) 42/1,000 percent (0.042%) per month.  Such fee is to be paid monthly in arrears on the first day of each month. |
| Conditions of Borrowing | Certain customary conditions precedent to extensions of credit, including, among other things, (a) execution of loan documents, (b) entry of the DIP Orders, (c) payment of certain fees, (d) the conditions precedent to make such loans and advances under the DIP Financing Documents and the Pre-Petition Financing Documents have been satisfied in full or waived by Agent and Lender in their sole discretion, (e) receipt of Budget, and (f) no Default or Event of Default shall have occurred or be existing. |
| Budget | Use of Cash Collateral and proceeds from the DIP Facility are subject to a customary Budget attached to the Interim Order. |
| Reporting Information | The Debtor shall provide to the DIP Lender financial statements, reports, certificates, and all other items and information required by the Existing Loan Agreement and the Pre-Petition Financing Documents as and when required to be delivered to the Existing Lender thereunder.<br><br>Following delivery of the Budget, and each week thereafter during the Chapter 11 Case, the Debtor shall deliver to the DIP Lender an updated |

| Description | Summary of Material Terms |
|---|---|
|  | 13-week cash flow forecast, in each case, in form and substance satisfactory to the DIP Lender (the "**Weekly Cash Flow Forecast**") for the subsequent 13-week period consistent with the form of the Budget.<br><br>Beginning on the second Tuesday following the Closing Date, and on each Tuesday following, a variance report (the "**Variance Report**") setting forth actual cash receipts and disbursements of the Debtor for the prior week and setting forth all the variances, on a three-week line-item and aggregate rolling basis, from the amount set forth for such week as compared to (1) the Budget on a weekly and cumulative basis, and (2) the most recent Weekly Cash Flow Forecast (as applicable) delivered by the Debtor, in each case, on a weekly and cumulative basis. |
| Variance Covenant | Debtor shall adhere to the Budget, subject to Permitted Variances. "**Permitted Variances**" means (i) all favorable variances, (ii) an unfavorable variance of no more than 10.0%. |
| Chapter 11 Milestones | Obtain the Bankruptcy Court's approval of (x) the Interim Order within three (3) business days of the Petition Date, and (y) the Final Order within thirty-five (35) days after the Petition Date. |
| Liens and Priorities | The DIP Liens shall be (i) subject and subordinate to any valid, perfected prior liens and security interests existing as of the Petition Date in favor of any third-party creditor (other than the Existing Lender) to the extent such perfected prior lien is senior to the liens of the Existing Lender securing the Existing Obligations, and (ii) subject to the Carve Out, by first priority senior and priming liens and security interests.  The DIP Collateral shall include, upon entry of the Final Order, Avoidance Actions and proceeds of Avoidance Actions.<br><br>The DIP Obligations shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a claim having priority over any or all administrative expenses of the kind specified in, among other sections, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code (the "**DIP Super-Priority Claim**"), subject only to the Carve Out.<br><br>Subject to the entry of the Final Order, the DIP Super-Priority Claim shall be payable from any claims or causes of action arising under chapter 5 of the Bankruptcy Code or any applicable state fraudulent transfer statutes (together, "**Avoidance Actions**") and any proceeds thereof. |
| Events of Default | The DIP Facility shall be subject to the events of default applicable to the Loan Parties and their respective subsidiaries contained in the Existing Loan Agreement, and those events of default listed in the DIP Financing Agreement (each, an "**Event of Default**"). |

