## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CEDAR HAVEN ACQUISITION, LLC,[1] | Case No. 19-11736 (JKS) |
| Debtor. | |

## COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF REORGANIZATION OF CEDAR HAVEN ACQUISITION, LLC

Dated:  February 25, 2022
        Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**
William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:        chipman@chipmanbrown.com
              desgross@chipmanbrown.com
              olivere@chipmanbrown.com

*Counsel for the Debtor and Debtor-in-Possession*

---

[1]   The Debtor in this case, along with the last four digits of the federal tax identification numbers, is Cedar Haven Acquisition, LLC (8400).  The mailing address for the Debtor is 590 South 5th Avenue, Lebanon, Pennsylvania 17042.

# Table of Contents

I.      Introduction...................................................................................................1
II.     Important Dates..............................................................................................2
III.    Definitions and Construction of Terms...........................................................3
        A.      Definitions.............................................................................................3
        B.      Interpretation; Application of Definitions and Rules of Construction...................12
IV.     Background and Disclosures...........................................................................13
        A.      General Background .............................................................................13
        B.      Events Leading to Commencement of the Chapter 11 Case....................18
        C.      The Chapter 11 Case..............................................................................20
        D.      Chapter 11 Plan Terms..........................................................................23
        E.      Summary of Treatment of Claims and Interests and Estimated Recoveries Under the Plan...................................................................................................26
        F.      Certain Federal Income Tax Consequences...........................................27
        G.      Certain Risk Factors to Be Considered .................................................29
        H.      Feasibility.............................................................................................31
        I.      Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement..............................................................................................31
        J.      Releases by the Debtor..........................................................................32
        K.      Administrative Expense Claims.............................................................33
        L.      Professional Fee Claims........................................................................33
        M.      Priority Tax Claims...............................................................................34
        N.      Statutory Fees.......................................................................................34
V.      Classification and Treatment of Claims and Interests ....................................34
        A.      Classification of Claims and Interests...................................................34
        B.      Treatment of Claims and Interests ........................................................35
        C.      Impaired Claims and Equity Interests...................................................37
        D.      Modification of Treatment of Claims and Equity Interests ...................37
        E.      Cramdown and No Unfair Discrimination..............................................37
VI.     Confirmation Procedures ..............................................................................37
        A.      Confirmation Procedures ......................................................................37
        B.      Solicitation and Voting Procedures .......................................................39
VII.    Provisions Regarding the GUC Administrator ...............................................41
VIII.   Provisions Governing Distributions Under the Combined Plan and Disclosure Statement.....................................................................................................42
IX.     Implementation and Effect of Confirmation of Combined Plan and Disclosure Statement.....................................................................................................45
X.      Executory Contracts and Unexpired Leases ..................................................51
        A.      Executory Contracts and Unexpired Leases ..........................................51
        B.      Rejection Claims...................................................................................51
        C.      Restrictions on Assignment Void ..........................................................52
        D.      Benefit Plans ........................................................................................52
        E.      Workers' Compensation and Insurance Programs..................................53
        F.      Debtor's Insurance Policies ..................................................................53
XI.     Conditions Precedent to Confirmation and the Effective Date........................53

A.     Conditions Precedent to Confirmation.................................................53
B.     Conditions Precedent to the Effective Date .......................................53
C.     Waiver of Conditions ...........................................................................54
D.     Effect of Nonoccurrence of Conditions .............................................54
XII.    Exculpation, Releases, and Injunctions ...........................................................54
A.     Injunction ..............................................................................................54
B.     Exculpation ............................................................................................55
C.     Estate Releases ......................................................................................55
XIII.   Retention of Jurisdiction ...................................................................................56
XIV.   Miscellaneous Provisions...................................................................................58
A.     Amendment or Modification of the Combined Plan and Disclosure Statement....58
B.     Exhibits/Schedules ...............................................................................58
C.     Plan Supplement ...................................................................................58
D.     Filing of Additional Documents .........................................................59
E.     Binding Effect of Plan .........................................................................59
F.     Governing Law ......................................................................................59
G.     Time ........................................................................................................59
H.     Severability ............................................................................................59
I.      Revocation .............................................................................................59
J.      Dissolution of the Committee .............................................................59
K.     Inconsistency..........................................................................................60
L.      No Admissions ......................................................................................60
M.    Reservation of Rights............................................................................60
N.     Compromise of Controversies ............................................................60
XV.    Recommendation ................................................................................................60

**PLAN EXHIBITS**

<u>Exhibit A</u>:    Term Sheet

<u>Exhibit B</u>:    Projections

<u>Exhibit C</u>:    Liquidation Analysis

## NOTICE

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED PLAN AND DISCLOSURE STATEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

## I.    INTRODUCTION[2]

The Debtor hereby proposes this Combined Plan and Disclosure Statement pursuant to sections 105, 1125, and 1129 of the Bankruptcy Code.  The Debtor is the "proponent" of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code.

In connection with the Debtor's efforts to sell its assets, on August 2, 2019, it commenced this Chapter 11 Case.  At the outset of this Bankruptcy Case, the Debtor filed the Sale Motion.  The Sale Motion initiated a marketing process that was designed to solicit interest in bids and culminate in an auction in an effort to maximize the value of the Debtor's assets for the benefit of the Debtor, its Estate and all parties-in-interest.

On January 16, 2020, the Bankruptcy Court entered the Sale Order.   In accordance with the Sale Order, the Debtor was working towards closing on the contemplated sale of certain assets to Allaire Health Care Services, LLC ("**Purchaser**"), however the Purchaser failed to close on the Sale and terminated the Sale agreement on June 2, 2020. Given the unexpected failure of the Purchaser to close on the Sale, the Debtor engaged SSG Advisors, LLC ("**SSG**") as investment banker to the Debtor to assist with marketing and selling the Debtor's assets.  The sale process was severely impacted due to the ongoing Covid-19 pandemic and negotiations with the Landlord.

Despite almost a year of marketing by SSG, the Debtor and SSG were unable to locate a buyer for the Debtor's assets.  Thereafter, the Debtor, the Committee, the Landlord and Stone Barn engaged in robust negotiations about the nature and terms of a transaction that would provide the maximum value to the Debtor's Estate and creditors.  As a result of these negotiations, the Debtor, with agreement of the Committee, decided to pivot from the marketing process and proceed instead with a reorganization under the terms of this Combined Plan and Disclosure Statement.

Implementation of the reorganization through Combined Plan and Disclosure Statement allows the Debtor and its Estate to achieve a number of benefits for the Debtor's residents and creditors, including: (i) saving significant costs that would have accrued in connection with the running of another lengthy sale process with uncertain results; (ii) shortening the duration of this Chapter 11 Case, and thus curtailing the continued accumulation of administrative expenses; (iii) providing for potential recoveries to unsecured creditors; (iv) rightsizing the Debtor's leasehold interest in the Debtor's facility; and (v) providing for the continued operation of the Debtor's facility and the ongoing care of its residents.

**Copies of this Combined Plan and Disclosure Statement and all other documents related to this Chapter 11 Case are available for review without charge through the Debtor's Claims and Noticing Agent's website at https://case.stretto.com/cedarhaven and with charge on the bankruptcy case website at https://www.pacer.gov/.**

---

[2]   All capitalized terms used but not defined in the Introduction shall have the meanings ascribed to them in Article II of the Combined Plan and Disclosure Statement.

The Combined Plan and Disclosure Statement constitutes a chapter 11 plan of reorganization for the Debtor. The Combined Plan and Disclosure Statement provides that on the Effective Date: (a) the Class 4 Landlord Claim will be allowed in the amount of $1,566,692.00 and satisfied in full pursuant to the Term Sheet (defined herein); (b) the Amended Lease will be assumed; (c) all property comprising the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, and other encumbrances; (d) the Equity Interests will be reinstated; and (e) the establishment of the GUC Pool, as discussed herein, and the appointment of the GUC Administrator. There are two (2) impaired classes identified in the Combined Plan and Disclosure Statement that are entitled to vote to accept the Combined Plan and Disclosure Statement: (i) Class 4 Landlord Claim, and (ii) Class 5 General Unsecured Claims. Class 4 and 5 are the only Classes entitled to vote on the Combined Plan and Disclosure Statement.

As provided in Article IV.E of the Combined Plan and Disclosure Statement, Class 4 will receive the treatment set forth in the Amended Lease and Term Sheet. The Combined Plan and Disclosure Statement also provides that each Holder of a General Unsecured Claim in Class V shall receive its Pro Rata share of the GUC Pool as set forth in this Combined Plan and Disclosure Statement. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter and at various intervals thereafter.

Each Holder of a Claim against the Debtor entitled to vote to accept or reject the Combined Plan and Disclosure Statement is encouraged to read the Combined Plan and Disclosure Statement in its entirety before voting.

Subject to the restrictions on modifications as set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and in this Combined Plan and Disclosure Statement, the Debtor expressly reserves the right to alter, amend, or modify the Combined Plan and Disclosure Statement one or more times before its substantial consummation.

## II.   IMPORTANT DATES

| | |
|---|---|
| Voting Procedures Hearing Objection Deadline | March 9, 2022 at 4:00 pm (ET) |
| Voting Procedures and Interim Disclosure Statement Hearing | March 16, 2022 at 1:00 p.m. (ET) |
| Voting Record Date | The date of entry of the Interim Approval and Procedures Order |
| Solicitation Commencement Date | Within five (5) business days after entry of the Interim Approval and Procedures Order |
| Deadline for Creditors to File Rule 3018 Motions | March 30, 2022 at 4:00 p.m. (ET) |

| Deadline for Debtor to Respond to Rule 3018 Motions | April 6, 2022 at 4:00 p.m. (ET) |
|---|---|
| Voting Deadline for the Combined Plan and Disclosure Statement | April 13, 2022 at 4:00 p.m. (ET) |
| Combined Plan and Disclosure Statement Objection Deadline | April 13, 2022 at 4:00 p.m. (ET) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Plan and Disclosure Statement | April 18, 2022 at 4:00 p.m. (ET) |
| Deadline to File Voting Tabulation Affidavit | April 18, 2022 at 4:00 p.m. (ET) |
| Combined Hearing | April 21, 2022 at 10:00 a.m. (ET) |

## III.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

"**Additional Rent**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Administrative Expense Bar Date**" means the date that is 30 days after the Effective Date.

"**Administrative Expense Claim**" means any right to payment constituting actual and necessary costs and expenses of preserving the Estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without limitation: (a) Professional Fee Claims, (b) any fees or charges assessed against the Estate under section 1930 of title 28 of the United States Code, and (c) all Claims arising under section 503(b)(9) of the Bankruptcy Code.

"**Affiliate**" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with reference to any Claim, proof of which was timely and properly Filed or, if no Proof of Claim was Filed, that has been or hereafter is listed by the Debtor on its Schedules as liquidated in amount and not disputed or contingent and, in each case, as to which: (a) no objection to allowance has been interposed within the applicable period fixed by the Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Bankruptcy Court; or (b) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order.

"**Amended Lease**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise.

"**Ballot**" means the voting form distributed to each Holder of an Impaired Claim entitled to vote on the Combined Plan and Disclosure Statement, on which the Holder is to indicate acceptance or rejection of the Combined Plan and Disclosure Statement in accordance with the voting instructions and make any other elections or representations required pursuant to the Combined Plan and Disclosure Statement.

"**Balloting Agent**" means Bankruptcy Management Solutions, Inc. d/b/a Stretto.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Case or, if such Court ceases to exercise jurisdiction over the Chapter 11 Case, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Case in lieu of the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Exception**" means the exception defined in Internal Revenue Code § 108(a).

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

"**Bar Date**" means, with respect to any particular Claim, the specific date established by the Bar Date Order or the Bankruptcy Court as the last day for filing Proofs of Claim against the Debtor or requests in the Chapter 11 Case for that specific Claim.

"**Bar Date Order**" means the *Order Establishing Deadlines for Filing Proofs of Claim and Proofs of Interests and Approving the Form and Manner of Notice Thereof* [Docket No. 135].

"**Bidding Procedures Order**" means the *Order (I) Scheduling a Hearing to Consider Approval of the Sale of Substantially All of the Debtor's Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures, Assumption and Assignment of Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 156].

"**Board**" means the Debtor's current and former Board of Directors.

"**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Capital Funding**" means Capital Funding, LLC.

"**Capital Funding Liens**" means Capital Funding's first priority Liens on substantially all of the Debtor's assets pursuant to that certain Operator Security Agreement dated as of

December 1, 2017, by and between the Debtor and the Capital Funding, and governed by the Intercreditor Agreement.

"**Cash Collateral**" has the meaning set forth in 11 U.S.C. § 363.

"**Cash**" means legal tender of the United States of America or equivalents thereof, including, without limitation, payment in such tender by check, wire transfer, or any other customary payment method.

"**Causes of Action**" means any Claim, cause of action, controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, or franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Case**" means the chapter 11 case initiated by the Debtor's filing on the Petition Date of a voluntary petition for relief in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Claims and Noticing Agent**" means Bankruptcy Management Solutions, Inc. d/b/a Stretto.

"**Claims Register**" means the official register of Claims maintained on https://www.pacer.gov/

"**Class**" means any group of substantially similar Claims or Equity Interests classified by the Combined Plan and Disclosure Statement pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**COD**" means cancellation of indebtedness.

"**Combined Plan and Disclosure Statement**" means this combined disclosure statement and chapter 11 plan of reorganization including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time.

"**Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee on August 20, 2019 [Docket No. 51].

"**Company**" means Cedar Haven Acquisition, LLC.

"**Confirmation Date**" means the date on which the Confirmation Order is entered on the Bankruptcy Court Docket in the Chapter 11 Case.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Hearing Notice**" means the notice of the Confirmation Hearing.

"**Confirmation Order**" means the Order of the Bankruptcy Court confirming the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

"**Confirmation**" means confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.

"**Creditor**" means any Person that is the Holder of a Claim against the Debtor.

"**Critical Vendors**" means certain vendors, suppliers, service providers, and other similar parties that are essential to maintaining the going concern value of the Debtor's business.

"**Debtor**" means the Debtor in the Chapter 11 Case: Cedar Haven Acquisition, LLC.

"**DIP Facility**" means the financing facility provided to the Debtor pursuant to the terms of the Final DIP Order.

"**DIP Facility Claims**" means all Claims asserted against the Debtor by the DIP Lender, including, without limitation, principal, accrued and unpaid interest, any reimbursement obligations (contingent or otherwise), all fees, expenses, and disbursements (including, without limitations, attorneys' fees, financial advisors' fees, and related expenses and disbursements incurred by, or on behalf of, the DIP Lender), indemnification obligations, all other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof.

"**DIP Lender**" means Capital Finance, LLC in its capacity as postpetition lender in the Chapter 11 Case.

"**DIP Liens**" means the senior secured superpriority liens granted to the DIP Lender in all of the Debtor's Assets under the Final DIP Order.

"**Disallowed**" means, when used in reference to a Claim, all or that portion, as applicable, of any Claim that has been disallowed under the Combined Plan and Disclosure Statement, the Bankruptcy Code, applicable law, or by Final Order.

"**Disputed**" means any Claim or Equity Interest, or any portion thereof, that is (a) listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been Filed, or (b) the subject of an objection or

request for estimation filed by the Debtor, the Reorganized Debtor, the GUC Administrator, or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order.

"**Distribution**" means any distribution to the Holders of Allowed Claims.

"**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

"**Effective Date**" means the date on which the conditions specified in Article XI of the Combined Plan and Disclosure Statement have been met or satisfied.

"**Effective Date Distributions**" means all the Distributions required to be made on the Effective Date of the Combined Plan and Disclosure Statement to the Holders of Claims that are Allowed as of the Effective Date.

"**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means all equity interests in the Debtor, including, but not limited to, all issued, unissued, authorized, or outstanding shares or membership interests together with any warrants, options, or contract rights to purchase or acquire such interests at any time.

"**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"**Excess Cash**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Excess Cash Procedures**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Exculpated Parties**" means the following Entities, each in their respective capacities as such, (a) the Debtor; (b) the Reorganized Debtor; (c) the Committee and its members; and (d) the Related Parties of each of the foregoing.

"**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between the Debtor and any other Person or Persons, specifically excluding contracts and agreements entered into pursuant to this Combined Plan and Disclosure Statement.

"**Exit Financing**" means [TBD].

"**File, Filed, or Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

"**Final Decree**" means the order entered pursuant to section 350 of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 5009-1 closing the Chapter 11 Case.

"**Final DIP Order**" means the *Final Order (a) Authorizing Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Claims, (c) Authorizing the*

*Use of Cash Collateral, (d) Granting Adequate Protection, (e) Modifying the Automatic Stay, and (f) Granting Related Relief* [Docket No. 102].

"**Final Order**" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has been entered on the docket in the Chapter 11 Case (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated and as to which (a) the time to appeal, petition for certiorari or move for a new trial, reargument or rehearing pursuant to Bankruptcy Rule 9023 has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was timely and properly appealed, or certiorari shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired.

"**First Day Declaration**" means the *Declaration of Charles B. Blalack in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3].

"**First Day Motions**" means the Debtor's motions filed upon the commencement of the Chapter 11 Case, Docket Nos. 4 through 13.

"**General Bar Date**" means December 2, 2019 at 5:00 p.m. (*prevailing* Pacific Time), as stated in the Notice of Entry of Order Establishing Bar Dates for Filing Proofs of Claim, filed on October 16, 2019 [Docket No. 138].

"**General Unsecured Claims**" means any unsecured Claim against the Debtor, which is not a Priority Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, DIP Facility Claim, First Lien Claim, Other Secured Claim, or the Landlord Claim, and is not entitled to a priority under the Bankruptcy Code or any order of the Bankruptcy Court.

"**Governmental Bar Date**" means January 29, 2020 at 5:00 p.m. (*prevailing* Pacific Time), which was the deadline for Governmental Units to file Proofs of Claim on account of pre-petition Claims against the Debtor.

"**Governmental Unit**" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"**GUC Administrator**" means the person appointed under Article VII of the Combined Plan and Disclosure Statement.

"**GUC Pool**" means up to $2,000,000, to be funded by the Reorganized Debtor through contributions of Retained Excess Cash from time to time on a quarterly basis, as further described in Article IV.D of the Combined Plan and Disclosure Statement.

"**Holder**" means the beneficial holder of any Claim or Interest.

"**HUD**" means the United States Department of Housing and Urban Development.

"**Impaired**" means, with respect to any Class, a Class that is impaired within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of December 12, 2017, between the Prepetition Lender, the Debtor, the Landlord and Capital Funding.