| Description | Summary of Material Terms |
|---|---|
| Carve-Out | "**Carve-Out**" means an amount equal to the sum of the following expenses: (A)(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000.00; and (iii) to the extent allowed by the Bankruptcy Court at any time, all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any official committee within the amounts set forth in the Budget at any time before or on the date and time of the delivery by the DIP Lender of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice and not otherwise payable from any retainers; and (B) after the date and time of the delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any official committee of creditors in an aggregate amount not to exceed $50,000.00. |
| 506(c) Waiver | Upon entry of a Final Order providing for such relief, except for the Carve-Out, no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Case at any time shall be charged against the DIP Lender or any of its claims or liens (including any claims or liens granted pursuant to the Interim Order) or the DIP Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code, or otherwise. |
| Section 552(b) Waiver | Upon entry of a Final Order providing for such relief, the Existing Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply to the Existing Lender with respect to proceeds, products, offspring, or profits of any of the Existing  Lender Priority Collateral. |
| Stipulations to Prepetition Liens and Claims | The Debtor stipulates and acknowledges (i) the amount and validity of the obligations under the Existing Loan Agreement, and (ii) that the Debtor has no offsets, defenses or counterclaims to the indebtedness under the Existing Loan Agreement. |

| Description | Summary of Material Terms |
|---|---|
| Adequate Protection | In consideration of any diminution in the value of the Existing Lender's interests in the Existing Lender Priority Collateral (including Cash Collateral) as a result of (i) the Debtor's use, sale or lease of the Existing Lender Priority Collateral (including Cash Collateral) during the Chapter 11 Case, (ii) the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code, and/or (iii) the Carve-Out ("**Diminution in Value**"), the Existing Lender shall receive adequate protection in the form of, among other things, (i) current payment of all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Existing Lender (ii) replacement liens on the Existing Lender Priority Collateral, junior only to the Carve-Out and the DIP Liens (the "**Adequate Protection Liens**"), (iii) superpriority administrative expense claims under sections 503 and 507(b) of the Bankruptcy Code with priority in payment over all other administrative expenses of the estate, to the extent that the Adequate Protection Liens are insufficient to compensate the Existing Lender for Diminution in Value, subject and subordinate only to the Carve-Out, the DIP Liens, and the DIP Super-Priority Claim (the "**Adequate Protection Super-Priority Claims**"), (iv) access to the Debtor's books and records and such financial reports as are provided to the DIP Lender, (v) the Gradual Roll-up, (vi) timely payments of principal and interest in respect of the Pre-Petition Obligations as set forth in the Existing Loan Agreement, and (vii) the determination of liens and claims and release provided in the Investigation Rights section.<br><br>Subject to the terms of the Intercreditor Agreement and solely to the extent of the diminution of the value of the interests of Capital Funding and Landlord in their collateral, Capital Funding and Landlord shall have and be granted replacement liens and superpriority administrative expense claims as set forth in the Interim Order. |
| Waiver/Modification of the Automatic Stay | The automatic stay imposed by section 362 of the Bankruptcy Code otherwise applicable to the DIP Lender shall be modified so that five (5) business days after the date a Termination Notice is delivered (the "**Remedies Notice Period**") the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Documents and the Orders to satisfy the DIP Obligations, the DIP Super-Priority Claim, and the DIP Liens. |
| Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens | All liens authorized and granted pursuant to the Interim Order or the Final Order entered by the Bankruptcy Court approving the DIP Facility or with respect to adequate protection shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to affect such perfection. |

| Description | Summary of Material Terms |
|---|---|
| Releases | Subject to the effect of the Interim Order: Debtor agrees that there does not exist (or to the extent there does exist, Debtor hereby waives and releases) any defense or right of set-off, recoupment or counterclaim to the payment when due of those amounts due under the Loans or any of the other Pre-Petition Obligations, and that there does not exist (or to the extent there does exist, Debtor hereby waives and releases) any other claim against the Agent and/or the Lender with respect to the Notes, the Pre-Petition Obligations, or otherwise.<br><br>Debtor will release, acquit and forever discharge each of the Agent, the Lender, its respective officers, employees, and agents, from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of services, expenses and compensation whatsoever, which now have or which may hereafter accrue on account of or in any way arise out of or resulting from the Obligations, Financing Documents, any of the transactions, duties or obligations arising under or relating to the Obligations or the other Financing Documents or which now have or which may hereafter accrue on account of or in any way arise out of or resulting from any other agreements, transactions, duties or obligations, or facts whatsoever, whether related to the Obligations, Financing Documents or otherwise, and whether arising in contract or tort, in law or in equity as set forth in Article II of the DIP Financing Agreement. |
| Indemnification | The Debtor shall indemnify and hold harmless the Agent and DIP Lender, and reimburse all expenses of the Agent and DIP Lender, all in accordance with the terms and conditions of the Existing Loan Agreement and the Pre-Petition Financing Documents. |
| Liens on Avoidance Actions | Liens on avoidance actions shall attach subject to entry of a Final Order providing for such relief. |
| Challenge Period | No later than (a) sixty (60) calendar days after the date of the Committee's formation, or (b) seventy-five (75) calendar days after entry of the Interim Order for any other party in interest (the "**Investigation Period**"), and (ii) the Bankruptcy Court enters a final, non-appealable judgment in favor of the plaintiff or movant against the Existing Lender in any such timely and properly commenced proceeding. |