"**Interest**" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued, authorized or outstanding ownership interests (including common and preferred) or other equity interests, together with any warrants, options, convertible securities, liquidating preferred securities or contractual rights to purchase or acquire any such equity interests at any time and all rights arising with respect thereto.

"**Interim Approval and Procedures Order**" means the order of the Bankruptcy Court conditionally approving the Combined Plan and Disclosure Statement for solicitation purposes only and authorizing the Debtor to solicit the Combined Plan and Disclosure Statement.

"**IRS**" means the Internal Revenue Service.

"**Landlord**" means 590 South 5th Avenue, LLC.

"**Landlord Claim**" has the meaning set forth in Article V.B.4 of the Combined Plan and Disclosure Statement.

"**Lease**" means the Operating Lease dated as of December 1, 2017, by and between Landlord and the Company, as amended.

"**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

"**Other Priority Claim**" means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim, Administrative Expense Claim, or Professional Fee Claim.

"**Other Secured Claims**" means any Secured Claim other than the DIP Facility Claims including, without limitation, any claims of Capital Funding secured by the Capital Funding Liens.

"**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means August 2, 2019, the date on which the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"**Plan Documents**" means the Combined Plan and Disclosure State, and the Plan Supplement.

"**Plan Supplement**" means the appendix of schedules and exhibits to be Filed with the Bankruptcy Court on or before seven (7) days prior to the earlier of (a) the Voting Deadline, or (b) the deadline to object to confirmation of the Combined Plan and Disclosure Statement, unless otherwise ordered by the Bankruptcy Court, including, without limitation: (i) identification and compensation of the GUC Administrator; (ii) identification of the board for the Reorganized Debtor; (iii) retained Causes of Action; and (iv) the Exit Facility agreement.

"**Prepetition Lender**" means Capital Finance, LLC in its capacity as prepetition lender.

"**Priority Claims**" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than Administrative Expense Claims and Priority Tax Claims.

"**Priority Tax Claims**" means Claims of a Governmental Unit against the Debtor entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code or specified section of section 502(i) of the Bankruptcy Code.

"**Pro Rata**" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in the same Class.

"**Professional Fee Claims Bar Date**" means the date that is 30 days after the Effective Date for Professional Fee Claims to be filed.

"**Professional Fee Claims**" means all Claims for compensation and reimbursement of expenses by Professionals to the extent Allowed by the Bankruptcy Court.

"**Professional**" means any professional Person employed in the Chapter 11 Case pursuant to section 327, 328, 363, or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court who is to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

"**Proof of Claim**" means a proof of Claim Filed against the Debtor in accordance with the Bar Date Order or any other Order by the Court requiring for the fixing of Claims.

"**Rejection Bar Date**" means the deadline for filing any Rejection Claims, which is the later of (i) the General Bar Date, (ii) thirty (30) days after entry of any order authorizing the rejection of an executory contract or unexpired lease, including any order confirming the Plan, or (iii) the date set forth in an order authorizing rejection of an executory contract or unexpired lease.

"**Rejection Claims**" means any Claim arising from, or relating to, the rejection of an executory contract or unexpired lease pursuant to section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected unexpired lease, by section 502(b)(6) of the Bankruptcy Code.

"**Release by Debtor**" means the release given by the Debtor to the Released Parties as set forth in Article XII.

"**Related Parties**" means, with respect to any Person or Entity, such Person's or Entity's current and former direct or indirect subsidiaries and affiliates and each of their respective current and former stockholders, members, limited partners, general partners, equity holders, directors, managers, officers, employees, agents, designees, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives.

"**Released Parties**" means the following Entities or Persons, each in their respective capacities as such, (a) the Debtor and Reorganized Debtor; (b) the DIP Lender; (c) the Committee and its members; (d) the Landlord; (e) Charles B. Blalack; (f) Stone Barn; (g) Stone Barn Management; and (h) the Related Parties of the foregoing.

"**Reorganized Debtor**" means the Debtor, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"**Retained Excess Cash**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Rule 3018 Motion**" means a motion for temporary allowance of a claim for the purpose of voting on this Combined Plan and Disclosure Statement.

"**Sale Motion**" means the *Debtor's Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief, and (II) an Order Approving the Sale of the Assets* [Docket No. 124].

"**Sale Order**" means the *Order (I) Authorizing the Assumption, Assignment and Sale of Certain Assets to Allaire Health Services, LLC and/or its Designated Subsidiary or Affiliate Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [Docket No. 239].

"**Sale**" means the sale of the Acquired Assets pursuant to the APA from the Debtor to Purchaser as approved by the Sale Order.

"**Schedules**" means the schedules of assets and liabilities, the list of Holders of Equity Interests, and the statements of financial affairs Filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto.

"**Secured Claims**" means Claims which are: (a) secured by a valid and perfected lien in collateral which is enforceable pursuant to applicable law, the amount of which is equal to or less than the value of such collateral (i) as set forth in this Combined Plan and Disclosure Statement, (ii) as agreed to by the Holder of such Claim and the Debtor, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code; or (b) subject to a valid right of setoff under section 553 of the Bankruptcy Code.

"**Security Deposit**" has the meaning set forth in Article IV.D of the Combined Plan and Disclosure Statement.

"**Solicitation Package**" means the packages to be distributed to creditors for solicitation of votes on this Combined Plan and Disclosure Statement.

"**Statutory Fees**" means all fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, and any interest thereupon.

"**Stone Barn**" means Stone Barn Holdings, LLC.

"**Stone Barn Management**" means Stone Barn Management, LLC.

"**Tax Code**" means the Internal Revenue Code, as amended.

"**Term Sheet**" means the Term Sheet for Amendment and Assumption of Lease, dated as of January 24, 2022, between the Landlord and the Debtor.

"**Treasury Regulations**" means the regulations, including temporary regulations or any successor regulations, promulgated under the United States Internal Revenue Code, as amended from time to time.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

"**Unclaimed Distribution Deadline**" means ninety (90) days from the date the Debtor makes a Distribution of Cash or other property under the Combined Plan and Disclosure Statement to a holder of an Allowed Claim.

"**Unexpired Lease**" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Voting Classes**" means Class 4 and Class 5.

"**Voting Deadline**" means April 13, 2022 at 4:00 p.m. (Eastern Time).

"**Voting Record Date**" means the date established by the Bankruptcy Court pursuant to the Interim Approval and Procedures Order.

### B.    Interpretation; Application of Definitions and Rules of Construction

The following rules of construction, interpretation, and application shall apply:

(1)    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.

(2)    Unless otherwise specified, each section, article, schedule, or exhibit reference in the Combined Plan and Disclosure Statement is to the respective section in, article of, schedule to, or exhibit to the Combined Plan and Disclosure Statement.

(3)     The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained in the Combined Plan and Disclosure Statement.

(4)     The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Combined Plan and Disclosure Statement.

(5)     A term used herein that is not defined herein but that is used in the Bankruptcy Code shall have the meaning ascribed to that term in the Bankruptcy Code.

(6)     The headings in the Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of the Combined Plan and Disclosure Statement.

(7)     Unless otherwise provided, any reference in the Combined Plan and Disclosure Statement to an existing document, exhibit, or schedule means such document, exhibit, or schedule as may be amended, restated, revised, supplemented, or otherwise modified.

(8)     In computing any period of time prescribed or allowed by the Combined Plan and Disclosure Statement, the provisions of Bankruptcy Rule 9006(a) shall apply.

## IV.     BACKGROUND AND DISCLOSURES

On the Petition Date, the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code and, since that date, has operated as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### A.     General Background[3]

### 1.     The Debtor's Business as of the Petition Date

The Debtor is a Licensed Skilled Nursing Facility located in Lebanon, Pennsylvania, that offers professionally supervised nursing care and related medical and health services to persons whose needs are such that they can only be met in a nursing facility on an inpatient basis because of age, illness, disease, injury, convalescence or physical or mental infirmity.  The Company is known for its experienced team, high-quality care, therapeutic success, and friendly atmosphere. For individuals in need of skilled nursing home care after a hospital stay, when recovering from the onset of sudden illness or injury, after surgery, or for chronic disease management, care is provided 24-hours-a-day, 7-days a week.

---

[3]     Further information regarding the Debtor's business, assets, capital structure, and the circumstances leading to the filing of this Chapter 11 Case is set forth in detail in the First Day Declaration, which is incorporated by reference herein.  Copies of the First Day Declaration and all other filings in the Chapter 11 Case can be obtained (and viewed) free of charge at the following web address: **https://case.stretto.com/cedarhaven.**

The Company, as it exists today, was formed in 2014 through the sale of Cedar Haven Healthcare Center by the Lebanon County Commissioners to Cedar Haven. The Company is one of many privatized formerly county-owned skilled nursing facilities in Pennsylvania. Since the Company has come under new ownership, the quality of clinical care has improved, and the number of employees and employee wages have increased.

The Company is an integral part of the community in which it sits. In addition to much needed healthcare facilities and services for every level of resident need, the Company is an important trading partner with over fifty (50) vendors and other entities that partly rely on the Company for their livelihoods. In short, the Company is an important economic engine for the greater Lebanon, Pennsylvania region. Moreover, at any given time, the Company employs approximately two hundred eight-five (285) mostly-skilled employees. These employees rely on the Company for their livelihoods and the Company relies on these incredible employees to act in a professional manner. The lifeblood of Cedar Haven is its employees and the work they do each day to ensure each resident's health, safety, and welfare.

The Company's policy is to admit persons who require the provision of inpatient services that are needed on a daily basis, ordered by and provided under the direction of a physician, and which require the skills of and are furnished directly by or under the supervision of technical or professional personnel, such as, registered nurses, licensed practical nurses, physical therapists, occupational therapists, speech pathologists, *etc*.

Cedar Haven offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services. Cedar Haven is a 324 licensed bed facility located at 590 South 5th Avenue, Lebanon, Pennsylvania. (the "**Facility**").

The life care benefits that the Company provides include: (i) skilled nursing, (ii) memory care, (iii) short-term rehabilitation, (iv) in-house therapy, (v) respite care, and (vi) hospice care.

    a.  **Skilled Nursing**. The Facility provides skilled nursing care for those requiring home care following a hospital stay, sudden illness or injury, surgery, or related to chronic disease management.

    b.  **Memory Care**. The Facility's memory care unit provides excellent care for individuals challenged by Alzheimer's, dementia, and other forms of memory loss.

    c.  **Short-term Rehab & In-house Therapy**. The Facility's therapy department is comprised of modern facilities and over twenty (20) certified therapists who assist both long- and short-term residents with their physical, speech, and occupational therapy goals.

    d.  **Respite Care**. Cedar Haven provides Respite Services for caregivers who need temporary, short-term care for their loved ones in a nurturing and fun environment.

e. **Hospice Care**.    Cedar Haven provides high-quality care to residents during many phases of life, including treatment for terminal illness and compassionate end-of-life care.    The Facility's staff has a rich history of providing supportive and dignified care to its community.    Our team supports our residents and their families to improve quality of life and provide the best possible care.

As of the Petition Date, the Facility employed approximately five hundred (500) employees (the "**Employees**").  The Employees include (i) registered nurses, licensed practical nurses and certified nursing assistants; (ii) physicians; (iii) physical, occupational, and speech therapist; and (iv) social service, activities, housekeeping, laundry, maintenance, dietary, and administrative staff.  The Employees are retained on a full-time, part-time, or casual basis, all of whom are all located in the greater Lebanon, Pennsylvania area.

Cedar Haven's nursing department includes highly skilled Registered Nurses, Licensed Practical Nurses and Certified Nursing Assistants.  The nursing team is available 24-hours a day to assist with resident medications, wound care, and the activities of daily living.  Cedar Haven's team of physicians is led by its medical director.  Physicians are on-site six days a week and are available on-call as needed.  Cedar Haven's therapy department has approximately twenty-six (26) certified therapists who assist the Facility's long and short-term residents with their physical, occupational, and speech therapy goals.  The therapy team also works with families and caregivers to provide training and support for a safe discharge.

As of the Petition Date, the Company had 294 residents, consisting of 259 Medicaid residents, 21 private pay residents, 11 Medicare residents, 2 HMO residents and 1 bed holds resident and its occupancy rate was 90.74%.  The Company currently has 175 residents, consisting of 149 Medicaid residents, 9 private pay residents, 13 Medicare residents, 4 HMO residents and 0 bed holds resident.  Based on the Company's 324 licensed beds, its current occupancy is 54%.

The Company receives most of its revenue from Medicaid reimbursements for the services it provides to its residents.  The Company also receives significant revenue from Medicare, Medicare Plan B, HMO insurers, other providers of private insurance.  The Company receives a small amount of revenue from its gift shop, Renova,[4] vending machines and bed tax revenues.

The Company records its revenues based on its standard charges for resident services rendered.  The Company has contractual arrangements with the Commonwealth of Pennsylvania Department of Human Services (DHS) and the Centers for Medicare & Medicaid Services (Medicare) to render services to qualifying Medicaid and Medicare beneficiaries under cost-based programs which result in the Company receiving payments for such services which differ

---

[4]    Renova is a County run program where the Company was asked to continue to provide physical space as an accommodation. Renova is an intermediate care provider serving approximately twenty-five (25) people with intellectual disabilities.

from the standard charges. Any differences of this nature are recorded as contractual adjustments.

Under the Medical Assistance program, nursing services provided to beneficiaries are paid at prospectively determined rates per day. These rates vary according to clinical diagnostic and other factors and are subject to limitations and adjustments including a budget adjustment factor. In addition, the Company is eligible to receive disproportionate share incentive payments if occupancy is at least 90% and 80% of the resident occupancy are beneficiaries of medical assistance.

### 2. The Leased Facility

The Company leases the land, facility, fixtures, and the Certificate of Need from the Landlord. The Landlord retains title to these items and they are not separable under the terms of the lease agreement. In December 2017, the Landlord obtained a HUD-insured loan secured by the healthcare facility. As part of the refinancing, the Company entered into an amended lease with the Landlord (the "**Lease**"). The Lease is partially guaranteed by the sole member of Stone Barn.

In addition, the Company is responsible for any additional sums, amounts, fees, expenses, and costs payable or reimbursable to the Landlord, including payments to the reserve for taxes, insurance, payments to the replacement reserve and necessary maintenance, as described in the Lease.

### 3. Prepetition Related Party Transactions

The Company has service agreements with Stone Barn, and Stone Barn Management, an affiliate of Stone Barn. The service agreements are subordinated to the lease payments to Landlord.

The Company is supported by efforts and professional services by Stone Barn and Stone Barn Management. The industry's usual and customary fee of five percent (5%) is split between both entities relative to their different responsibilities. Together, Stone Barn and Stone Barn Management provide strategic development, competitive understandings and operational plans to constantly improve the Company along with the Company's management. Stone Barn supervises and oversees the performance by Stone Barn Management of its management services at the facility and also provides oversight, advisory, supportive, consultative and administrative services for the Debtor in connection with, among other things, the areas of: (i) dietary; (ii) facility maintenance; (iii) clinical assistance; (iv) resident care and quality assurance; (v) administration; (vi) purchasing; (vii) and data processing, pursuant to that certain Management Services Agreement dated as of July 30, 2015. Stone Barn also prepares a written annual budget for the operation of the Facility for the Debtor.

Stone Barn Management provides certain non-clinical and non-medical administrative services for the Debtor, including, among other things: (i) fiscal management and administration; (ii) nursing; (iii) finance and accounting; (iv) dietary; (v) facility maintenance; (vi) housekeeping and laundry; (vii) social services; (viii) recreational therapy; (ix) marketing and admissions; and (x) clinical reimbursement.

On the Effective Date, the management fee for Stone Barn and Stone Barn Management will be reduced to total $80,000 per month as part of the parties' agreement on the Amended Lease, as further described in the Term Sheet.

### 4.   Prepetition Ownership and Capital Structure of the Company

Stone Barn owns ninety-five percent (95%) and Michael D. D'Arcangelo owns five percent (5%) of the membership interests of the Debtor. Charles B. Blalack, the Debtor's Managing Partner, owns one hundred percent (100%) of the membership interests of Stone Barn.

### 5.   Prepetition Debt Structure

#### a.   The Prepetition Credit Facility

On December 1, 2015, the Debtor and Capital Finance and the additional financing institutions from time-to-time party (collectively, the "**Existing Lender**") and Capital Finance, as Agent (together with its successors and assigns "**Agent**"), entered into the that certain Credit and Security Agreement dated December 1, 2015 (as amended by that certain First Amendment to Credit and Security Agreement and Waiver dated November 30, 2018 (the "**Existing Loan Agreement**"). The Existing Loan Agreement was guaranteed by Stone Barn (the "**Senior Guarantor**").

Pursuant to the Existing Loan Agreement, the Existing Lender provided the Debtor with a $3,000,000.00 revolving credit facility (the "**Revolving Credit Facility**"). As of the Petition Date, the outstanding principal balance of the Revolving Credit Facility was $1,417,591.00 (the "**Pre-Petition Obligations**"). All of the Pre-Petition Obligations were rolled-up and paid in full by the DIP Facility.

The Pre-Petition Obligations were secured by liens (the "**Pre-Petition Liens**") on substantially all of the Debtor's assets (the "**Pre-Petition Collateral**"). The Agent, for the benefit of itself and the Existing Lender, had a first priority lien on: (a) all Accounts arising from the delivery of goods and rendering services by the Debtor prior to an event of default and the proceeds thereof; (b) Deposit Accounts and the proceeds thereof; and (c) All Accounts arising after an event of default and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the event of default in accordance with the terms of the Intercreditor Agreement (the "**Existing Lender Priority Collateral**").

#### b.   The Operating Lease Obligations

The Debtor is also indebted to the Landlord and Capital Funding pursuant to the Lease (and related agreements).

The initial term of the Lease was for 30 years and the monthly rent due under the Lease at the Petition Date was approximately $270,000 (the "**FHA Obligations**"). The FHA Obligations are secured by liens (the "**FHA Liens**") on substantially all of the Debtor's assets ("**Capital Funding's Collateral**") pursuant to that certain Operator Security Agreement (the "**Operator Security Agreement**"), dated as of December 1, 2017, by and between the Debtor and Capital Funding and are governed by the Intercreditor Agreement.

Capital Funding has a first priority lien on substantially all of the Debtor's assets, except for the Existing Lender Priority Collateral, in accordance with the terms of the Intercreditor Agreement (the "**Capital Funding Priority Collateral**").

### c.    The Intercreditor Agreement

The relative rights of the Existing Lender, Capital Funding, the Landlord and the Debtor are governed by the Intercreditor Agreement.