## RELIEF REQUESTED

29.     By this motion, the Debtor requests entry of the Interim Order and Final Order authorizing the Debtor to enter into the DIP Facility.  More specifically, the Debtor seeks authority to:

a.      permit the Debtor, pursuant to and upon the entry of an Interim Order in form and substance acceptable to DIP Lender, to borrow funds under the DIP Facility in accordance with the Budget on an interim basis;

b.      permit the Debtor, pursuant to and upon entry of a Final Order in form and substance acceptable to DIP Lender, to borrower up to a maximum aggregate amount of $3,000,000.00 under the DIP Facility in accordance with the Budget;

c.      grant first priority priming liens under, as applicable, section 364(d) of the Bankruptcy Code on all assets of the Debtor that are subject to liens granted under the Pre-Petition Financing Documents, and including, subject to entry of the Final Order, any proceeds of, or property and interests recovered in respect of, claims or causes of action of the estate, including those arising under sections 544, 545, 547, 548, and 549 of the United States Bankruptcy Code excluding any specified assets that are subject to a valid and perfected lien, not otherwise subject to avoidance, in favor of a third party which lien existed as of the date the Chapter 11 Case commenced (the "**Prior Permitted Senior Liens**"); provided, however, DIP Lender shall be granted a junior lien in such assets pursuant to section 364(c)(3) of the Bankruptcy Code.  Any property of the estate that is not unencumbered by a Prior Permitted Senior Lien as of the Petition Date, shall become subject to a lien in favor of the DIP Lender pursuant to section 364(c)(2) of the Bankruptcy Code, subject and subordinate to the Carve-Out (as defined below).  All of the foregoing liens to be granted pursuant to section 364 of the Bankruptcy Code shall be referred to collectively as the "**DIP Liens**" and all collateral subject to such DIP Liens, the "**DIP Collateral**";

d.      grant pursuant to section 364(c)(1) of the Bankruptcy Code, the obligations under the DIP Facility shall be entitled to allowed superpriority administrative expense claim status in the Chapter 11 Case (the "**DIP Super-Priority Claim**") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 326, 330, 331, 364(d), 503(b), 506, 507(a), 507(b), 726 or any other provision of the Bankruptcy Code, subject and subordinate to the Carve-Out (as defined below);

e.      use "cash collateral" (as such term is defined in section 363 of the Bankruptcy Code) (the "**Cash Collateral**") subject to the consent of the DIP Lender;

f.      grant adequate protection to the Existing Lender, Capital Funding and Landlord in the form of replacement liens and superpriority claims as set forth in the Interim Order;

g.      modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Documents and the Interim Order and the Final Order;

h.      waive any applicable stay, including under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order; and

i.    pursuant to Bankruptcy Rule 4001, set a date for a hearing to consider entry of the Final Order, authorizing and approving the transactions described herein on a final basis.