Pursuant to section 2.1(a) of the Intercreditor Agreement, the Existing Lender had a first priority security interest in the Existing Lender Priority Collateral to secure the Pre-Petition Obligations and Capital Funding has subordinated to Existing Lender's security interest Capital Funding's security interest in the Existing Lender Priority Collateral.

Pursuant to section 2.2(a) of the Intercreditor Agreement, Capital Funding has a first priority security interest in Capital Funding Priority Collateral to secure the FHA Obligations and the Existing Lender has subordinated to Capital Funding Existing Lender's security interest, if any, in the Capital Funding Priority Collateral to secure the FHA-Insured Loan.

Finally, pursuant to section 4.3 of the Intercreditor Agreement, in the event of the commencement of a bankruptcy case by the Debtor, the Existing Lender has the non-exclusive option to continue to provide financing to the Debtor if the Existing Lender deems such financing to be in its best interests.  The subordination and lien priority provisions in the Intercreditor Agreement continue to apply to all Existing Lender Priority Collateral arising on the commencement and during the pendency of this Chapter 11 Case pursuant to the terms of the Intercreditor Agreement.

### d.    The Chas Blalack Loan and Security Agreement

On November 9, 2018, the Debtor and Charles Blalack entered into that certain Loan and Security Agreement (the "**Blalack Loan Agreement**") whereby the Debtor acknowledged: (i) that Blalack had advanced an aggregate sum of Two Million Five Hundred Seven Thousand Nine Hundred Ninety-Seven Dollars ($2,507,997.00) to the Debtor plus accrued interest in the amount of Three Hundred Twenty-Six Thousand Six Hundred Twenty-Nine Dollars and Eighty Cents ($326,629.80); and (ii) that the balance of such loans, including interest on such loans accruing at the Debtor's borrowing rate, was Two Million Eight Hundred Thirty-Four Thousand Six Hundred Twenty-Six Dollars and Eighty Cents ($2,834,626.80) (the "**Blalack Loan**").  The Blalack Loan was advanced by Blalack to fund continued operations to ensure residents would continue to receive the care they needed during the strike and thereafter.  Interest on the Blalack Loan accrues at a rate of eight (8%) percent per annum and Charles Blalack asserts is secured by a junior lien on all of the Debtor's assets.  To further aid in easing the liquidity crisis the strike caused, Stone Barn and Stone Barn Management also voluntarily agreed to defer $1,497,023.86 in management fees for operating the Facility.

### B.    Events Leading to Commencement of the Chapter 11 Case

As set forth more fully in the First Day Declaration, despite the improvements made by the Company in the operations and the financial success of the Facility, the Company filed the

Chapter 11 Case in an effort to restructure its debts and alleviate burdensome costs deriving from (i) a prior union strike, (ii) challenges due to reductions in Medicaid reimbursement rates, and (iii) contentious litigation.

### Medicaid Reductions

In 2017, the Company experienced three large Medicaid reimbursement reductions that totaled $12.25 per resident day:



As a skilled-nursing facility committed to caring for the aging population of Lebanon County (with 86% Medicaid residents in 2017), this rate change affected the Company's profitability dramatically.

Additionally, there was a staggering number of call-offs by employees that made the Company's efficient operation even more difficult. In nursing alone, Cedar Haven experienced 219 call-offs in August and 155 call-offs between September 1st and 20th of 2017. These excessive call-offs dramatically increased overtime and temporary nursing agency costs.

### The 2017 Union Strike

These difficulties were complicated by the Company's relationship with the Union that represented over 250 (84%) of the Company's employees at the time, The American Federation of State, County and Municipal Employees, AFL-CIO Council 89 (the "**Union**"). In October 2017, after approximately eleven meetings over several months, Cedar Haven and the Union reached an impasse over contract negotiations. Reaching an agreement was frustrated by the Union's lack of meaningful movement, especially in light of significant cuts in Medicaid reimbursements affecting Cedar Haven's revenue and a 12% increase in health insurance costs.

In October, Cedar Haven implemented its Last, Best and Final offer. The National Labor Relations Board thoroughly investigated the Union's claim that Cedar Haven committed an unfair labor practice by implementing its Last, Best and Final offer, and such claim was dropped.

Cedar Haven employees represented by the Union decided to strike beginning on October 20, 2017.  During the strike, Cedar Haven remained focused on its mission — to deliver high-quality care to its residents every day.  Cedar Haven deployed US Nursing Corporation staff from other areas to ensure that its residents would continue to receive quality care despite the strike.  This emergency staffing effort cost Cedar Haven over $5 million but was necessary in order to care for the needs of its residents.  Sixty-nine (69) Union-represented employees chose not to strike, seventy (70) more returned to work by January, 2018, and fifty (50) other non-Union employees continued to care for the residents.  Through multiple job fairs and accelerated hiring campaigns, Cedar Haven was able to hire over one hundred (100) new staff members during the strike.  In April 2018, the Debtor's employees voted to decertify the Union.

Prior to the Petition Date, the Company was also a defendant in ten (10) lawsuits filed by various former vendors seeking in excess of $4.9 million in damages.  Despite these challenges, Cedar Haven was slightly profitable in March of 2019.  However, soon after the Company received notice that it would face additional Medicaid reimbursement reductions of $7.15 per resident per day.  The decreased census and slashed reimbursement rate, paired with the exorbitant costs accrued during the strike and the ongoing litigation, put Cedar Haven in another extremely challenging period.

In response to these challenges, Cedar Haven underwent a restructuring in May of 2019.  The Company raised private pay bed rates and introduced a new pricing structure for amenities including salon services and television rentals, which had previously been provided free of charge for residents.  The Company conducted a thorough audit of its existing staffing schedule and, under the leadership of its new Director of Nursing, launched a completely new schedule that improved the effectiveness and efficiency of the business as a provider of high-quality healthcare services.  The Company continues to find ways to be more efficient in its operations.

Based on the above circumstances, the Debtor made the difficult decision that filing for Chapter 11 protection was in the best interests of the Debtor, its stakeholders and its residents.

## C.    The Chapter 11 Case

**The following is a brief description of certain material events that have occurred during this Chapter 11 Case.**

### 1.    First Day Motions and Orders

On the Petition Date, the Debtor Filed the First Day Motions to transition into operations during the Chapter 11 Case, stabilize operations, and preserve relationships with vendors, clients, and employees.

The First Day Pleadings requested relief from the Bankruptcy Court to, among other things: (a) pay employee wages; (b) maintain the Debtor's cash management system; (c) obtain postpetition financing; and (d) pay Critical Vendors.  In support of the motions, the Debtor relied upon the First Day Declaration.

The Bankruptcy Court held hearings on August 6, 2019 and September 4, 2019, and granted the relief sought in the First Day Motions.

### 2.    Retention of Professionals and Patient Care Ombudsman

The Debtor, through various applications which were subsequently approved by the Bankruptcy Court, sought to employ certain professionals including: Chipman Brown Cicero & Cole, LLP as counsel [Docket No. 47]; SLIB II, Inc. d/b/a Senior Living Investment Brokerage as Leasehold and Business Broker [Docket No. 49]; and SSG [Docket No. 473].    The Bankruptcy Court later approved these retentions [Docket Nos. 88, 89 and 473].

The United States Trustee also appointed the Patient Care Ombudsman [Docket No. 105]. On September 10, 2019, Margaret Barajas was appointed Patient Care Ombudsman pursuant to section 333 of the Bankruptcy Code.

### 3.    Appointment of the Committee

On August 20, 2019, the U.S. Trustee officially appointed the Committee [Docket No. 51]. The Committee is made up of the following parties: (1) Select Rehabilitation; (2) Culinary Services Group LLC; (3) Maxim Healthcare Services; (4) Healthcare Services Group, Inc.; and (5) Medline Industries, Inc.

The Committee selected Potter Anderson & Corroon LLP as its counsel and selected Ryniker Consultants LLC as its financial advisor.  The Committee filed applications seeking to retain the firms [Docket Nos. 115 and 116].  The Bankruptcy Court later approved each of these retentions [Docket Nos. 120 and 121].

### 4.    Post-Petition Financing

Prior to the filing of the Chapter 11 Case, the Debtor sought and obtained a proposal for DIP financing from Capital Finance.  On August 2, 2019, the Debtor filed its *Motion for Entry of Interim and Final Orders (a) Authorizing Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Claims, (c) Authorizing the Use of Cash Collateral, (d) Granting Adequate Protection, (e) Modifying the Automatic Stay, and (f) Granting Related Relief* [Docket No. 13] (the "**DIP Motion**").  On August 6, 2019, the Bankruptcy Court entered the *Interim Order (a) Authorizing Postpetition Financing, (b) Granting Liens and Providing Superpriority Administrative Expense Claims, (c) Authorizing the Use of Cash Collateral, (d) Granting Adequate Protection, (e) Modifying the Automatic Stay, and (f) Granting Related Relief* [Docket No. 38] (the "**Interim Order**").  On September 9, 2019, the Bankruptcy Court entered the Final DIP Order [Docket No. 102].

Over the course of the Chapter 11 Case, the Debtor, the DIP Lender, and Stone Barn as guarantor, entered into multiple Letter Agreements modifying the terms of the DIP Financing Documents and extending the Termination Date. [Docket Nos. 102, 196, 221, 243, 253, 302, 304, 321, 346, 378, 395, 415, 436, 451, 485, 497, 509, 528, 553, 562, 585, 602, 635, 653, 672, 705 and 731].

### 5.    Monthly Reporting, Schedules, and Meeting of Creditors

The Debtor has filed substantially all monthly operating reports and is currently working to bring the last few months current. [Docket Nos. 57, 148, 163, 215, 233, 252, 286, 303, 325,

327, 371, 374, 394, 414, 441, 480, 493, 499, 530, 531, 561, 582, 701, 704, 710, 712, 722, 729, and 734], and timely filed its Schedules on August 30, 2019 [Docket Nos. 77 and 78], with an amendment filed on September 10, 2019 [Docket No. 107].  On September 11, 2019, the U.S. Trustee conducted the meeting of creditors pursuant to section 341 of the Bankruptcy Code.

### 6.    Claims Process and Bar Date

On September 12, 2019, the Debtor filed the *Motion of the Debtor to Establish Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Docket No. 110] (the "**Bar Date Motion**").  Among other things, the Bar Date Motion sought entry of an Order establishing the Bar Dates, including the General Bar Date, the Government Bar Date, and the Rejection Bar Date.  On October 15, 2019, the Bankruptcy Court entered the Bar Date Order [Docket No. 135].

### 7.    The Unsuccessful Sale of the Debtor's Assets

The Debtor, pursuant to the Sale Motion, sought to sell substantially all of its assets in accordance with the Bidding Procedures Order.  To that end, the Debtor, through its professionals, conducted a comprehensive postpetition marketing process.  This marketing process contemplated a sale of substantially all of the Debtor's assets in pieces or as a whole.

Pursuant to the Bidding Procedures Order, only one Potential Bidder submitted a Qualifying Bid before the November 18, 2019 initial deadline for submitting bids, and that bidder was determined to be a Qualified Bidder under the Bidding Procedures Order.  One additional bid was received prior to November 18, 2019, but that was not a Qualifying Bid.  The Bid Deadline was thereafter extended through and including November 20, 2019.

The Auction was held on November 21 and 22, 2019.  The bid by Allaire Health Services, LLC (or the Purchaser) was the only Qualified Bid received, and the auction was thereafter closed.

On January 16, 2020, the Bankruptcy Court entered the Sale Order.   In accordance with the Sale Order, the Debtor was working towards closing on the contemplated sale of certain assets to the Purchaser, however the Purchaser failed to close on the Sale and terminated the Sale agreement on June 2, 2020.

Given the unexpected failure of the Purchaser to close on the Sale, the Debtor engaged SSG as investment banker to the Debtor to assist with marketing and selling the Debtor's assets. The sale process was severely impacted due to the ongoing Covid-19 pandemic and negotiations with the Landlord.

Despite almost a year of marketing by SSG, the Debtor and SSG were unable to locate a buyer for the Debtor's assets.  Thereafter, the Debtor, the Committee, the Landlord and Stone Barn engaged in robust negotiations about the nature and terms of a transaction that would provide the maximum value to the Debtor's Estate and creditors.  As a result of these negotiations, the Debtor, with agreement of the Committee, decided to pivot from the marketing process and proceed instead with a reorganization under the terms of this Combined Plan and Disclosure Statement.

8.    **Stipulations With Landlord to Extend Deadline to Assume or Reject the Lease**

On October 18, 2019, the Debtor filed its *Motion for Entry of an Order (I) Extending the Time to Assume or Reject its Unexpired Lease of Nonresidential Property and (II) Granted Related Relief* (the "**Extension Motion**") [Docket No. 142], which sought to extend the deadline to assume or reject the Lease for an additional 90-day period pursuant to section 365(d)(4)(B) of the Bankruptcy Code.

On November 21, 2019 [Docket No. 186], the Court approved the Extension Motion and extended the deadline to assume or reject the Lease through and including February 28, 2020.

Thereafter, the Debtor and Landlord entered into subsequent stipulations extending the deadline for the Debtor to assume or reject the Lease, which stipulations were approved by numerous orders of the Bankruptcy Court. [Docket Nos. 255, 300, 324, 345, 392, 432, 488, 508, 551, 583, 633, 648, 662, 668, 675, 685, 697, and 724]. The deadline for the Debtor to assume or reject the Lease under section 365(d)(4) of the Bankruptcy Code currently runs through and including February 28, 2022.

9.    **Stipulation With Charles B. Blalack, Stone Barn, and the Committee to Extend Deadline to Commence Proceeding Under Bankruptcy Code Section 546**

During the course of the Chapter 11 Case, the Committee identified potential Causes of Action under sections 544, 545, 547, 548 or 553 of the Bankruptcy Code for the avoidance of liens as preferential transfers, and the avoidance of management fees and preferential or constructive fraudulent transfers, against Charles B. Blalack and Stone Barn. The ability of the Committee to pursue those claims was extended by stipulation through and including (i) February 1, 2022, or (ii) such later dates as may be agreed to by the parties (the "**Committee Stipulations**"). The Committee Stipulations were approved by order of the Bankruptcy Court. [Docket Nos. 600 and 671]. Pursuant to the terms of the Combined Plan and Disclosure Statement, the deadline to filed claims under the Committee Stipulations has been extended through the Effective Date or thirty (30) days after the conversion of the case to chapter 7, in the event Confirmation is unsuccessful.

D.    **Chapter 11 Plan Terms**

The Debtor seeks approval of the Combined Plan and Disclosure Statement under sections 1125 and 1129 of the Bankruptcy Code. The Debtor is the proponent of the Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code.

The Combined Plan and Disclosure Statement contemplates a chapter 11 plan of reorganization. The Combined Plan and Disclosure Statement accomplishes a number of beneficial outcomes for the Debtor and its creditors, including among others:

- *The Debtor's Emergence from Chapter 11*: Except as otherwise provided in this Combined Plan and Disclosure Statement, the Reorganized Debtor shall continue to exist on and after the Effective Date as a limited liability company, with all of

the powers of such an entity under the laws of the State of Delaware and as provided under the Debtor's operating agreement in effect immediately prior to the Effective Date (provided that such organizational documents shall be amended to prohibit the Reorganized Debtor from issuing non-voting equity securities, to the extent necessary to comply with section 1123(a) of the Bankruptcy Code), without prejudice to any right of the Reorganized Debtor to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.   In accordance with Article IX.D.2, and except as explicitly provided in this Combined Plan and Disclosure Statement, on the Effective Date, all property comprising the Estate shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, and other encumbrances.  The Reorganized Debtor shall not assume any Claims or liabilities of the Debtor, except as specifically provided herein, which Claims or liabilities shall be discharged as against the Reorganized Debtor.

The Debtor believes that it is in the best interests of the Debtor's estate and its stakeholders to continue with Stone Barn as the majority owner and manager of the Debtor.  In accordance with *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership Bank*, 526 U.S. 434 (1999), the opportunity for any third party to serve as a plan sponsor and obtain the equity interests in the Debtor, or to purchase the Debtor's assets, was subject to two fulsome and lengthy open-market bidding processes, without success.  Under the Combined Plan and Disclosure Statement, the Equity Interests held by Stone Barn and Michael D. D'Arcangelo will be reinstated in exchange for significant value. First, continuing with existing equity avoids the costly process of unwinding and recreating the corporate structure and business relationships between and among the Debtor, the Landlord, HUD, Stone Barn, and all of the Debtor's residents and vendors.   Moreover, reinstatement will enhance the value available to the Debtor's stakeholders.   Indeed, General Unsecured Creditors in Class 5 will receive up to $2 million in value in the aggregate that would otherwise be distributable to the fully secured Landlord and Capital Funding for the FHA Obligations.  Absent approval of the Combined Plan and Disclosure Statement, the case is likely to convert to a case under Chapter 7 and no value will be available to General Unsecured Creditors.  Additionally, as described more fully below, Stone Barn has agreed to subordinate the payment of its administrative claim, capped at $165,000, until all other administrative claims are paid in full and to reduce its ongoing management fees to a total of $80,000 per month; and Mr. Blalack has agreed to have the secured Blalack Loan treated as a general unsecured claim.  Finally, the Equity Interests in the Debtor have no realizable economic value absent approval of the Combined Plan and Disclosure Statement.

- *Entry into the Amended Lease*: On the Effective Date, the Debtor and the Landlord, together with Stone Barn as Manager, and Mr. Blalack as Guarantor,

shall enter into an amendment to the Lease (the "**Amended Lease**").[5]  The Amended Lease shall provide for, *inter alia*, (1) reduced Fixed Rent during the Term shall be as set forth in the Term Sheet attached hereto as **Exhibit A** (for calendar year 2022, the monthly rent is being reduced from approximately $270,000 to $125,000); and (2) the annual Fixed Rent for each Lease Year of the First Extension Period shall be reduced from 102.5% to 101.75% of the amount of Fixed Rent due in the immediately preceding Lease Year.

- *Special Provisions for Lease Year 2022 under Amended Lease*: The Amended Lease shall provide: (1) Fixed Rent shall increase to $150,000 per month beginning in the month after the average census reaches 240; and (2) No Event of Default will occur during the period 1/1/22 – 6/30/22 based solely on Debtor's failure to pay the full amount of the Fixed Rent in any month.  Any unpaid Fixed Rent during this period shall accrue as "Unpaid 2022 Rent", and all Unpaid 2022 Rent shall be paid in full by 6/30/23.

- *Security Deposit under Amended Lease*: Landlord shall use the existing security deposit to pay, in part, the Landlord Claim on the Effective Date.