## THE DEBTOR HAS AN IMMEDIATE NEED FOR CASH

29.    As noted above, the Debtor proposes to use the DIP Facility and Cash Collateral to provide resident care, satisfy employee wages, employee benefits, certain other operational expenses as set forth in the Budget, and to fund administration of this Chapter 11 Estate.  Without access to the DIP Facility and Cash Collateral to satisfy these obligations, the Debtor will have insufficient funds to provide for: (i) resident welfare, care and safety; (ii) pay wages for their employees; (iii) preserve and maximize the value of its estate; and (iv) administer this Chapter 11 Case through a reorganization process.  Thus, the Debtor's access to the DIP Facility and Cash Collateral is critical to the continued operation of the Debtor's business as a going concern for the benefit of all stakeholders.  Absent approval of the Interim Order, the Debtor will not have access to the DIP Facility or the Cash Collateral necessary to fund administration of this chapter 11 estate, causing immediate and irreparable harm to the Debtor's estate to the detriment of all residents, stakeholders and other parties-in-interest.

## ALTERNATIVE SOURCES OF FINANCING ARE NOT READILY AVAILABLE

30.    The Debtor does not believe that alternative sources of financing are readily available due to the Debtor's capital structure and their inability to obtain a commitment from other potential lenders to provide debtor-in-possession financing.  Substantially all of the Debtor's assets are encumbered by liens arising under the Existing Loan Agreement and the Operating Lease.  As a result, the Debtor does not believe that third-party debtor-in-possession financing would be reasonably available given the Debtor's existing capital structure.

31.    Indeed, the Debtor, after consulting its advisors, believes that because any potential sources of financing have insisted on priming the Existing Lender and Capital Funding

(collectively, the "**Prepetition Secured Parties**"), such outside financing is not a feasible option. Without the consent of the Prepetition Secured Parties, any attempts at non-consensual priming of the Prepetition Secured Parties' liens would likely involve a costly, extended and contested hearing. Moreover, any such outside financing would expose the Debtor to the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.

32.     In contrast, the proposed DIP Facility offered by the DIP Lender will allow the Debtor to avoid the need to engage in a costly and time-consuming priming fight at the outset of this Chapter 11 Case. Accordingly, the Debtor believes that the DIP Facility provides, on balance, a more attractive postpetition financing proposal than alternative postpetition financing obtained from a third-party. Further, the DIP Facility is the product of extensive good faith, arms'-length negotiations with the DIP Lender and is essential to continue to provide resident care and continue to operate as a going concern.

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

33.     In accordance with Local Rule 4001-2, the following provisions of the DIP Facility are highlighted below. As discussed in detail herein, the Debtor believes that these provisions are reasonable in light of the facts and circumstances of this Chapter 11 Case and should be approved.

     a.    **Local Rule 4001-2(a)(i)(A) — *Cross-Collateralization Protection*.** The DIP Orders do provide a "Gradual Roll-up" feature that is common for revolving loans but do not provide for cross-collateralization protection (other than replacement liens or other adequate protection) to the Prepetition Secured Lenders. See Interim Order, ¶ F, H, 4(c).

     b.    **Local Rule 4001-2(a)(i)(B) — *Challenge Period*.** The Challenge Period under the DIP Facility for any party-in-interest (other than the Debtor, which has waived any Challenge rights) is the period that terminates sixty (60) days after the appointment of the Committee, if any, but in no event later than seventy-five (75) calendar days from entry of the Interim Order for any other party in interest (the "**Investigation Period**"). Notwithstanding the foregoing, if the Chapter 11 Case is converted to a case

under chapter 7 of the Bankruptcy Code or if a chapter 11 trustee is appointed in the Chapter 11 Case prior to the expiration of the Investigation Period, then any chapter 7 trustee or chapter 11 trustee, as applicable, shall have (i) until the later of the expiration of the Investigation Period and the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Chapter 11 Case to chapter 7, as applicable, to bring any such Challenge, and (ii) if a Committee has asserted a Challenge prior to the expiration of the Investigation Period, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such a Challenge. *See* Interim Order, ¶ 9.

c.      **Local Rule 4001-2(a)(i)(C) — *506(c) Waiver*.** Subject to entry of the Final Order that provide such relief, the DIP Collateral shall not be subject to surcharge pursuant to section 506(c) of the Bankruptcy Code. *See* Interim Order, ¶ 12.