- *Application of Excess Cash under the Amended Lease*:  The Amended Lease shall provide for the allocation of quarterly EBITDA as follows (the "**Excess Cash Procedures**"): (1) fifty percent (50%) of all of the Company's quarterly EBITDA above $250,000 ("**Excess Cash**") shall be paid to the Landlord until (a) the Landlord Claim is paid in full, and (b) Debtor has fully funded a new Security Deposit equal to three (3) months of Fixed Rent (the "**Catch-Up Period**"); (2) after the Catch-Up Period, fifty percent (50%) of all of the Debtor's quarterly EBITDA above $250,000 shall be paid to the Landlord as Additional Rent, up to the total amount of Fixed Rent that was payable for that quarter under the Lease prior to the amendment.  The other fifty percent (50%) of the Excess Cash shall be retained by the Company (the "**Retained Excess Cash**") to fund the GUC Pool.  After the GUC Pool has been funded and paid in full, then the Retained Excess Cash shall be retained and utilized by the Reorganized Debtor in its sole discretion.

- *Amendment to Guaranty*: The Guaranty Cap (as that term is defined in the Guaranty) shall be reduced to six (6) months on the then current Fixed Rent payable under the Lease at the time of the Reorganized Debtor's default.

- *Amendment to Management Agreement*:  The management agreement between Stone Barn and the Company shall be amended to set Stone Barn's monthly management fee at $80,000, and the management agreement as so amended shall be subject to approval by the Company, Landlord, Landlord's lender, and HUD.

---

[5]   Capitalized but undefined terms used in the summary of the Amended Lease shall have the meanings ascribe to them in the Lease.

- *Appointment of the GUC Administrator*: The GUC Administrator shall be appointed for purposes of reviewing and objecting, as necessary, to general unsecured claims and overseeing distributions to Holders of Allowed General Unsecured Claims by the Reorganized Debtor.  The Reorganized Debtor shall be responsible for the GUC Administrator's fees and costs capped at [TBD] per quarter.

- *The Treatment of the Blalack Loan and Mr. Blalack's Claim*: The Blalack Loan shall be treated as a fully unsecured loan and Mr. Blalack's Claim shall be Allowed in the amount of $3,103,379.00 as a Class 5 Unsecured Claim.

- *Funding of GUC Pool and Related Distributions*:  Retained Excess Cash shall be set aside on a quarterly basis to fund the GUC Pool, and the Reorganized Debtor shall make semi-annual Pro Rata payments to holders of Allowed Unsecured Claims until $2 million is distributed to Holders of Allowed Unsecured Claims.

- *Stone Barn's Administrative Claim*:  Stone Barn's Administrative Claim shall be capped at $165,000 and shall be subordinated to payment of all other Administrative Claims.

- *Landlord's Cure Claim*:  The Landlord agrees to waive any and all late fees that may be due or owing under the Lease as well as any and all attorneys' fees in connection with its Cure Claim.

- *Landlord's Further Agreement*:  Once the Landlord's Cure Claim is paid in full and the new security deposit is replenished, Excess Cash received by the Landlord shall be equal to forty-five percent (45%) and the Retained Excess Cash retained by the Reorganized Debtor shall be equal to fifty-five percent (55%) until the GUC Pool is fully funded at $2 million.  After the GUC Pool is fully funded, Excess Cash and Retained Excess Cash shall revert back to fifty percent (50%) each.

- *Extension of Committee's Right to Causes of Action Against Blalack or Stone Barn*.  The deadline to filed claims under the Committee Stipulations has been extended through the Effective Date or thirty (30) days after the conversion of the case to chapter 7, in the event Confirmation is unsuccessful

E.    **Summary of Treatment of Claims and Interests and Estimated Recoveries Under the Plan**

The following chart provides a summary of treatment of each Class of Claims and Equity Interests (other than Administrative Expense Claims, Priority Tax Claims and Professional Claims) and an estimate of the recoveries of each Class.  The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article V of this Combined Plan and Disclosure Statement.

| Class | Estimated Allowed Claims[6] | Treatment | Estimated Recovery to Holders of Allowed Claims[7] |
|---|---|---|---|
| Class 1 – DIP Facility Claims | $800,000.00 | Unimpaired / Deemed to Accept | 100% |
| Class 2 – Other Secured Claims | $0.00 | Unimpaired / Deemed to Accept | 100% |
| Class 3 – Priority Claims | $600.00 | Unimpaired / Deemed to Accept | 100% |
| Class 4 – Landlord Claim | $1,566,692.00 | Impaired, entitled to vote | *See* Article V.B.4 |
| Class 5 – General Unsecured Claims | $12,391,328.00[8] | Impaired, entitled to vote | TBD % |
| Class 6 – Equity Interests | N/A | Unimpaired / Deemed to Accept | Reinstated for the consideration provided to implement the Combined Plan and Disclosure Statement |

### F.    Certain Federal Income Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtor and to Holders of Claims and Equity Interests. This discussion is based on the Tax Code, Treasury Regulations promulgated

---

[6]   These amounts represent estimated Allowed Claims, and do not represent amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Case, and objections to such Claims have not been Filed and/or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated.

[7]   The estimated percentage recovery is based upon, among other things, an estimate of the Allowed Claims in the Chapter 11 Case. As set forth above, the actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected depending upon, among other things, the amounts and priorities of Claims that are actually allowed by the Bankruptcy Court.

[8]   The amount of Allowed General Unsecured Claims listed herein is equal to the amount set forth in the *Summary of Assets and Liabilities for Non-Individuals on Schedule E/F* [Docket Nos. 126 and 127]. These amounts have not been reconciled to Filed Proofs of Claim and Filed Proofs of Claim have not been reviewed for accuracy at this point in time.  As provided for in Article V.B.5, the Blalack Loan shall be allowed as a Class 5 Claim in the amount of $3,103,379.00, and Stone Barn's pre-petition deferred management fee claims shall be allowed as a Class 5 Claim in the amount of $1,494,500.00.

and proposed thereunder, judicial decisions and published administrative rules, and pronouncements of the IRS, all as in effect on the date hereof.

Due to the complexity of certain aspects of the Combined Plan and Disclosure Statement, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims, and each Holder's status and method of accounting and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are uncertain. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial, or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the Holders of Claims or Equity Interests in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies, financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Equity Interests as part of a "straddle," "hedge," "constructive sale," or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local, or estate and gift taxation is addressed.

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.**

### 1.    Tax Consequences to the Debtor

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must recognize income from COD Income to the extent that such taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue price determined in the manner described below. Generally, the amount of COD Income, subject to certain statutory and judicial exceptions, is the excess of (a) the adjusted issue price of the discharged indebtedness less (b) the sum of the fair market value (determined at the date of the exchange) of the consideration, if any, given in exchange for such discharged indebtedness.

The recognition of COD Income may be treated differently in the context of a confirmed chapter 11 plan. For example, under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to section 108(b) to reduce certain of that taxpayer's tax attributes to the extent of the amount of COD Income. The tax attributes of the taxpayer generally are reduced in the following order: net operating losses, general business and minimum

tax credit carry forwards, capital loss carry forwards, the basis of the taxpayer's assets and, finally, foreign tax credit carry forwards. If the amount of COD Income exceeds the amount of tax attributes available to be reduced, the excess still is excluded from income. Pursuant to section 108(b)(4)(A), the reduction of tax attributes does not occur until the end of the taxable year after such tax attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized. Section l08(e)(2) provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes.

### 2.    Tax Consequences for Holders of Claims

Generally, a Holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a Holder's Claim. The tax basis of a Holder in a Claim will generally be equal to the Holder's cost. To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain, or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized generally will be characterized as capital gain or loss and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one (1) year.

A Holder who received Cash (or potentially other consideration) in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Combined Plan and Disclosure Statement, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Combined Plan and Disclosure Statement on account of its Claim.

### G.    Certain Risk Factors to Be Considered

Effect of Failure to Confirm the Combined Plan and Disclosure Statement. If the Combined Plan and Disclosure Statement is not confirmed by the requisite majorities in number and amount as required by section 1126 of the Bankruptcy Code, or if any of the other confirmation requirements imposed by the Bankruptcy Code are not met, the Chapter 11 Case may not have sufficient funding to proceed, which may result in conversion to a case under

chapter 7 of the Bankruptcy Code or dismissal. Accordingly, the Debtor believes that the Combined Plan and Disclosure Statement enables creditors to realize the best return under the circumstances.

"Cramdown." While the Debtor believes that the requirements of section 1129 of the Bankruptcy Code have been met, the Bankruptcy Court is afforded discretion to determine whether dissenting Holders of Claims would receive more if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

Claims Estimation. While the Debtor has undertaken its best efforts to estimate the amount of Claims in each Class is correct, the actual amount of allowed Claims may differ from the estimates.

Delays. Any delay in Confirmation of the Combined Plan and Disclosure Statement or delay to the Effective Date, could result in additional Administrative Expense Claims. This may endanger ultimate approval of the effectiveness of the Combined Plan and Disclosure Statement or result in a decreased recovery for Holders of Claims entitled to a Distribution.

Reduction or Delay to Estimated GUC Recoveries. The Allowed amount of Claims in Class 5 could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. Further, the funding of the GUC Pool may be delayed or impaired as a result of Covid-19-related issues or otherwise. Accordingly, there is no assurance as to whether the GUC Administrator will make any distributions on account of the GUC Pool, the amount, if any, or the timing on which such distributions may be made. However, should the Combined Plan and Disclosure Statement not be confirmed, the Chapter 11 Case will likely be converted to a case under chapter 7 of the Bankruptcy Code or dismissed. If that occurs, it is not likely that holders of Allowed General Unsecured Claims will receive any distribution on account of their Allowed General Unsecured Claims.

Impact of the Chapter 11 Case on the Debtor. Despite the treatment for Holders of General Unsecured Claims under the Combined Plan and Disclosure Statement, the Chapter 11 Case may affect the Debtor's relationships with, and its ability to negotiate favorable terms with, creditors, customers, suppliers, vendors, employees, and other personnel and counterparties. While the Debtor expects to continue normal operations during the Chapter 11 Case, the commencement of the Chapter 11 Case and the filing of the Combined Plan and Disclosure Statement may affect the Debtor's relationships with, and their ability to negotiate favorable terms with, creditors, customers, suppliers, vendors, employees and other personnel and counterparties, which could adversely affect the Reorganized Debtor's ability to conduct its business and operations in a controlled, efficient, and value-maximizing manner.

Additional Factors to Be Considered; No Duty to Update. The statements contained in this Combined Plan and Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Combined Plan and Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Combined Plan and Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### H.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Combined Plan and Disclosure Statement).  For the purposes of determining whether the Debtor's plan meets this requirement, the Debtor has analyzed the ability of the Reorganized Debtor to meet its obligations under the Combined Plan and Disclosure Statement. *See* Projections attached hereto as **Exhibit B**.  Based on its analysis, the Debtor believes that the terms of the Plan meets the financial feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  Moreover, the Debtor believes that sufficient funds will exist to make all payments required by the Plan.  Accordingly, the Debtor is confident that it will have sufficient means to provide for the distributions under the Plan and, therefore, believes that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

The Debtor's management prepared the projections provided in this Combined Plan and Disclosure Statement.  While the Debtor has presented these projections with numerical specificity, it has necessarily based the projections on a variety of estimates and assumptions which, though considered reasonable by management, may not be realized, and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Reorganized Debtor's control.  The Debtor cautions that it cannot make any representations as to the accuracy of these projections or to the Reorganized Debtor's ability to achieve the projected results.  Some assumptions inevitably will not materialize.  Furthermore, events and circumstances occurring subsequent to the date on which these projections were prepared may differ from any assumed facts and circumstances.  Alternatively, any events and circumstances that come to pass may well have been manipulated, and thus may affect financial results in a materially adverse or materially beneficial manner.  The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

### I.    Best Interests Test and Alternatives to the Combined Plan and Disclosure Statement

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an impaired Claim or Equity Interest either (a) accept the Combined Plan and Disclosure Statement or (b) receive or retain under the Combined Plan and Disclosure Statement property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  A hypothetical chapter 7 liquidation analysis is attached to this Combined Plan and Disclosure Statement as **Exhibit C**.  The value of any Distributions if the Debtor's Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of Distributions under the Combined Plan and Disclosure Statement for a variety of reasons.  First, a liquidation under chapter 7 of the Bankruptcy Code would not provide for any distributions to General Unsecured Creditors given the amount of Secured Claims held by the DIP Lender, the Landlord, and Charles B. Blalack.  Second, conversion of the Chapter 11 Case to a chapter 7 case would require the appointment of a chapter 7 trustee, who would be entitled to statutory fees relating to the Distributions of the already-monetized assets.  Accordingly, a portion of the Cash currently available, or that would

be available upon the Effective Date under the Plan, for Distributions to Holders of Allowed Claims would instead have to be paid to a chapter 7 trustee. In addition, the chapter 7 trustee would likely retain new professionals. The "learning curve" that the trustee and new professionals would be faced with comes with potentially additional costs to the Estate and with a delay compared to the time of Distributions under the Combined Plan and Disclosure Statement.

The Landlord has agreed to, *inter alia*, (i) enter into the Amended Lease with the Debtor; and (ii) reduce the Landlord Claim, which will provide the Debtor with available cash to pay Priority Claims and fund the GUC Pool. Stone Barn has likewise agreed to, *inter alia*, (w) waive the assertion of its claim as a secured claim; (x) amend the management agreement to reduce the management fee to $80,000 per month; (y) cap its administrative claim at $165,000; and (z) subordinate its management fee administrative claim until all other administrative claims are paid in full. None of this additional consideration for creditors would be available in a hypothetical chapter 7 liquidation. In any event, the conversion to a chapter 7 case would likely result in additional costs and administrative expenses incurred in connection therewith, as well as a resulting delay in Distributions, if any.

As a result, the Debtor believes that the Estate would have fewer funds distribute in a hypothetical chapter 7 liquidation than it would if the Combined Plan and Disclosure Statement is confirmed. Moreover, based on the structure of the Combined Plan and Disclosure Statement, and the settlements contained therein, the Holders of Allowed General Unsecured Claims will recover more under the Combined Plan and Disclosure Statement than in the hypothetical chapter 7 case. Accordingly, the Debtor believes that the Combined Plan and Disclosure Statement satisfies the "best interests" test of section 1129 of the Bankruptcy Code.

### J.    Releases by the Debtor

Article XII of this Combined Plan and Disclosure Statement contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and consummation of the Combined Plan and Disclosure Statement will affect any claim, interest, right, or action with regard to the Debtor and certain third parties.

**THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

Under the voting procedures described in Article VI of this Combined Plan and Disclosure Statement, the Debtor believes that these releases, exculpations, and injunction language are considered consensual under applicable bankruptcy law.

The Combined Plan and Disclosure Statement provides Releases for the Released Parties. During the course of the Chapter 11 Case, the Committee has informally asserted potential Causes of Action under sections 544, 545, 547, 548 or 553 of the Bankruptcy Code for the avoidance of liens as preferential transfers, and the avoidance of management fees and

preferential or constructive fraudulent transfers, against Charles B. Blalack and Stone Barn.  The Committee Stipulations extended the deadline to pursue those claims through the Effective Date or thirty (30) days after the conversion of the case to chapter 7.  The Debtor is not aware of any other potential claims or causes of action against the Released Parties.  Mr. Blalack is the Managing Partner of Stone Barn, which is the Managing Member for the Company.  Mr. Blalack and Stone Barn have advised the Debtor and have been integral to all aspects of the chapter 11 process, including the preparation of the filing, and the promulgation, and hopeful confirmation, of the Combined Plan and Disclosure Statement.

The Debtor is also not aware of any claims or causes of action against its current Professionals, the Committee and members of the Committee, the Committee's professionals, or any their respective direct and indirect current and former Affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, Professionals, advisors, and representatives, each in their capacity as such, but excluding all officers and directors of the Debtor who were not serving in that capacity as of the Effective Date.

### K.    Administrative Expense Claims

Requests for payment of Administrative Expense Claims must be Filed no later than the applicable Administrative Expense Bar Date.  Holders of Administrative Expense Claims that do not File requests for the allowance and payment thereof on or before the applicable Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtor or its Estate.  This provision does not apply to 28 U.S.C. § 1930 obligations, including U.S. Trustee fees and court costs, which are payable as a condition to confirmation.  The Reorganized Debtor shall continue to pay ordinary course administrative expenses as such expenses come due from and after the Effective Date.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Administrative Expense Claim, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash (a) on the Effective Date or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due or as soon thereafter as is reasonably practicable, (b) if an Administrative Expense Claim is Allowed after the Effective Date, on the date such Administrative Expense Claim is Allowed or as soon thereafter as is reasonably practicable or, if not then due, when such Allowed Administrative Expense Claim is due, or (c) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### L.    Professional Fee Claims

All Professionals or other Persons requesting compensation or reimbursement of Professional Fee Claims for services rendered before the Effective Date (including compensation requested by any Professional or other entity for making a substantial contribution in the Chapter

11 Case) shall File an application for final allowance of compensation and reimbursement of expenses no later than the Professional Fee Claims Bar Date.

The Final Fee Hearing to determine the allowance of Professional Fee Claims shall be held as soon as practicable after the Professional Fee Claims Bar Date. The Debtor's counsel shall File a notice of the Final Fee Hearing. Such notice shall be served upon counsel for the Creditors' Committee, all Professionals, the U.S. Trustee, and all parties on the Debtor's Bankruptcy Rule 2002 service list.

Allowed Professional Fee Claims of the Professionals shall be paid (a) as soon as is reasonably practicable following the later of (i) the Effective Date and (ii) the date upon which the order relating to any such Allowed Professional Fee Claims is entered by the Bankruptcy Court, or (b) upon such other terms as agreed by the Holder of such an Allowed Professional Fee Claims.

### M.    Priority Tax Claims

Except to the extent the Debtor, with the consent of the GUC Administrator, as applicable, and the Holder of an Allowed Priority Tax Claim agree to a different and less favorable treatment, the Debtor shall pay, in full satisfaction and release of such Claim, to each holder of a Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of: (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is reasonably practicable.

The Debtor estimates that the aggregate amount of Allowed Priority Tax Claims does not exceed $600.00.

### N.    Statutory Fees

All Statutory Fees incurred prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Reorganized Debtor shall pay any and all such fees when due and payable and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until such time that the case is closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

## V.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests

The below categories of Claims and Interests classify such Claims and Interests for all purposes, including voting, Confirmation, and Distribution pursuant hereto and pursuant to sections 1122 and 1123 of the Bankruptcy Code.