d.      **Local Rule 4001-2(a)(i)(D) — *Liens on Avoidance Actions*.** Upon entry of the Final Order that provide such relief, avoidance actions and proceeds of avoidance actions will constitute a portion of the DIP Collateral. *See* Interim Order, ¶ 4(e).

e.      **Local Rule 4001-2(a)(i)(E) — *Repayment Features*.** The DIP Facility includes a "Gradual Roll-up" feature wherein the application of the Cash Collateral will first be applied to pay down the Revolving Credit Facility. *See* Interim Order, ¶ *F, H, 4(c)*.

f.      **Local Rule 4001-2(a)(i)(F) — *Disparate Carve-Out Treatment*.** The DIP Orders do not provide for disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the Debtor with respect to the Carve-Outs.

g.      **Local Rule 4001-2(a)(i)(G) — *Nonconsensual Priming*.** The DIP Facility will provide the DIP Lender with *consensual* priming liens on the collateral currently secured by the existing liens of the Existing Lender. *See* Interim Order, ¶ *4(e)*.

h.      **Local Rule 4001-2(a)(i)(H) — *Section 552(b)(1)*.** The proposed waiver of "equities of the case" claims under section 552(b)(1) of the Bankruptcy Code will only be effective after entry of the Final Order providing for such relief. *See* Interim Order, ¶ 22(h).

## BASIS FOR RELIEF

I. **THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN POSTPETITION FINANCING THROUGH THE DIP FINANCING DOCUMENTS.**

A. **Entering into the DIP Financing Documents Is an Exercise of the Debtor's Sound Business Judgment**

34. The Court should authorize the Debtor, as an exercise of the Debtor's sound business judgment, to enter into the DIP Financing Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

35. Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

36.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm.  Mobil Oil Corp.  v. First Nat'l Bank & Trust Co.  (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the debtor offered by a proposed postpetition facility.  For example, in *In re Ion Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

37.     The Debtor's determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arms'-length process and careful evaluation of alternatives.  Specifically, and in the face of limited cash on hand, the Debtor and its advisors determined that the Debtor would require significant postpetition financing to support its operational and restructuring activities.  Accordingly, the Debtor negotiated the DIP Financing

Documents with the DIP Lender in good faith, at arms' length, and with the assistance of its advisors, and the Debtor believes that it has obtained the best financing available.

**B.     The Debtor Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

38.     The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c). *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

39.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

    b.     the credit transaction is necessary to preserve the assets of the estate; and

    c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Ames Dep't Stores*, 115 B.R. at 37-39; *see also In re St.  Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

40.     As described above, prior to negotiating the DIP Facility, the Debtor, together with its advisors, considered other sources of postpetition financing to determine whether the Debtor could obtain debtor-in-possession financing on better terms.  Based on current capital market conditions, after consultation with its advisors, the Debtor determined that postpetition financing on an unsecured basis would be unobtainable.  Without postpetition financing, the Debtor will not

be able to continue to provide for the welfare, care and safety of its residents.  Absent sufficient

financing to operate the Debtor's business during this Chapter 11 Case, the Debtor would be unable

to continue to provide services at the Facility to the detriment of all residents and other

stakeholders.  Given the Debtor's circumstances, the Debtor believes that the terms of the DIP

Facility, as set forth in the DIP Financing Documents, are fair, reasonable, and adequate, all as

more fully set forth herein.

41.     In the event that a debtor is unable to obtain unsecured credit, section 364(c)(1) of

the Bankruptcy Code provides that the debtor may obtain credit that is secured by an administrative

expense claim having priority "over any or all administrative expenses of the kind specified in

section 503(b) or 507(b) of [the Bankruptcy Code]."  As described above, the Debtor is unable to

obtain unsecured credit.  Therefore, approving the DIP Super-Priority Claim in favor of the DIP

Lender is reasonable and appropriate.  Further, subsections 364(c)(2) and (c)(3) of the Bankruptcy

Code provides that the debtor may obtain credit that is secured by lien on property of the estate

that is not otherwise subject to a lien or secured by a junior lien on property of the estate that is

subject to a lien.  As the Debtor is unable to obtain the critical financing that it needs to administer

this Chapter 11 Case from any other source, Debtor respectfully represents that granting DIP Liens

to the DIP Lender on unencumbered property and/or a junior lien basis is warranted under the

circumstances.