### B.    Treatment of Claims and Interests

### 1.    Class 1 — DIP Facility Claims

Holders of Claims in Class 1 are Unimpaired under the Combined Plan and Disclosure Statement.  Capital Finance's DIP Facility Claims are deemed Allowed Claims. Capital Finance shall receive the full amount of the DIP Facility Claims that are outstanding as of the Effective Date from the proceeds of the Exit Financing in full and final satisfaction, settlement, release, and discharge of, and in exchange for the Allowed DIP Facility Claims.  Therefore, Holders of Claims in Class 1 are not entitled to vote to accept or reject the Combined Plan and Disclosure Statement, as they are deemed to accept.

### 2.    Class 2 — Other Secured Claims

Except to the extent that a Holder of an Allowed Other Secured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Secured Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Other Secured Claim, at the option of the Debtor, in consultation with the GUC Administrator, shall (i) be paid in full in Cash; (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under Bankruptcy Code section 506(b); or (iii) receive other treatment rendering such Claim Unimpaired in accordance with Bankruptcy Code section 1124, in each case on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is reasonably practicable.  In the event the Debtor or the GUC Administrator treat a Claim under clause (i) of this Section, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization, or approval of any Person.  The Debtor and the GUC Administrator specifically reserve the right to challenge the validity, nature, and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Liens relating to the Other Secured Claims.

The Debtor estimates that the aggregate amount of Allowed Other Secured Claims will be not more than approximately $0.00, and likely less as certain Claims included in this Class are assumed under the settlement with Landlord and Stone Barn.  Class 2 is Unimpaired and is deemed to accept the Combined Plan and Disclosure Statement.

### 3.    Class 3 — Priority Claims

Except to the extent that a Holder of an Allowed Other Priority Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed Other Priority Claim has not been paid in full prior to the Effective Date, each such Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later of (i) the Effective Date; (ii) the date the Other Priority Claim becomes an Allowed Claim; or (iii) the date for payment provided by any agreement or arrangement between the Debtor or GUC Administrator, as the case may be, and the Holder of the Allowed Other Priority Claim.

The Debtor estimates that the aggregate amount of Allowed Other Priority Claims does not exceed approximately $600.00.

Class 3 is Unimpaired and is deemed to accept the Combined Plan and Disclosure Statement.

### 4.    Class 4 — Landlord Claim

Except to the extent that the Holder of the Landlord Claim has agreed to a less favorable treatment of such Claim, the Holder of the Landlord Claim shall receive an allowed claim in the amount of $1,566,592.00, which shall be paid as set forth in the Term Sheet attached to the Combined Plan and Disclosure Statement as Exhibit A.  On the Effective Date, the Landlord shall apply the Security Deposit against the Landlord Claim.  To the extent that the Security Deposit is insufficient to pay the Landlord Claim in full, then the remaining portion of the Landlord Claim shall be paid in accordance with the Excess Cash Procedures.  The treatment hereunder shall be in full and complete satisfaction of all Landlord Claims

Class 4 is Impaired and is entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 5.    Class 5 — General Unsecured Claims

Except to the extent that a Holder of an Allowed General Unsecured Claim has agreed to a less favorable treatment of such Claim, and only to the extent that any such Allowed General Unsecured Claim has not been paid by any applicable Debtor prior to the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive such Holder's Pro Rata Share of the GUC Pool as full and complete satisfaction of their Claims, which Claims shall not be assumed by, and are extinguished and discharged against the Reorganized Debtor.

The Debtor estimates that the aggregate amount of Allowed General Unsecured Claims will be approximately $12,391,328.00 based on the Debtor's Schedules and Claims asserted against the Estates.  The Blalack Loan shall be allowed as a Class 5 Claim in the amount of $3,103,379.00, and Stone Barn's pre-petition deferred management fee claims shall be allowed as a Class 5 Claim in the amount of $1,494,500.00.

Class 5 is Impaired and is entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 6.    Class 6 — Equity Interests

Holders of Claims in Class 6 are Unimpaired under the Combined Plan and Disclosure Statement.  Holders of Class 6 Equity Interests will continue to own 100% of all existing Equity Interests in the Debtor for the consideration provided to implement the Combined Plan and Disclosure Statement.  Therefore, Class 6 is Unimpaired and is deemed to accept the Combined Plan and Disclosure Statement.

C.      **Impaired Claims and Equity Interests**

Under the Combined Plan and Disclosure Statement, Holders of Claims in Classes 4 and 5 are the Impaired Classes pursuant to section 1124 of the Bankruptcy Code because the Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims treated in such Class.

D.      **Modification of Treatment of Claims and Equity Interests**

The Debtor or the GUC Administrator, as applicable, reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the Holder of such Claim at any time after the Effective Date upon the Consent of the Holder of the Claim whose Allowed Claim, as the case may be, is being adversely affected.

E.      **Cramdown and No Unfair Discrimination**

To the extent that any Impaired Class does not accept the Combined Plan and Disclosure Statement, the Debtor will seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code.  This provision allows the Bankruptcy Court to confirm a plan accepted by at least one impaired class so long as it does not unfairly discriminate and is fair and equitable with respect to each class of claims and interest that is impaired and has not accepted the plan. Colloquially, this mechanism is known as a "cramdown."

The Debtor believes the treatment of Claims and Interests described in this Combined Plan and Disclosure Statement are fair and equitable and do not discriminate unfairly. The proposed treatment of Claims and Interests provides that each Holder of such Claim or Interest will be treated identically within their respective class and that, except when agreed to by such Holder, no Holder of any Claim or Interest junior will receive or retain any property on account of such junior Claim or Interest.

VI.    **CONFIRMATION PROCEDURES**

A.      **Confirmation Procedures**

1.      **Combined Hearing**

The Confirmation Hearing before the Bankruptcy Court has been scheduled for **April 21, 2022 at 10:00 a.m. (*prevailing* Eastern Time)** at the United States Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom 7, Wilmington, Delaware 19801 to consider (a) approval of the Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code, and (b) confirmation of the Combined Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### 2. Procedure for Objections

Any objection to approval or confirmation of the Combined Plan and Disclosure Statement must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objection must be Filed by **April 13, 2022 at 4:00 p.m. (*prevailing* Eastern Time)** with the Bankruptcy Court and served on (a) COUNSEL FOR THE DEBTOR, *Chipman Brown Cicero & Cole, LLP*, Hercules Plaza, 1313 North Market Street, Suite 5400, Wilmington, Delaware 19801 (*Attn*: William E. Chipman, Jr., Esquire and Mark D. Olivere, Esquire) (*Email*: chipman@chipmanbrown.com and olivere@chipmanbrown.com); (b) COUNSEL TO CAPITAL FINANCE, LLC, *Miles & Stockbridge P.C.*, 100 Light Street, Baltimore, Maryland 21202 (*Attn*: Joel L. Perrell, Jr., Esquire) (*Email:* jperrell@milesstockbridge.com); (c) COUNSEL FOR CAPITAL FUNDING, LLC, *Whiteford Taylor Preston LLP*, (i) Seven Saint Paul Street, Suite 1500, Baltimore, Maryland 21202 (*Attn*: Edward U. Lee III, Esquire) (*Email:* elee@wtplaw.com); and (ii) 200 First Avenue, Floor 3, Pittsburgh, Pennsylvania 15222 (*Attn:* Daniel R. Schimizzi, Esquire) (*Email:* dschimizzi@wtplaw.com); (d) COUNSEL TO LANDLORD, *Duane Morris LLP*, (i) 190 South LaSalle Street, Suite 3700, Chicago, Illinois 60603 (*Attn:* John R. Weiss, Esquire and Neville M. Bilimoria, Esquire) (*Email:* jrweiss@duanemorris.com and nmbilimoria@duanemorris.com); and (ii) 222 Delaware Avenue, Suite 1600, Wilmington, Delaware 19801 (*Attn:* Michael R. Lastowski, Esquire) (*Email:* mlastowski@duanemorris.com); (e) COUNSEL FOR STONE BARN HOLDINGS, LLC, *Cozen O'Connor*, 1201 North Market Street, Suite 1001, Wilmington, Delaware 19801 (*Attn:* Mark E. Felger) (*Email:* mfelger@cozen.com); (f) COUNSEL FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, *Potter Anderson & Corroon LLP*, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (*Attn:* Christopher M. Samis, Esquire, L. Katherine Good, Esquire, and Aaron H. Stulman, Esquire) (*Email:* csamis@potteranderson.com, kgood@potteranderson.com, and astulman@potteranderson.com); and (g) *Office of the United States Trustee*, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801 (*Attn*: Timothy J. Fox, Esquire) (Email: timothy.fox@usdoj.gov). **Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court.**

### 3. Requirements for Confirmation

The Bankruptcy Court will confirm the Combined Plan and Disclosure Statement only if the requirements of section 1129 of the Bankruptcy Code are met. As set forth in this Combined Plan and Disclosure Statement, the Debtor believes that the Combined Plan and Disclosure Statement: (a) meets the cramdown requirements; (b) meets the feasibility requirements; (c) is in the best interests of creditors; (d) has been proposed in good faith; and (e) meets all other technical requirements imposed by the Bankruptcy Code.

Additionally, pursuant to section 1126 of the Bankruptcy Code, under the Combined Plan and Disclosure Statement, only Holders of Claims in Impaired Classes are entitled to Distributions.

### B.    Solicitation and Voting Procedures

### 1.    Eligibility to Vote on the Combined Plan and Disclosure Statement

Except as otherwise ordered by the Bankruptcy Court, only Holders of Claims in Class 4 and Class 5 may vote on the Combined Plan and Disclosure Statement pursuant to section 1126 of the Bankruptcy Code.  To vote on the Combined Plan and Disclosure Statement, a Holder must hold a Claim in Class 4 or Class 5 or have a Claim that is identified on the Schedules and is not listed as disputed, unliquidated, or contingent, or be the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 4 AND 5**.

### 2.    Solicitation Package

Accompanying the Combined Plan and Disclosure Statement for the purposes of soliciting votes on the Combined Plan and Disclosure Statement are Solicitation Packages, which contain copies of: (a) the Confirmation Hearing Notice; (b) the Interim Approval and Procedures Order, excluding the exhibits annexed thereto; (c) a Ballot; and (d) such other documents the Bankruptcy Court may direct or approve or that the Debtor deems appropriate.

Holders of Claims in non-voting classes will receive packages consisting of: (a) the Confirmation Hearing Notice; and (b) a notice of such Holder's non-voting status.

### 3.    Voting Procedures and Voting Deadline

The Voting Record Date for determining which Holders of Claims in Classes 4 and 5 may vote on the Combined Plan and Disclosure Statement is the earliest of **March 16, 2022** or the entry of the Interim Approval and Procedures Order.

The Voting Deadline by which the Debtor must *RECEIVE* original ballots by mail, overnight delivery, hand delivery, or for electronic ballots, the deadline by which such electronic ballots must be submitted, is **April 13, 2022 at 4:00 p.m. (*prevailing* Eastern Time)**.

If you are entitled to vote to accept or reject the Combined Plan and Disclosure Statement, a Ballot is enclosed. Please carefully review the Ballot instructions and complete the Ballot by: (a) indicating your acceptance or rejection of the Combined Plan and Disclosure Statement; and (b) signing and returning the Ballot to the Debtor.

If you are a member of a Voting Class and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, contact Debtor's counsel at:

**CHIPMAN BROWN CICERO & COLE, LLP**
Re: Cedar Haven Acquisition, LLC
William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:     (302) 295-0191
Facsimile:     (302) 295-0199
Email:         chipman@chipmanbrown.com
               desgross@chipmanbrown.com
               olivere@chipmanbrown.com

The following Ballots will not be counted or considered:

(1)     any Ballot received after the Voting Deadline, unless the Bankruptcy Court grants an extension to the Voting Deadline with respect to such Ballot;

(2)     any Ballot that is illegible or contains insufficient information;

(3)     any Ballot cast by a Person or Entity that does not hold a Claim in a Voting Class;

(4)     any Ballot cast for a Claim designated as unliquidated, contingent, or disputed or as zero (0) or unknown in amount and for which no Rule 3018 Motion has been Filed by the Rule 3018 Motion deadline;

(5)     any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of the Combined Plan and Disclosure Statement;

(6)     simultaneous duplicative Ballots voted inconsistently;

(7)     Ballots partially rejecting and partially accepting the Combined Plan and Disclosure Statement;

(8)     any Ballot received other than the official form sent by Debtor's counsel;

(9)     any unsigned Ballot; or

(10)    any Ballot that is submitted by facsimile.

### 4.    Deemed Acceptance or Rejection

Holders of Claims in Classes 1, 2, 3, and 6 are unimpaired, thus deemed to accept the Combined Plan and Disclosure Statement. Under section 1126(f) of the Bankruptcy Code,

Holders of such Claims are conclusively presumed to have accepted the Combined Plan and Disclosure Statement, and the votes of the Holders of such Claims shall not be solicited.

Holders of Claims in Classes 4 and 5 are impaired and entitled to vote to accept or reject the Combined Plan and Disclosure Statement.

### 5. Acceptance by Impaired Classes

In order for the Combined Plan and Disclosure Statement to be accepted by an Impaired Class of Claims, a majority in number (i.e., more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Combined Plan and Disclosure Statement. At least one (1) impaired Class of creditors, excluding the votes of insiders, must actually vote to accept the Combined Plan and Disclosure Statement. The Debtor urges that you vote to accept the Combined Plan and Disclosure Statement.

**YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE BALLOT ATTACHED TO THE NOTICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## VII. PROVISIONS REGARDING THE GUC ADMINISTRATOR

### A. Appointment of the GUC Administrator

On the Effective Date, a GUC Administrator, who shall be selected by the Committee, shall be appointed and thereafter serve in accordance with this Combined Plan and Disclosure Statement. The GUC Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As soon as practicable after the Voting Deadline, or as part of the Plan Supplement, the Debtor shall File with the Bankruptcy Court a notice identifying the GUC Administrator and the material terms of the GUC Administrator's compensation.

### B. Rights and Powers of the GUC Administrator

The GUC Administrator shall, in addition to any powers and authority specifically set forth in other provisions of the Combined Plan and Disclosure Statement, be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Combined Plan and Disclosure Statement, (ii) review all Distributions made by the Reorganized Debtor in accordance with the Combined Plan and Disclosure Statement, and (iii) exercise such other powers as may be vested in the GUC Administrator by order of the Bankruptcy Court, under the Combined Plan and Disclosure Statement, or as deemed by the GUC Administrator to be necessary and proper to implement the provisions hereof.

### C. Post Effective Date Expenses of the GUC Administrator

The GUC Administrator shall receive reasonable compensation for services rendered in connection with the Combined Plan and Disclosure Statement without further Court order. The

GUC Administrator shall be paid by the Reorganized Debtor up to [TBD] per quarter for these services.

## VIII.    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED PLAN AND DISCLOSURE STATEMENT

### A.    Method of Payment

Unless otherwise expressly agreed, in writing, all Cash payments to be made under the Combined Plan and Disclosure Statement shall be made by check drawn on a domestic bank or by an electronic wire transfer.

### B.    Objections to and Resolution of Claims

Except with respect to Professionals Claims, the Reorganized Debtor, or the GUC Administrator with respect to General Unsecured Claims, shall have the exclusive right to File objections and/or motions to estimate any and all Claims after the Effective Date.   The Reorganized Debtor, or the GUC Administrator with respect to General Unsecured Claims, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to any and all Claims, without approval of the Bankruptcy Court.

### C.    Claims Objection Deadline

Except as otherwise set forth in Article IV.L. above with respect to Professionals Claims, the Reorganized Debtor shall File and serve any objection to any Claims no later than the Claims Objection Deadline; provided, however, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Reorganized Debtor or the GUC Administrator, as applicable.

### D.    Late Claims and Amendments to Claims After the Confirmation Date

Except as provided herein or otherwise agreed, any and all Holders of proofs of claim Filed after the applicable Bar Date shall not be treated as creditors for purposes of Distribution pursuant to Bankruptcy Rule 3003(c)(2) and the Bar Date Order unless on or before the Confirmation Date such late Claim has been deemed timely Filed by a Final Order.  After the Confirmation Date, a proof of claim may not be Filed or amended without the authorization of the Bankruptcy Court and the Reorganized Debtor and GUC Administrator, as applicable, may direct the Claims Agent to expunge any such Claims without further notice or Order of the Court.

### E.    No Distribution Pending Allowance

Notwithstanding any other provision of the Combined Plan and Disclosure Statement, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Plan and Disclosure Statement.

F.      **Estimation**

The Reorganized Debtor or the GUC Administrator with respect to General Unsecured Claims, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Reorganized Debtor has previously objected to such Claim.   In the event the Bankruptcy Court estimates any Disputed Claim, the estimated amount may constitute a maximum limitation on such Claim, as determined by the Bankruptcy Court. Notwithstanding this, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to the allowance and payment of such Claim.  All of the aforementioned Claims objection and estimation procedures are cumulative and not exclusive of one another.

G.      **Claims Reserve**

On any date that Distributions are to be made under the terms of the Combined Plan and Disclosure Statement, the Reorganized Debtor, in consultation with the GUC Administrator, shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.  Such Cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

H.      **Timing of Distributions**

Unless otherwise provided herein, on each Distribution Date, each Holder of an Allowed Claim shall receive such Distributions that this Combined Plan and Disclosure Statement provide for Allowed Claims in accordance with Article V hereof.  In the event that any payment or act under this Combined Plan and Disclosure Statement is required to be made or performed on a date that it not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. The Reorganized Debtor shall have no obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Confirmation Date.

I.      **Delivery of Distributions**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (1) at the addresses set forth on the respective proofs of Claim Filed by such Holders; (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtor after the date of any related Proof of Claim; or (3) at the address reflected in the Schedules if no Proof of Claim is Filed and the Reorganized Debtor has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Reorganized Debtor as undeliverable, no further distribution shall be made to such Holder unless and until the Reorganized Debtor is notified in writing of such Holder's then current address.  Undeliverable Distributions shall remain in the possession of the Reorganized Debtor until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.

The Reorganized Debtor shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; provided, however, nothing contained in the Combined Plan and Disclosure Statement shall require the Reorganized Debtor to locate any Holder of an Allowed Claim.

### J.      Unclaimed Distributions

Any Cash or other property to be distributed under the Combined Plan and Disclosure Statement shall revert to the Reorganized Debtor if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline.  If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, unless such deadline is extended in the sole discretion of the Reorganized Debtor, the Distribution made to such Entity shall be deemed to be reduced to zero.