C.    **The Debtor Should Be Authorized to Obtain Postpetition
Financing Secured by First Priority Priming Liens**

42.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code,

courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or

equal in priority to existing liens on the encumbered property, without the consent of the existing

lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing

lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). Consent by the secured creditors to priming obviates the need to show adequate protection. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtor may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.

43.     Here, the Debtor seeks authority to enter into the DIP Facility, which will provide the DIP Lender with consensual priming liens only on collateral currently encumbered by their existing first priority liens on their Existing Lender Priority Collateral. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### D.     No Comparable Alternative to the DIP Facility Is Reasonably Available

44.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel,*

- 23 -

*Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

45.     Prior to the Petition Date, the Debtor explored other potential sources of financing to no avail.  The Debtor does not believe that alternative sources of financing are reasonably available.  Substantially all the Debtor's assets are encumbered by liens arising under their prepetition lending facilities.  Third-party debtor-in-possession financing was not a feasible option given the Debtor's existing capital structure.  Thus, the Debtor has determined that the DIP Facility provides the best option under the circumstances to fund this Chapter 11 Case, continue to operate the Facility for the benefit of the residents, and provides a clear path toward maximizing the value of the Debtor's assets for all stakeholders.  Therefore, the Debtor submits that the requirements of sections 364 of the Bankruptcy Code are satisfied.

### E.     <u>The Repayment Features of the DIP Facility is Appropriate</u>

46.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he

[Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

47.     The repayment function of the DIP Facility is a sound exercise of the Debtor's business judgment.  The DIP Facility is structured as a continuation of the prepetition asset-based Revolving Credit Facility, such that the Debtor's cash receipts are swept on a daily basis to pay down outstanding loans, and the Debtor is able to re-borrow loans, pursuant to the borrowing base limitations.  Continuing this prepetition practice, the DIP Facility contemplates applying proceeds from cash collected by the Debtor in the ordinary course of its operations, or cash generated from the DIP Collateral to pay down the Revolving Credit Facility under the Existing Loan Agreement, and then issuing new borrowings under the DIP Facility.  This structure allows the Revolving Credit Facility to be gradually "rolled-up" into the DIP Facility during the course of this Chapter 11 Case.  The DIP Lender has agreed to continue extending credit under the DIP Facility, even though they could not be compelled to do so on a postpetition basis, and, therefore, it is reasonable to allow the DIP Facility to continue to function in the same manner as the prepetition Revolving Credit Facility — paying down past loans with cash proceeds, and issuing new loans.

48.     The DIP Lender would not have agreed to extend postpetition financing without a roll-up or repayment of all of the Pre-Petition Obligations.  Finally, the Interim Order preserves the rights of other parties-in-interest, including any statutory committee of unsecured creditors, to investigate and challenge the validity, enforceability, perfection, and priority of the Pre-Petition Obligations and the liens and security interests granted in connection therewith, including the proposed Gradual Roll-up.

49.     Repayment of prepetition debt is a common feature in debtor-in-possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features on the first

day of the case. *See, e.g.*, *EveryWare Global, Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. April 10, 2015) (authorizing ABL DIP Facility providing for collection and payment related to ABL Collateral be first applied to pay down prepetition ABL Facility); *In re Tactical Intermediate Holdings, Inc.*, No. 14-11659 (KG) (authorizing $2.8 million DIP that included full roll-up of bridge loan in the approximate amount of $1 million pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013) (authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order).[4]

## II.    THE DEBTOR SHOULD BE AUTHORIZED TO USE THE CASH COLLATERAL.

50.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor-in-possession to use cash collateral with the consent of the secured party.  Here, the Existing Lender consents to the Debtor's use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and Final Order.