### K.      *De Minimis* Distributions

The Reorganized Debtor shall not distribute Cash to the Holder of an Allowed Claim in an impaired Class if the amount of Cash to be distributed on account of such Claim is less than $50.00 in the aggregate. Any Holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $50.00 in the aggregate will be forever barred from asserting its Claim for such distribution against the Reorganized Debtor or its property. Any Cash not distributed under Articles V and VIII of the Combined Plan and Disclosure Statement will be the property of the Reorganized Debtor.

### L.      Setoff and Recoupment

The Reorganized Debtor shall retain the right, subject to any applicable notice provisions under applicable law, to reduce any Claim by way of setoff or recoupment in accordance with the Debtor's books and records.  Unless otherwise authorized by a Final Order, any Holder of a Claim, other than a holder of a Governmental Claim, must assert any setoff rights against a Claim by a Debtor against such Entity by Filing an appropriate motion seeking authority to setoff on or before the Confirmation Date or will be deemed to have waived and be forever barred from asserting any right to setoff against a Claim by a Debtor, or Reorganized Debtor, notwithstanding any statement to the contrary in a proof of claim or any other pleading or document Filed with the Bankruptcy Court or delivered to the Debtor.

### M.      Postpetition Interest

Interest shall not accrue on any prepetition Claims, and no Holder of a prepetition Claim shall be entitled to interest accruing on or after the Filing Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of secured Claims under section 506(b) of the Bankruptcy Code.

### N.      Allocation of Distributions Between Principal and Interest

For Distributions in respect of Allowed General Unsecured Claims, to the extent that any such Allowed General Unsecured Claim entitled to a Distribution under the Combined Plan and Disclosure Statement is comprised of indebtedness and accrued but unpaid interest thereon, such

Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### O.    No Penalty Claims

Unless otherwise specifically provided for in this Combined Plan and Disclosure Statement or the Confirmation Order, no Holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

### P.    No Creditor to Receive More than Payment in Full

Notwithstanding any other provision hereof, no creditor shall receive more than full payment of its applicable Allowed Claim including any interest, costs or fees that may be payable with respect thereto under the Plan.

### Q.    Escheatment

Notwithstanding any state escheatment law, any state that was entitled to File a Claim in its own right in connection with claims for property that had been deemed abandoned and had escheated to the state prepetition, but failed to comply with the Bar Date Order and File a proof of claim, will be forever barred from assertion of such Claim against the Debtor and its Estate unless otherwise ordered by the Bankruptcy Court.

### R.    Compliance with Tax Requirements

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Reorganized Debtor is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.  The Reorganized Debtor may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim complete and return a Form W-8 or W-9, as applicable to each such Holder.  If the Reorganized Debtor makes such a request and the Holder fails to comply before the date that is 90 days after the request is made, unless such date is extended in the sole discretion of the Reorganized Debtor, the amount of such Distribution shall irrevocably revert to the Reorganized Debtor and the right to a distribution on account of such Claim shall be forfeited.

## IX.    IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED PLAN AND DISCLOSURE STATEMENT

### A.    Means for Implementation of the Combined Plan and Disclosure Statement

In addition to the provisions set forth elsewhere in the Combined Plan and Disclosure Statement, the following shall constitute the means for implementation of the Combined Plan and Disclosure Statement:

1.      **Funding of Liabilities and Distributions**

All consideration necessary to make all monetary payments in accordance with the Combined Plan and Disclosure Statement shall be obtained from the Exit Financing, Cash and cash equivalents of the Debtor or the Reorganized Debtor, as applicable, including the consideration to fund the GUC Pool and payments to the Landlord.

2.      **Corporate Action; Effectuating Documents; Further Transactions**

On the Effective Date, all matters and actions provided for under the Combined Plan and Disclosure Statement that would otherwise require approval of the directors and officers, or members or managers of the Debtor shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members and managers of the Reorganized Debtor.  The Reorganized Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

3.      **Direction to Parties**

From and after the Effective Date, the Reorganized Debtor may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution of delivery of any instruments required to effect a transfer of property contemplated by or necessary to effectuate this Plan, and to perform any other act that is necessary for the consummation of this Combined Plan and Disclosure Statement, pursuant to section 1142(b) of the Bankruptcy Code.

4.      **Title to Accounts**

Title to all of the Debtor's bank, brokerage, and other accounts shall vest in the Reorganized Debtor, effective as of the Effective Date, without any further order of the Bankruptcy Court or further action on the part of any Person or Entity.  On and after the Effective Date, all such accounts shall be deemed to be accounts in the name of the Reorganized Debtor without any further action by any Person or Entity or any further order of the Bankruptcy Court.

5.      **Exemption from Certain Taxes**

As authorized by section 1146(a) of the Bankruptcy Code, any transfers of property under the Combined Plan and Disclosure Statement shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents related to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming

and assigning any contract, lease or sublease; (3) any transaction authorize by this Combined Plan and Disclosure Statement; (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Combined Plan and Disclosure Statement.

### B.     Provisions Regarding Corporate Governance of the Reorganized Debtor

#### 1.     Retention of Membership Interests in the Reorganized Debtor

On the Effective Date, Stone Barn will continue to own ninety-five percent (95%) and Michael D. D'Arcangelo will continue to own five percent (5%) of all existing Equity Interests in the Debtor for the consideration provided to implement the Combined Plan and Disclosure Statement.

#### 2.     Management of the Reorganized Debtor

On the Effective Date, the term of each member of the current board of managers of the Debtor shall expire, and the board of managers of the Reorganized Debtor, as well as the officers of the Reorganized Debtor, shall consist of those individuals that will be identified in the Plan Supplement.  Following the Effective Date, the appointment and removal of the members of board of managers of the Reorganized Debtor shall be governed by the terms of the Reorganized Debtor's entity governance documents.

#### 3.     Powers of Officers

The officers of the Debtor or the Reorganized Debtor, as applicable, shall have the power to (i) enter into, execute, or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of the Combined Plan and Disclosure Statement, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of the Combined Plan and Disclosure Statement, including the making of appropriate filings, applications, or recordings.

### C.     Provisions Regarding Means of Implementation, Voting, Distributions, and Resolution of Disputed Claims

#### 1.     General Settlement of Claims

Upon the Effective Date, the provisions of this Combined Plan and Disclosure Statement shall constitute a good faith compromise and settlement of all Claims, interests and controversies resolved under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Combined Plan and Disclosure Statement.  Distributions made under the Combined Plan and Disclosure Statement to holders of Allowed Claims in any Class are intended to be final.

Under Bankruptcy Rule 9019, a bankruptcy court can approve a compromise or settlement if it is in the best interests of the debtor's estate. *See Law Debenture Trust Co. of New York v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95–96 (D. Del. 2006) ("Pursuant to Bankruptcy Rule 9019, the Bankruptcy Court must determine whether a

proposed settlement is in the best interest of the debtor's estate before such a settlement is approved."). In evaluating a settlement, the bankruptcy court must exercise its discretion and make an independent determination that the settlement is fair and reasonable. *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("This court has described the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (*quoting In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)). In addition, a court must: "'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal' in light of four factors: (1) the probability of success in the litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interests of the creditors." *In re Kaiser Aluminum Corp.*, 339 B.R. at 96 (*quoting In re Martin*, 91 F.3d 389, 392 (3d Cir. 1996)).

### 2.     Avoidance Actions

On the Effective Date, all rights to commence, prosecute, or settle all Avoidance Actions, shall vest in the Reorganized Debtor. The Reorganized Debtor shall be deemed to have waived all such Avoidance Actions upon the Effective Date.

### 3.     Restructuring Transactions

After the Effective Date, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by, or necessary to effectuate the terms of this Combined Plan and Disclosure Statement, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms herein and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Combined Plan and Disclosure Statement and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution under applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 4.     Approval and Authorization of Corporate and Company Action

Under the Combined Plan and Disclosure Statement, upon the Effective Date, all corporate and limited liability company actions contemplated by the Combined Plan and Disclosure Statement shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article IX of this Combined Plan and Disclosure Statement, (ii) the adoption and filing of appropriate certificates or articles of incorporation, formation, association, reincorporation, merger, consolidation, conversion, or dissolution, and memoranda and amendments thereto, under applicable law, (iii) the initial selection of managers, directors or officers for the Reorganized Debtor, (iv) the Distributions made under the Plan, and (v) all other

actions contemplated by the Combined Plan and Disclosure Statement (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in the Combined Plan and Disclosure Statement. All matters provided for under the Combined Plan and Disclosure Statement involving the entity structure of the Debtor and Reorganized Debtor or corporate and company action to be taken by or required of the Debtor or the Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Equity Interests, managers of the Debtor or the Reorganized Debtor, as applicable, or any other Person, except to effect the filing of any new entity governance documents respecting the Debtor, as necessary.

### 5.    Effectuating Documents; Further Transactions

After the Effective Date, the Reorganized Debtor, its managers, its officers, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Combined Plan and Disclosure Statement and the securities issued by effect of the Combined Plan and Disclosure Statement in the name of and on behalf of the Reorganized Debtor, without need for any approvals, authorization, or consents except for those expressly required by the Combined Plan and Disclosure Statement and applicable non-bankruptcy law.

### 6.    Reorganized Debtor Operating Agreement

After the Effective Date, the Reorganized Debtor may amend and restate its operating agreement as permitted by the laws of Delaware, and any related governance documents.

### 7.    Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for herein or in the Plan Supplement, (1) the obligations of the Debtor under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically reinstated by the Combined Plan and Disclosure Statement), shall be cancelled solely as to the Debtor, and the Reorganized Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated by the Combined Plan and Disclosure Statement) shall be released and discharged; provided, however, notwithstanding confirmation of the Plan or the occurrence of the Effective Date, any agreement that governs the rights of the

holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under the Combined Plan and Disclosure Statement as provided herein.

### 8.    Distributions in Respect of Allowed Claims

Article VIII of this Combined Plan and Disclosure Statement sets forth the procedure for making distributions hereunder, which include provisions for the timing and manner of delivering distributions of claims, the treatment of unclaimed distributions, the treatment of interest on claims, the rights of the Debtor or Reorganized Debtor to effectuate setoffs against distribution and the certain tax and withholding information.

### D.    Effect of Confirmation of the Plan

### 1.    Continued Entity Existence

Except as otherwise provided herein or in the Plan Supplement, including as provided with respect to Reorganized Debtor as set forth in Article IX.D.1 herein, or as may be provided in the Confirmation Order, the Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a limited liability company, with all the powers thereof, under the law of the State of Delaware and any entity organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Combined Plan and Disclosure Statement and to the extent such documents are amended, such documents are deemed to be amended by the Combined Plan and Disclosure Statement and require no further action or approval.  For the avoidance of doubt, Stone Barn shall continue to own ninety-five percent (95%) and Michael D. D'Arcangelo owns five percent (5%) of the Equity Interests in the Reorganized Debtor after the Effective Date.

### 2.    Vesting of Assets

Except as otherwise set forth in this Combined Plan and Disclosure Statement, the Plan Supplement, or any other agreement, instrument, or other document incorporated herein, on the Effective Date all property of the Estate, all Causes of Action, and any other property acquired by the Debtor under the Combined Plan and Disclosure Statement shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for any Liens applicable to any capitalized leases existing on the Effective Date), except as is otherwise indicated herein.  On and after the Effective Date, except as otherwise provided herein, the Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of its property and assets and compromise or settle any Claims, interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 3.    Preservation of Causes of Action

Subject to the releases and exculpations set forth herein at Article XII, in accordance with section 1123(b)(3) of the Bankruptcy Code, under the Combined Plan and Disclosure Statement, the Reorganized Debtor shall retain all Causes of Action and nothing contained in the Combined Plan and Disclosure Statement or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Causes of Action.

4.      **Discharge of the Debtor**

Under section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Combined Plan and Disclosure Statement, the Plan Supplement, or the Confirmation Order, the Distributions and rights that are provided hereunder shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtor and Reorganized Debtor or any of its assets or properties, regardless of whether any property or assets shall have been distributed or retained under this Combined Plan and Disclosure Statement on account of such Claims, rights, and interests, including Claims and interests that arose before the Effective Date, any liability (including withdrawal liability to the extent such Claims relate to services performed by employees of the Debtor prior to the Filing Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date), and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or interest was Filed, is Filed, or deemed Filed under section 501 of the Bankruptcy Code, (b) a Claim or interests based upon such Claim, debt, right, or interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or interest accepted the Combined Plan and Disclosure Statement.  As provided in the Combined Plan and Disclosure Statement, the Confirmation Order shall be a judicial determination of the discharge of all Claims against and interests in the Debtor, subject to the terms thereof and the occurrence of the Effective Date.

## X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, each of the Executory Contracts not previously assumed or rejected pursuant to an order of the Bankruptcy Court will be deemed rejected as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code except any Executory Contract (1) identified in the Plan Supplement as an Executory Contract to be assumed, (2) that is the subject of a separate motion or notice to assume pending as of the Effective Date, or (3) that previously expired or terminated pursuant to its own terms (disregarding any terms the effect of which is invalidated by the Bankruptcy Code).

The Original Lease, as amended by the Amended Lease, is hereby expressly assumed pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  As a result of the treatment of the Landlord Claim hereunder, no cure claim shall be due in connection with the assumption of the Original Lease as amended by the Amended Lease.

### B.      Rejection Claims

In the event that the rejection of an executory contract or unexpired lease by the Debtor pursuant to the Combined Plan and Disclosure Statement results in a Rejection Claim in favor of a counterparty to such executory contract or unexpired lease, such Rejection Claim, if not heretofore evidenced by a timely and properly filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor, or its properties or interests in property, successors,

or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Reorganized Debtor and the GUC Administrator on or before the date that is 30 days after the Effective Date. All Allowed Rejection Claims shall be treated as General Unsecured Claims pursuant to the terms of the Combined Plan and Disclosure Statement.

### C.    Restrictions on Assignment Void

Any Executory Contract assumed shall remain in full force and effect to the benefit of the Reorganized Debtor in accordance with its terms, notwithstanding any provision in such Executory Contract (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision. Any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract, terminates or modifies such Executory Contract or allows the counterparty to such Executory Contract to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

No sections or provisions of any Executory Contract that purports to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

### D.    Benefit Plans

As of and subject to the Effective Date, all employment agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtor applicable generally to its employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, and senior executive retirement plans, but expressly excluding any nonqualified deferred compensation plans that are treated as unfunded for tax purposes and Title 1 of ERISA, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed hereunder, with a cure amount of zero dollars, and the Debtor's obligations under all such agreements and programs shall survive the Effective Date of this Combined Plan and Disclosure Statement, without prejudice to the Reorganized Debtor's rights under applicable non-bankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions there, except for (i) such executory contract or plans specifically rejected by this Combined Plan and Disclosure Statement (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such Executory Contracts or plans as have previously been terminated, or rejected, by a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

E. **Workers' Compensation and Insurance Programs**

All (i) applicable workers' compensation laws in the state in which the Reorganized Debtor operates and (ii) of the Debtor's written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs and plans regarding or relating to workers' compensation, workers' compensation insurance, and all other forms of insurance, unless specified in the Plan Supplement, are treated as Executory Contracts under this Combined Plan and Disclosure Statement and on the Effective Date will be assumed as authorized by sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

F. **Debtor's Insurance Policies**

Nothing in the Combined Plan and Disclosure Statement alters the rights and obligations of the Debtor (and its Estate) and the Debtor's insurers (and third-party claims administrators) under the Debtor's insurance policies or modifies the coverage of benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Debtor's insurance policies.

## XI. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A. **Conditions Precedent to Confirmation**

The following is the list of conditions precedent to Confirmation that must be satisfied or waived:

(1)    the Plan Supplement is Filed;

(2)    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtor, the Committee, and the Landlord;

(3)    Any exhibits or schedules incorporated as part of the Combined Plan and Disclosure Statement shall be reasonably acceptable in form and substance to the Debtor, the Committee, and the Landlord; and

(4)    the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as Filed on February 25, 2022, unless such material amendment, alteration, or modification has been made in accordance with Article XIV herein.

(5)    the Debtor, the Landlord, Stone Barn and Mr. Blalack shall have entered into a mutually acceptable Amended Lease, including the amended guaranty.

B. **Conditions Precedent to the Effective Date**

The following is the list of conditions precedent to the Effective Date that must be satisfied or waived:

(1)     The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be a Final Order;

(2)     no stay of the Confirmation Order shall then be in effect;

(3)     The Debtor and Landlord shall obtain approval of the Amended Lease by HUD, and the Debtor shall secure Exit Financing satisfactory to Landlord.

(4)     the GUC Administrator shall have been appointed and accepted such appointment;

(5)     the Combined Plan and Disclosure Statement shall not have been materially amended, altered, or modified from the Combined Plan and Disclosure Statement as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with Article XIV herein;

(6)     the Debtor shall have Filed Notice of the Effective Date.

### C.     Waiver of Conditions

The conditions precedent to Confirmation and conditions precedent to the Effective Date may be waived in whole or in part, in writing, by the Debtor, the Committee, and the Landlord, without further order of the Bankruptcy Court.

### D.     Effect of Nonoccurrence of Conditions

If the conditions precedent to the Effective Date are not satisfied or waived, the Debtor may, upon motion and notice to parties in interest, seek to vacate the Confirmation Order; *provided, however*, that notwithstanding the filing of such motion, the Confirmation Order may not be vacated if each of the conditions precedent to the Effective Date are satisfied or waived before the Bankruptcy Court enters an order granting such motion.

If the Confirmation Order is vacated: (i) the Combined Plan and Disclosure Statement is null and void in all respects; and (ii) nothing contained in the Combined Plan and Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against the Debtor, or (b) prejudice, in any manner, the rights of the Debtor or any other party in interest.

## XII.    EXCULPATION, RELEASES, AND INJUNCTIONS

### A.     Injunction

All injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date shall remain in full force and effect until the later of (a) the Effective Date, (b) the date indicated in the order providing for such injunction or stay, or (c) the date specified in section 362 of the Bankruptcy Code.

Except as otherwise provided in the Combined Plan and Disclosure Statement or to the extent necessary to enforce the terms and conditions of the Combined Plan and Disclosure Statement, the Confirmation Order, or a separate Order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against any property that is to be distributed under the terms of the Combined Plan and Disclosure Statement on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any lien or encumbrance; (d) asserting a setoff, right, or subrogation of any kind against any debt, liability, or obligation due to the Debtor; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Combined Plan and Disclosure Statement; *provided, however*, that such entities shall not be precluded from exercising their rights pursuant to and consistent with the terms of the Combined Plan and Disclosure Statement or the Confirmation Order; *provided, further*, that the foregoing provisions of this provision shall not apply to any acts, omissions, claims, causes of action, or other obligations expressly set forth in and preserved by this Combined Plan and Disclosure Statement or any defenses thereto.