51.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-

---

[4]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion.  Copies of these orders are available on request of the Debtor's proposed counsel.

case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

52.    As described more fully herein and in the Interim Order, the Debtor proposes to provide the Existing Lender with adequate protection to protect against the postpetition diminution in value of the Existing Lender Priority Collateral, whether resulting from the use, sale, or lease of the Existing Lender Priority Collateral by the Debtor, the priming liens, or the imposition of the automatic stay, namely, the Adequate Protection Liens and Superpriority Claims. The Adequate Protection also includes financial reporting. Accordingly, the proposed Adequate Protection provisions are sufficient to protect the Existing Lender from any diminution in value to the Existing Lender Priority Collateral. In light of the foregoing, the Debtor submits, and the Existing Lender agrees, that the proposed Adequate Protection to be provided for the benefit of the Existing Lender is appropriate.

53.    Additionally, as more fully described in the Interim Order, the Debtor proposes to provide Capital Funding and Landlord, solely to the extent of the diminution of the value of the interests of each in their Collateral: (i) replacement liens in their Collateral to the same extent and priority that existed as of the Petition Date, which, subject to the Intercreditor Agreement, shall be junior only to the Post-Petition Liens, the Pre-Petition Replacement Liens, any liens permitted

under the Pre-Petition Financing Documents, the DIP Financing Documents, and the Carve Out; and (ii) an allowed superpriority administrative expense claim which shall have priority (except with respect to the DIP Superpriority Claim, the Pre-Petition Superpriority Claim and the Carve Out) in the Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims against the Debtor and its estate, now, pre-petition or hereafter arising, of any kind or nature of the kinds specified in or ordered pursuant to sections 503(b) or 507(b) of the Bankruptcy Code, and, if approved in the Final Order, Section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

54.     Thus, the Debtor's provision of the Adequate Protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of this Chapter 11 Case to ensure that the Debtor is able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties-in-interest and its estate.

## III.    THE DEBTOR SHOULD BE AUTHORIZED TO PAY THE FEES REQUIRED BY THE DIP LENDER UNDER THE DIP FINANCING DOCUMENTS.

55.     Under the DIP Financing Documents, the Debtor has agreed, subject to Court approval, to pay certain fees to the DIP Lender.  In particular, as noted above, the Debtor has agreed to pay:

      a.      an Unused Line Fee (as that term is defined in the Existing Loan Agreement) of 3/100 percent (0.03%) of the difference between the Revolving Loan Commitment (as that term is defined in the Existing Loan Agreement) and the average daily balance of the Revolving Loans plus the Letter of Credit Obligations (as that term is defined in the Existing Loan Agreement) for each month, as further provided in the Existing Loan Agreement;

      b.      a Closing Fee in the amount of $22,500.00, which shall be paid the date of the entry of the Interim Order;

     c.       an Exit Fee in the amount of $22,500.00, which shall be paid on the Commitment Termination Date; and

     d.       a Collateral Fee to the Agent in an amount equal to (i) the average daily balance of the sum of the Revolving Loan Outstanding (as that term is defined in the Credit Agreement) during the preceding month, multiplied by (ii) 42/1,000 percent (0.042%) per month. Such fee is to be paid monthly in arrears on the first day of each month.

56.     The fees associated with obtaining the DIP Facility are usual and customary and within the range of reasonableness.  Indeed, courts routinely authorize debtors to pay fees similar to those the Debtor proposes to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate. *See, e.g.*, *In re EveryWare Global Inc.*, No. 15-10743 (LSS) (Bankr. D. Del. April 8, 2015) (approving 1.0% backstop fee, 2.0% original issue discount, and exit conversion fee payable in the form of common stock in an amount equal to 10% of the pro forma common stock); *In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS) (Bankr. D. Del. May 12, 2010) (approving 3.75 percent DIP break-up fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar.  18, 2009) (approving 3.5 percent exit fee and 3.5 percent front-end net adjustment against each lender's initial commitment); *In re Dura Auto.  Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Jan.  30, 2008) (approving 2.5 percent fee related to refinancing and extending a postpetition financing facility).[5]  Accordingly, the Court should authorize the Debtor to pay the fees provided under the DIP Financing Documents in connection with entering into those agreements.