The satisfaction, release, discharge, and exculpation pursuant to this Article XII of the Combined Plan and Disclosure Statement shall also act as a permanent injunction against any entity bound by such provision against commencing or continuing any action, employment of process or act to collect, offset, or recover any claim or cause of action satisfied, released, discharged, or exculpated under the Combined Plan and Disclosure Statement or the Confirmation Order to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

### B.    Exculpation

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, none of the Exculpated Parties shall have or incur any liability to any holder of a Claim or Interest (including Estate Causes of Action) for any act or omission in connection with, related to, or arising out of the Chapter 11 Case, the Combined Plan and Disclosure Statement, the pursuit of Confirmation, the consummation of the Combined Plan and Disclosure Statement, the administration of the Combined Plan and Disclosure Statement, the property to be liquidated and/or distributed under the Combined Plan and Disclosure Statement or any postpetition act taken or omitted to be taken in connection with or in contemplation of the reorganization of the Debtor, except for their willful conduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Combined Plan and Disclosure Statement.

### C.    Estate Releases

**PURSUANT TO BANKRUPTCY CODE SECTION 1123(B), AND NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE COMBINED PLAN**

**AND DISCLOSURE STATEMENT OR THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE RELEASED PARTIES SHALL BE DEEMED RELEASED BY THE DEBTOR AND THEIR ESTATES, FROM ANY AND ALL CLAIMS, OBLIGATIONS, DEBTS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTOR OR THE ESTATE, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTOR, ITS ESTATE, OR THE GUC ADMINISTRATOR, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN ITS OWN RIGHT, OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, THE CHAPTER 11 CASE, THE PURCHASE, SALE, TRANSFER, OR RESCISSION OF THE PURCHASE, SALE, OR TRANSFER OF ANY DEBT, SECURITY, ASSET, RIGHT, OR INTEREST OF THE DEBTOR, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASE, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AND ANY OTHER AGREEMENTS OR DOCUMENTS EFFECTUATING THE COMBINED PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, AND ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTOR OR THE ESTATE.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASE OF THE RELEASED PARTIES BY DEBTOR AND THE ESTATE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE RELEASE BY DEBTOR AND THE ESTATE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE RELEASE BY DEBTOR; (C) IN THE BEST INTERESTS OF THE DEBTOR, THE ESTATE, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (D) FAIR, EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO THE DEBTOR, OR ITS ESTATE, ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE RELEASE BY DEBTOR AND THE ESTATE.**

## XIII.   RETENTION OF JURISDICTION

Following the Confirmation Date and the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)     to hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

(2)     to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(3)     to issue such orders in aid of execution and consummation of the Combined Plan and Disclosure Statement, to the extent authorized by Bankruptcy Code section 1142;

(4)     to consider any amendments to or modifications of the Combined Plan and Disclosure Statement, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(5)     to hear and determine all requests for compensation and reimbursement of expenses to the extent allowed by the Bankruptcy Court under Bankruptcy Code sections 330 or 503;

(6)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Combined Plan and Disclosure Statement;

(7)     to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(8)     to hear any other matter not inconsistent with the Bankruptcy Code;

(9)     to enter the Final Decree;

(10)    to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Combined Plan and Disclosure Statement;

(11)    to decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(12)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of the Combined Plan and Disclosure Statement, except as otherwise provided herein;

(13)    to determine any other matters that may arise in connection with or related to the Combined Plan and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with the Combined Plan and Disclosure Statement;

(14)     to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(15)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof; and

(16)     to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the Bar Date, or the Confirmation Hearing for the purpose of determining whether a Claim or Interest is discharged hereunder, or for any other purpose.

## XIV.    MISCELLANEOUS PROVISIONS

### A.    Amendment or Modification of the Combined Plan and Disclosure Statement

Alterations, amendments, or modifications of the Combined Plan and Disclosure Statement may be proposed in writing by the Debtor, but only with the prior written consent of the Committee, at any time before the Confirmation Date; provided that the Combined Plan and Disclosure Statement, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123 and the Debtor shall have complied with Bankruptcy Code section 1125. The Debtor, but only with the prior written consent of the Committee, may modify the Combined Plan and Disclosure Statement at any time after Confirmation and before substantial consummation, provided that this Combined Plan and Disclosure Statement, as modified, meets the requirements of Bankruptcy Code sections 1122 and 1123 and the circumstances warrant such modifications. A Holder of a Claim that has accepted the Combined Plan and Disclosure Statement shall be deemed to have accepted such Combined Plan and Disclosure Statement as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.

### B.    Exhibits/Schedules

All exhibits and schedules to this Combined Plan and Disclosure Statement are incorporated into and are part of the Combined Plan and Disclosure Statement as if set forth in full herein.

### C.    Plan Supplement

The Debtor will File the Plan Supplement on or before seven (7) days prior to the earlier of (a) the Voting Deadline, or (b) the deadline to object to confirmation of the Combined Plan and Disclosure Statement, unless otherwise ordered by the Bankruptcy Court. The Plan Supplement will contain, among other things: (a) identification of the GUC Administrator; and (b) any other disclosures as required by the Bankruptcy Code.

### D.    Filing of Additional Documents

On or before substantial consummation of the Combined Plan and Disclosure Statement, the Debtor shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Combined Plan and Disclosure Statement.

### E.    Binding Effect of Plan

The Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, the Holders of Equity Interests, and their respective successors and assigns.

### F.    Governing Law

Except as required by the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the rights and obligations arising under the Combined Plan and Disclosure Statement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

### G.    Time

To the extent that any time for the occurrence or happening of an event as set forth in this Combined Plan and Disclosure Statement falls on a day that is not a Business Day, the time for the next occurrence or happening of said event shall be extended to the next Business Day.

### H.    Severability

Should any provision of this Combined Plan and Disclosure Statement be deemed unenforceable after the Effective Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Combined Plan and Disclosure Statement.

### I.    Revocation

The Debtor reserves the right to revoke and withdraw the Combined Plan and Disclosure Statement prior to the entry of the Confirmation Order.  If the Debtor revokes or withdraws the Combined Plan and Disclosure Statement, the Combined Plan and Disclosure Statement shall be deemed null and void, and nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor, any other Person, or to prejudice in any manner the rights of such parties in any further proceedings involving the Debtor.

### J.    Dissolution of the Committee

On the Effective Date, the Committee shall be dissolved and its members deemed released of any continuing duties, responsibilities, and obligations in connection with the Chapter 11 Case or the Combined Plan and Disclosure Statement and its implementation, and the retention and employment of the Committee's Professionals shall terminate, except with respect to: (i) prosecuting applications for Professionals' compensation and reimbursement of expenses

incurred as a member of the Committee; (ii) asserting, disputing, and participating in resolution of Professional Fee Claims; or (iii) prosecuting or participating in any appeal of the Confirmation Order or any request for consideration thereof. Upon the resolution of (i) through (iii), the Committee shall be immediately dissolved, released, and discharged.

### K.    Inconsistency

To the extent that the Combined Plan and Disclosure Statement conflicts with or is inconsistent with any agreement related to the Combined Plan and Disclosure Statement, the provisions of the Combined Plan and Disclosure Statement shall control. In the event of any inconsistency between any provision of any of the foregoing documents, and any provision of the Confirmation Order, the Confirmation Order shall control and take precedence.

### L.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Combined Plan and Disclosure Statement shall be deemed an admission by any Entity with respect to any matter set forth herein.

### M.    Reservation of Rights

Except as expressly set forth herein, the Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtor with respect to the Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims, or Holders of Equity Interests before the Effective Date.

### N.    Compromise of Controversies

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall constitute a good faith compromise and settlement of all Claims or controversies resolved pursuant to the Combined Plan and Disclosure Statement and in the Chapter 11 Case. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements, provided for in the Combined Plan and Disclosure Statement and the Chapter 11 Case.  The Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, the Estate, and all Holders of Claims and Equity Interests against the Debtor.

## XV.    RECOMMENDATION

In the opinion of the Debtor and the Committee, the Combined Plan and Disclosure Statement is superior and preferable to the alternatives described in this Combined Plan and Disclosure Statement. Accordingly, the Debtor and the Committee recommend that Holders of Claims entitled to vote on the Combined Plan and Disclosure Statement vote to accept the Combined Plan and Disclosure Statement and support Confirmation.

Dated:  February 25, 2022
      Wilmington, Delaware

**CHIPMAN BROWN CICERO & COLE, LLP**

*/s/ Mark D. Olivere*
_____
William E. Chipman, Jr. (No. 3818)
Mark L. Desgrosseilliers (No. 4083)
Mark D. Olivere (No. 4291)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
      desgross@chipmanbrown.com
      olivere@chipmanbrown.com

*Counsel for the Debtor and Debtor in Possession*

**Exhibit A**

Term Sheet

*IN RE CEDAR HAVEN ACQUISITION, LLC*

**TERM SHEET FOR AMENDMENT AND ASSUMPTION OF LEASE**

**JANUARY 24, 2022**

*This Term Sheet is intended to provide a preliminary description of certain terms of agreement between 590 South 5th Avenue LLC; Cedar Haven Acquisition, LLC; Stone Barn Management, LLC; and Charles B. Blalack. This Term Sheet is not intended by any of the parties hereto to be, and shall not be construed to be, a contract between or among any of the parties hereto. Each of the parties hereto acknowledges and agrees that no discussion of the terms set forth below, nor any exchange of comments concerning such terms, between or among the parties shall constitute a contract among any of them. Each of these terms remains subject to review and change at any time by any party hereto, and none of them shall be binding on any party until definitive documentation is signed by each party hereto.*

| | |
|---|---|
| **LANDLORD** | 590 South 5th Avenue, LLC |
| **TENANT** | Cedar Haven Acquisition, LLC |
| **MANAGER** | Stone Barn Management, LLC |
| **GUARANTOR** | Charles B. Blalack |
| **LEASE** | Operating Lease dated as of December 1, 2017, by and between Landlord and Tenant, as amended. Capitalized but undefined terms in this Term Sheet shall have the meanings ascribed to them in the Lease. |
| **BANKRUPTCY COURT** | United States Bankruptcy Court for the District of Delaware |
| **BANKRUPTCY CASE** | *In re Cedar Haven Acquisition, LLC, Debtor*, Case No. 19-11736 (JKS), pending in the Bankruptcy Court |
| **PLAN** | A plan of reorganization to be proposed by the Tenant in the Bankruptcy Case. |
| **EFFECTIVE DATE** | The effective date of the Plan. |
| **PROPOSED AMENDMENTS TO LEASE** | 1. Fixed Rent during the Term shall be as set forth on <u>Exhibit 1</u> hereto.<br>2. The annual Fixed Rent for the each Lease Year of the First Extension Period shall be 101.75% of the amount of Fixed Rent due in the immediately preceding Lease Year.<br>3. Section 3.2(d) of the Lease shall be amended by substituting the number "101.75%" for the number "102.5%". |

| SPECIAL PROVISIONS FOR LEASE YEAR 2022 | 1. Fixed Rent shall increase to $150,000 per month beginning in the month after the average census reaches 240. <br><br> 2. No Event of Default will occur during the period 1/1/22 – 6/30/22 based solely on Tenant's failure to pay the full amount of the Fixed Rent in any month. Any unpaid Fixed Rent during this period shall accrue as "Unpaid 2022 Rent", and all Unpaid 2022 Rent shall be paid in full by 6/30/23. |
|---|---|
| SECURITY DEPOSIT | Landlord shall use the existing security deposit to pay any Rent past due under the Lease on the Effective Date. |
| EXCESS CASH | 1. Fifty percent (50%) of all of the Tenant's quarterly EBITDA above $250,000 shall be paid to the Landlord until a) all remaining Rent past due under the Lease on the Effective Date is paid in full, and b) Tenant has fully funded a new Security Deposit equal to three (3) months of Fixed Rent (the "*Catch-Up Period*"). <br><br> 2. After the Catch-Up Period, fifty percent (50%) of all of the Tenant's quarterly EBITDA above $250,000 shall be paid to the Landlord as Additional Rent, up to the total amount of Fixed Rent that was payable for that quarter under the Lease prior to amendment. |
| TAXES AND ASSESSMENTS | The Plan shall provide for payment of all taxes and assessments owed by the Tenant. |
| CITATIONS | The Plan shall provide for resolution of all outstanding health or safety citations issued by any governmental or regulatory body. |
| PROPOSED AMENDMENT TO GUARANTY | The Guaranty Cap (as that term is defined in the Guaranty) shall be reduced to six (6) months of the then current Fixed Rent payable under the Lease at the time of Tenant's default. |
| MANAGEMENT AGREEMENT | The management agreement between Manager and Tenant shall be amended to set the Manager's monthly management fee at $80,000, and the management agreement as so amended shall be subject to approval by Tenant, Landlord, Landlord's lender, and HUD. |
| CONDITIONS TO EFFECTIVE DATE | The Effective Date shall be conditioned upon approval of the amendments to the Lease by HUD and upon the Tenant having secured operating financing satisfactory to Landlord. |
| REPRESENTATIONS AND WARRANTIES | Standard |

DM2\15122670.4

| MISCELLANEOUS PROVISIONS | Standard provisions as to exculpation, integration, amendment, etc. |
|---|---|

EXECUTED as of January 24, 2022.

**LANDLORD:**        590 SOUTH 5TH AVENUE, LLC, a Delaware limited liability company

By:    SNF Manager, Inc., a Delaware corporation, its Manager

By: _____

Name:   Ira Smedra

Title:    President

**TENANT:**        CEDAR HAVEN ACQUISITION, LLC, a Delaware limited liability company

By: _____

Name:

Title:

DM2\15122670.4

| MISCELLANEOUS PROVISIONS | Standard provisions as to exculpation, integration, amendment, etc. |
|---|---|

EXECUTED as of January 24, 2022.

**LANDLORD:**    590 SOUTH 5TH AVENUE, LLC, a Delaware limited liability company

By:    SNF Manager, Inc., a Delaware corporation, its Manager

By: _____
Name:
Title:


**TENANT:**    CEDAR HAVEN ACQUISITION, LLC, a Delaware limited liability company

By: _CHAS B. BL_____
Name: CHAS B. Blatack
Title: Managing Partner

**EXHIBIT 1**

| From | To | Monthly |
|------|------|---------|
| 1/1/2022 | 6/30/2022 | $ 125,000 |
| 7/1/2022 | 12/31/2022 | $ 125,000 |
| 1/1/2023 | 12/31/2023 | $ 150,000 |
| 1/1/2024 | 12/31/2024 | $ 225,000 |
| 1/1/2025 | 12/31/2025 | $ 228,375 |
| 1/1/2026 | 12/31/2026 | $ 231,801 |
| 1/1/2027 | 12/31/2027 | $ 235,857 |
| 1/1/2028 | 12/31/2028 | $ 239,985 |
| 1/1/2029 | 12/31/2029 | $ 244,184 |
| 1/1/2030 | 12/31/2030 | $ 248,458 |
| 1/1/2031 | 12/31/2031 | $ 252,806 |
| 1/1/2032 | 12/31/2032 | $ 257,230 |
| 1/1/2033 | 12/31/2033 | $ 261,731 |
| 1/1/2034 | 12/31/2034 | $ 266,312 |