---

[5]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this motion. Copies of these orders are available upon request of the Debtor's proposed counsel.

## IV.    THE DIP LENDER SHOULD BE DEEMED A GOOD-FAITH LENDER UNDER SECTION 364(E).

57.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

58.    Here, the DIP Financing Documents are the result of the Debtor's reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain needed postpetition financing, and of extended arms' length, good-faith negotiations between the Debtor and the DIP Lender.  The terms and conditions of the DIP Financing Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    THE AUTOMATIC STAY SHOULD BE MODIFIED ON A LIMITED BASIS.

59.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtor to grant the liens and security interests contemplated by the DIP Financing Documents and proposed Interim Order.  The

proposed Interim Order further provides that, following the occurrence of an Event of Default (as

defined in the DIP Financing Documents), the automatic stay shall be vacated and modified to the

extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with

the DIP Financing Documents (other than in the case of certain rights and remedies that are subject

to a five (5) calendar day notice period), or applicable law.

60.     Stay modifications of this kind are ordinary and standard features of debtor-in-

possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair

under the circumstances of this Chapter 11 Case. *See, e.g.*, *In re Peak Broad.*, LLC, No. 12-10183

(PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination

event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012)

(modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401

LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns,

Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.    FAILURE TO OBTAIN THE IMMEDIATE INTERIM ACCESS TO THE DIP FACILITY AND CASH COLLATERAL WOULD CAUSE IMMEDIATE AND IRREPARABLE HARM.

61.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after

the service of such motion.  Upon request, however, the Court is empowered to conduct a

preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash

collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

62.     The Debtor requests that the Court hold and conduct a hearing to consider entry of

the Interim Order authorizing the Debtor from and after entry of the Interim Order until the Final

Hearing to use the Cash Collateral and to withdraw and borrow funds under the DIP Facility.  The

Debtor requires access to these funds prior to the Final Hearing and entry of the Final Order to be able to continue to operate, provide critical resident care and pay their administrative expenses. This relief will enable the Debtor to operate their business in a manner that will permit it to provide for the care, safety and welfare of their residents and preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estate and all parties-in-interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

63.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

64.     To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

65.     Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtor's twenty (20) largest unsecured creditors as identified on the voluntary petition; (c) the United States Attorney's Office for the District of Delaware; (d) the United States Attorney's Office for the Commonwealth of Pennsylvania; (e) counsel to the Existing Lender, Capital Finance, LLC, *Miles & Stockbridge P.C.*, 100 Light Street, Baltimore, Maryland 21202 (*Attn:* Joel E. Perrell, Jr., Esquire); (f) counsel to Capital Funding, LLC, Whiteford Taylor Preston LLP, (i) Seven Saint Paul Street, Suite 1500, Baltimore, Maryland 21202 (Attn: Edward U. Lee III, Esquire), and (ii) 200 First Avenue, Floor 3, Pittsburgh,

Pennsylvania 15222 (Attn: Daniel R. Schimizzi, Esquire); and (g) counsel to landlord, *Duane Morris LLP*, (i) 190 South LaSalle Street, Suite 3700, Chicago, Illinois 60603 (*Attn:* John R. Weiss, Esquire and Neville M. Bilimoria, Esquire), and (ii) 222 Delaware Avenue, Suite 1600, Wilmington, Delaware 19801 (*Attn:* Michael R. Lastowski, Esquire).  As this Motion is seeking "first-day" relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtor respectfully submits that no further notice of this Motion is required.

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Interim Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  August 2, 2019
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ William E. Chipman, Jr.*

William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
      degross@chipmanbrown.com
      olivere@chipmanbrown.com

*Proposed Counsel for Debtor and Debtor-in-Possession*