DM2\15122670.4

**<u>Exhibit B</u>**

Projections

**Income Statement**
**9/1/1/2021 to 11/30/2021 Actual**
**12/1/2021 to 12/31/2022 Projected**

| Category | September 21_Actual $ | October 21_Actual $ | November 21_Actual $ | December 21 Projected | January 22 Projected | February 22 Projected | March 22 Projected | April 22 Projected | May 22 Projected | June 22 Projected | July 22 Projected | August 22 Projected | September 22 Projected | October 22 Projected | November 22 Projected | December 22 Projected | January 23 Projected | February 23 Projected | March 23 Projected | April 23 Projected | May 23 Projected | June 23 Projected | July 23 Projected | August 23 Projected | September 23 Projected | October 23 Projected | November 23 Projected | December 23 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Room Revenues | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Medicare Revenues | 179,937 | 268,101 | 170,095 | 84,318 | 111,500 | 102,466 | 116,686 | 117,313 | 124,465 | 123,587 | 130,948 | 134,189 | 132,997 | 140,672 | 139,270 | 147,154 | 150,395 | 138,769 | 156,878 | 154,954 | 163,360 | 161,227 | 169,843 | 173,084 | 170,638 | 179,567 | 176,911 | 186,049 |
| Medicare HMO Revenues | 37,173 | 12,587 | 17,386 | 56,486 | 40,000 | 36,759 | 41,860 | 42,086 | 44,651 | 44,336 | 46,977 | 48,140 | 47,712 | 50,465 | 48,837 | 51,602 | 52,738 | 48,661 | 55,012 | 54,337 | 57,285 | 56,537 | 59,558 | 60,695 | 59,837 | 62,968 | 62,036 | 65,241 |
| Private Revenue | 100,315 | 106,222 | 102,660 | 101,095 | 102,000 | 93,736 | 106,744 | 107,318 | 113,860 | 113,057 | 119,791 | 122,756 | 121,665 | 128,686 | 124,535 | 131,584 | 134,483 | 124,086 | 140,279 | 138,559 | 146,076 | 144,169 | 151,873 | 154,771 | 152,583 | 160,568 | 158,193 | 166,364 |
| Medicaid Revenue | 1,032,238 | 1,064,360 | 1,024,290 | 1,054,567 | 986,620 | 906,684 | 1,032,509 | 1,038,060 | 1,101,343 | 1,093,572 | 1,158,705 | 1,187,386 | 1,176,839 | 1,244,747 | 1,204,594 | 1,272,782 | 1,300,817 | 1,200,253 | 1,356,887 | 1,340,247 | 1,412,956 | 1,394,508 | 1,469,026 | 1,497,061 | 1,475,899 | 1,553,131 | 1,530,160 | 1,609,200 |
| MCD HMO | (181) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Insurance Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Disproportionate Share/MDOI | 20,000 | 20,000 | 23,652 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| TOTAL Room Revenues | 1,369,483 | 1,471,269 | 1,338,083 | 1,316,466 | 1,260,120 | 1,159,645 | 1,317,800 | 1,324,777 | 1,404,320 | 1,394,552 | 1,476,420 | 1,512,470 | 1,499,213 | 1,584,570 | 1,537,237 | 1,623,122 | 1,658,433 | 1,531,769 | 1,729,056 | 1,708,097 | 1,799,678 | 1,776,441 | 1,870,300 | 1,905,611 | 1,878,957 | 1,976,233 | 1,947,301 | 2,046,855 |
| Ancillary Revenues | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pharmacy Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | | | |
| Speech Therapy Revenue | 33,971 | 39,564 | 37,547 | 39,471 | 40,000 | 36,759 | 41,860 | 42,086 | 44,651 | 44,336 | 46,977 | 48,140 | 47,712 | 50,465 | 49,962 | 52,791 | 53,953 | 49,782 | 56,279 | 55,589 | 58,605 | 57,839 | 60,930 | 62,093 | 61,215 | 64,419 | 63,466 | 66,744 |
| Physical Therapy Revenues | 82,298 | 66,909 | 76,962 | 84,799 | 85,000 | 78,113 | 88,953 | 89,432 | 94,884 | 94,214 | 99,826 | 102,297 | 101,388 | 107,238 | 106,170 | 112,180 | 114,651 | 105,788 | 119,593 | 118,126 | 124,535 | 122,909 | 129,477 | 131,948 | 130,083 | 136,890 | 134,865 | 141,831 |
| Occupational Therapy Revenue | 71,425 | 71,040 | 90,626 | 84,104 | 80,000 | 73,518 | 83,721 | 84,171 | 89,302 | 88,672 | 93,953 | 96,279 | 95,424 | 100,930 | 99,925 | 105,581 | 107,907 | 99,565 | 112,558 | 111,178 | 117,209 | 115,679 | 121,860 | 124,186 | 122,431 | 128,837 | 126,932 | 133,488 |
| Other Ancillary Revenues | (32,830) | (32,657) | (27,419) | (36,556) | (35,000) | (32,164) | (36,628) | (36,825) | (39,070) | (38,794) | (41,105) | (42,122) | (41,748) | (44,157) | (43,717) | (46,192) | (47,209) | (43,560) | (49,244) | (48,640) | (51,279) | (50,610) | (53,314) | (54,331) | (53,563) | (56,366) | (55,533) | (58,401) |
| TOTAL Ancillary Revenues | 154,864 | 144,857 | 177,716 | 171,818 | 170,000 | 156,227 | 177,907 | 178,863 | 189,767 | 188,428 | 199,651 | 204,593 | 202,776 | 214,477 | 212,341 | 224,360 | 229,302 | 211,575 | 239,186 | 236,253 | 249,070 | 245,818 | 258,953 | 263,895 | 260,165 | 273,779 | 269,730 | 283,663 |
| Other Revenues | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Other Revenue | 350,119 | 270,669 | 310,676 | 390,161 | 32,000 | 32,000 | 32,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 38,000 | 38,000 | 38,000 | 38,000 | 38,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Assessment Tax Revenue | 80,000 | 443,337 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 |
| TOTAL Other Revenues | 430,119 | 714,007 | 410,676 | 490,161 | 132,000 | 132,000 | 132,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 138,000 | 138,000 | 138,000 | 138,000 | 138,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 |
| TOTAL Revenue | 1,954,467 | 2,330,132 | 1,926,475 | 1,978,445 | 1,562,120 | 1,447,872 | 1,627,707 | 1,638,641 | 1,729,087 | 1,717,980 | 1,811,071 | 1,852,063 | 1,836,989 | 1,934,047 | 1,884,577 | 1,982,483 | 2,025,736 | 1,881,345 | 2,106,242 | 2,082,350 | 2,186,747 | 2,162,258 | 2,269,253 | 2,309,506 | 2,279,122 | 2,390,012 | 2,357,031 | 2,470,518 |
| Expenses | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Operating Expenses | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 6115 Gen Nsg | 154,262 | 152,532 | 149,935 | 133,429 | 135,656 | 116,892 | 127,905 | 123,779 | 127,905 | 123,779 | 127,905 | 127,905 | 123,779 | 127,905 | 123,779 | 129,417 | 129,417 | 115,527 | 127,905 | 123,779 | 127,905 | 123,779 | 127,905 | 127,905 | 123,779 | 127,905 | 123,779 | 127,905 |
| 6117 Med Records Supplies | 75 | 50 | 75 | 75 | 75 | 75 | 83 | 80 | 83 | 80 | 83 | 83 | 80 | 83 | 80 | 83 | 83 | 75 | 83 | 80 | 83 | 80 | 83 | 83 | 80 | 83 | 80 | 83 |
| 6120 Adm Clinical | 123,380 | 145,832 | 182,291 | 138,337 | 140,549 | 126,956 | 139,010 | 134,526 | 139,010 | 134,526 | 139,010 | 139,010 | 134,526 | 139,010 | 134,526 | 140,559 | 140,559 | 125,558 | 139,010 | 134,526 | 139,010 | 134,526 | 139,010 | 139,010 | 134,526 | 139,010 | 134,526 | 139,010 |
| 6216 Cert Nsg | 497,007 | 499,006 | 485,061 | 448,208 | 466,807 | 432,833 | 471,046 | 455,851 | 471,046 | 455,851 | 471,046 | 471,046 | 455,851 | 471,046 | 455,851 | 471,046 | 479,208 | 432,833 | 471,046 | 437,517 | 451,224 | 436,669 | 451,224 | 451,224 | 436,669 | 451,224 | 436,669 | 451,224 |
| 6537 Nurse Aide Training | 8,168 | 8,263 | 11,861 | 11,861 | 11,824 | 10,680 | 11,627 | 11,252 | 11,627 | 11,252 | 11,627 | 11,627 | 11,252 | 11,627 | 11,252 | 11,627 | 11,824 | 10,680 | 11,627 | 11,252 | 11,627 | 11,252 | 11,627 | 11,627 | 11,252 | 11,627 | 11,252 | 11,627 |
| 6812 Pharmacy | 36,243 | 27,532 | 14,206 | 14,206 | 14,206 | 12,831 | 14,206 | 13,748 | 14,206 | 13,748 | 14,206 | 14,206 | 13,748 | 14,206 | 13,748 | 14,206 | 14,206 | 12,831 | 14,206 | 13,748 | 14,206 | 13,748 | 14,206 | 14,206 | 13,748 | 14,206 | 13,748 | 14,206 |
| 6813 IV | 3,066 | 4,571 | 3,005 | 3,005 | 3,005 | 2,714 | 3,005 | 2,908 | 3,005 | 2,908 | 3,005 | 3,005 | 2,908 | 3,005 | 2,908 | 3,005 | 3,005 | 2,714 | 3,005 | 2,908 | 3,005 | 2,908 | 3,005 | 3,005 | 2,908 | 3,005 | 2,908 | 3,005 |
| 6826 PT | 806 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6829 PEN | 1,431 | 707 | 729 | 729 | 729 | 658 | 729 | 705 | 729 | 705 | 729 | 729 | 705 | 729 | 705 | 729 | 729 | 658 | 729 | 705 | 729 | 705 | 729 | 729 | 705 | 729 | 705 | 729 |
| 6830 Wound Care | 1,311 | 1,340 | 796 | 796 | 796 | 719 | 796 | 770 | 796 | 770 | 796 | 796 | 770 | 796 | 770 | 796 | 796 | 719 | 796 | 770 | 796 | 770 | 796 | 796 | 770 | 796 | 770 | 796 |
| 6831 Urology & Ostomy | 361 | 355 | 378 | 378 | 378 | 341 | 378 | 366 | 378 | 366 | 378 | 378 | 366 | 378 | 366 | 378 | 378 | 341 | 378 | 366 | 378 | 366 | 378 | 378 | 366 | 378 | 366 | 378 |
| 6845 Chargeable M/S | 452 | 422 | 687 | 687 | 687 | 621 | 687 | 665 | 687 | 665 | 687 | 687 | 665 | 687 | 665 | 687 | 687 | 621 | 687 | 665 | 687 | 665 | 687 | 687 | 665 | 687 | 665 | 687 |
| 6856 Oxygen | 7,795 | 4,862 | 4,966 | 4,966 | 4,966 | 4,485 | 4,966 | 4,806 | 4,966 | 4,806 | 4,966 | 4,966 | 4,806 | 4,966 | 4,806 | 4,966 | 4,966 | 4,485 | 4,966 | 4,806 | 4,966 | 4,806 | 4,966 | 4,966 | 4,806 | 4,966 | 4,806 | 4,966 |
| 6857 Radiology | 1,147 | 1,537 | 1,704 | 1,704 | 1,704 | 1,539 | 1,704 | 1,649 | 1,704 | 1,649 | 1,704 | 1,704 | 1,649 | 1,704 | 1,649 | 1,704 | 1,704 | 1,539 | 1,704 | 1,649 | 1,704 | 1,649 | 1,704 | 1,704 | 1,649 | 1,704 | 1,649 | 1,704 |
| 6858 Lab | 2,752 | 2,737 | 3,984 | 3,984 | 3,984 | 3,598 | 3,984 | 3,855 | 3,984 | 3,855 | 3,984 | 3,984 | 3,855 | 3,984 | 3,855 | 3,984 | 3,984 | 3,598 | 3,984 | 3,855 | 3,984 | 3,855 | 3,984 | 3,984 | 3,855 | 3,984 | 3,855 | 3,984 |
| 6859 Central Supply & Hospitality | 25,771 | 42,717 | 23,563 | 23,563 | 24,023 | 21,698 | 23,660 | 22,897 | 23,660 | 22,897 | 23,660 | 23,660 | 22,897 | 23,660 | 22,897 | 23,660 | 24,023 | 21,698 | 23,660 | 22,897 | 23,660 | 22,897 | 23,660 | 23,660 | 22,897 | 23,660 | 22,897 | 23,660 |
| 6870 Beauty & Barber | 5,160 | 5,629 | 5,195 | 5,195 | 5,364 | 2,415 | 2,634 | 2,549 | 2,634 | 2,549 | 2,634 | 2,634 | 2,549 | 2,634 | 2,549 | 2,634 | 2,674 | 2,415 | 2,634 | 2,549 | 2,634 | 2,549 | 2,634 | 2,634 | 2,549 | 2,634 | 2,549 | 2,634 |
| 7714 Activities | 34,448 | 33,131 | 31,514 | 31,514 | 31,514 | 14,954 | 16,556 | 15,808 | 16,335 | 15,808 | 16,335 | 16,335 | 15,808 | 16,335 | 15,808 | 16,335 | 16,556 | 14,954 | 16,335 | 15,808 | 16,335 | 15,808 | 16,335 | 16,335 | 15,808 | 16,335 | 15,808 | 16,335 |
| 7741 Social Services | 13,956 | 15,105 | 18,121 | 18,121 | 18,665 | 16,859 | 18,426 | 17,832 | 18,426 | 17,832 | 18,426 | 18,426 | 17,832 | 18,426 | 17,832 | 18,426 | 18,665 | 16,859 | 18,426 | 17,832 | 18,426 | 17,832 | 18,426 | 18,426 | 17,832 | 18,426 | 17,832 | 18,426 |
| 7930 Dietary (non-PR) | 108,835 | 93,737 | 110,533 | 110,533 | 110,533 | 99,836 | 110,533 | 106,967 | 110,533 | 106,967 | 110,533 | 110,533 | 106,967 | 110,533 | 106,967 | 110,533 | 110,533 | 99,836 | 110,533 | 106,967 | 110,533 | 106,967 | 110,533 | 110,533 | 106,967 | 110,533 | 106,967 | 110,533 |
| 8010 Admin | 149,369 | 180,338 | 147,997 | 147,700 | 143,363 | 131,582 | 139,712 | 135,351 | 139,196 | 133,711 | 136,414 | 135,779 | 131,799 | 134,688 | 135,613 | 133,797 | 134,560 | 123,885 | 132,759 | 129,071 | 133,524 | 128,588 | 131,787 | 131,600 | 128,024 | 131,278 | 132,533 | 131,015 |
| 8011 Admissions | 21,320 | 23,143 | 18,972 | 19,134 | 6,062 | 4,734 | 5,241 | 5,072 | 5,241 | 5,072 | 5,241 | 5,241 | 5,072 | 5,241 | 5,072 | 5,241 | 5,241 | 4,734 | 5,241 | 5,072 | 5,241 | 5,072 | 5,241 | 5,241 | 5,072 | 5,241 | 5,072 | 5,241 |
| 8060 Therapy | 118,850 | 113,792 | 102,969 | 103,520 | 103,520 | 93,502 | 103,520 | 100,181 | 103,520 | 100,181 | 103,520 | 103,520 | 100,181 | 103,520 | 100,181 | 103,520 | 103,520 | 93,502 | 103,520 | 100,181 | 103,520 | 100,181 | 103,520 | 103,520 | 100,181 | 103,520 | 100,181 | 103,520 |
| 8250 Maintenance | 53,682 | 52,778 | 46,413 | 46,413 | 47,521 | 42,922 | 47,024 | 45,507 | 47,024 | 45,507 | 47,024 | 47,024 | 45,507 | 47,024 | 45,507 | 47,024 | 47,521 | 42,922 | 47,024 | 45,507 | 47,024 | 45,507 | 47,024 | 47,024 | 45,507 | 47,024 | 45,507 | 47,024 |
| 8340 Housekeeping | 44,631 | 52,431 | 48,684 | 48,684 | 49,470 | 44,682 | 48,854 | 47,278 | 48,854 | 47,278 | 48,854 | 48,854 | 47,278 | 48,854 | 47,278 | 48,854 | 49,470 | 44,682 | 48,854 | 47,278 | 48,854 | 47,278 | 48,854 | 48,854 | 47,278 | 48,854 | 47,278 | 48,854 |
| 8360 Laundry | 51,063 | 48,209 | 50,429 | 50,429 | 51,799 | 41,237 | 45,186 | 43,728 | 45,186 | 43,728 | 45,186 | 45,186 | 43,728 | 45,186 | 43,728 | 45,186 | 45,656 | 41,237 | 45,186 | 43,728 | 45,186 | 43,728 | 45,186 | 45,186 | 43,728 | 45,186 | 43,728 | 45,186 |
| 8380 Dietary Wages/PR | 85,872 | 87,383 | 82,418 | 82,418 | 82,418 | 76,814 | 85,044 | 80,896 | 83,592 | 80,896 | 83,592 | 83,592 | 80,896 | 83,592 | 80,896 | 83,592 | 85,044 | 76,814 | 85,044 | 80,896 | 83,592 | 80,896 | 83,592 | 83,592 | 80,896 | 83,592 | 80,896 | 83,592 |
| 8410 Bad Debt | 36,139 | 43,930 | 54,689 | 54,689 | 54,689 | 51,332 | 54,689 | 53,570 | 54,689 | 53,570 | 54,689 | 54,689 | 53,570 | 54,689 | 53,570 | 54,689 | 54,689 | 51,332 | 54,689 | 53,570 | 54,689 | 53,570 | 54,689 | 54,689 | 53,570 | 54,689 | 53,570 | 54,689 |
| 8510 Tele & Utilities | 29,162 | 26,119 | 35,257 | 40,512 | 40,512 | 39,579 | 36,391 | 30,620 | 29,391 | 30,620 | 32,891 | 31,891 | 29,620 | 26,891 | 35,120 | 41,391 | 41,391 | 38,579 | 39,391 | 32,120 | 29,891 | 31,120 | 32,891 | 31,891 | 29,620 | 26,891 | 33,620 | 38,391 |
| 8776 Business Ins | 28,145 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 | 28,861 |
| TOTAL Operating Expenses | 1,644,659 | 1,697,049 | 1,665,293 | 1,573,651 | 1,583,678 | 1,425,951 | 1,546,457 | 1,492,077 | 1,537,268 | 1,490,437 | 1,537,986 | 1,536,351 | 1,487,525 | 1,530,259 | 1,496,839 | 1,546,929 | 1,559,948 | 1,414,490 | 1,542,283 | 1,468,963 | 1,512,274 | 1,466,631 | 1,513,537 | 1,512,350 | 1,464,568 | 1,507,028 | 1,473,077 | 1,518,265 |
| Management Fees/Rent/RE Taxes | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8910 Mgmt Fees/Rent/RE Taxes | 98,148 | 116,931 | 96,725 | 96,725 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| 9176 Taxes Exp Non-Property | 29,745 | 29,766 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 | 29,734 |
| 9376 Rent | 271,198 | 271,198 | 271,198 | 271,198 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 |
| TOTAL Management Fees/Rent/RE Taxes | 399,091 | 417,895 | 397,657 | 397,657 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 234,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 | 259,734 |
| Other Income or Expense | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| EBITDA | (89,283) | 215,188 | (136,475) | 7,137 | (256,292) | (212,813) | (153,484) | (88,170) | (42,914) | (7,191) | 38,351 | 80,978 | 114,729 | 169,053 | 153,004 | 200,820 | 206,054 | 207,121 | 304,225 | 353,652 | 414,740 | 435,893 | 495,982 | 537,423 | 554,820 | 623,250 | 624,219 | 692,519 |
| 9576 Depr Exp | 12,238 | 12,262 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 | 12,363 |
| 9776 Interest Exp/Inc | 34,592 | 34,290 | 33,976 | 33,976 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 | 3,977 |
| 9999 Extraordinary Exp | 51,912 | 18,027 | 78,216 | 43,985 | 30,000 | 30,000 | 30,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL Other Income or Expense | 98,742 | 64,579 | 124,555 | 90,324 | 46,340 | 46,340 | 46,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 | 16,340 |
| TOTAL Expenses | 2,142,492 | 2,179,523 | 2,187,505 | 2,061,632 | 1,864,752 | 1,707,025 | 1,827,531 | 1,743,151 | 1,788,342 | 1,741,511 | 1,789,060 | 1,787,425 | 1,738,599 | 1,781,333 | 1,747,913 | 1,798,003 | 1,836,022 | 1,690,564 | 1,818,357 | 1,745,037 | 1,788,348 | 1,742,705 | 1,789,611 | 1,788,424 | 1,740,642 | 1,783,102 | 1,749,151 | 1,794,339 |
| Net Income (Loss) | (188,025) | 150,609 | (261,030) | (83,187) | (302,632) | (259,153) | (199,824) | (104,510) | (59,254) | (23,531) | 22,011 | 64,638 | 98,389 | 152,713 | 136,664 | 184,480 | 189,714 | 190,781 | 287,885 | 337,312 | 398,400 | 419,553 | 479,642 | 521,083 | 538,480 | 606,910 | 607,879 | 676,179 |

**<u>Exhibit C</u>**

Liquidation Analysis

*[Intentionally Omitted]*